**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 1:25-cv-22939**

TENANT TURNER, INC. and
SHOWMOJO, LLC,

*Plaintiffs*,

v.

THRESHOLD TECHNOLOGY LLC d/b/a
RENTENGINE and ALEXANDER
STRINGFELLOW,

*Defendants.*

---

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

Plaintiffs Tenant Turner, Inc. ("Tenant Turner") and ShowMojo, LLC ("ShowMojo" and together with Tenant Turner, "Plaintiffs"), bring this Third Amended Complaint against Defendants Threshold Technology LLC d/b/a RentEngine ("RentEngine") and Alexander Stringfellow ("Stringfellow" collectively, "Defendants"), and allege as follows:

**INTRODUCTION**

1. Defendants have engaged in a covert, months-long campaign to unlawfully gain access to Plaintiffs' confidential business information by penetrating Plaintiffs' password-protected platforms under disguised identities, inducing customers to provision competitor-controlled logins and harvesting non-public architecture, analytics, user interface, and lockbox-security data to accelerate competing offerings and solicit migrations. Through this lawsuit, Plaintiffs seek to put an end to Defendants' deception and misconduct and recover their resulting damages.

2. Plaintiffs are leading providers of proprietary, cloud-based property management software platforms relied upon by real estate professionals throughout the United States (collectively, "Plaintiffs' Platforms" or the "Platforms").

3. ShowMojo's and Tenant Turner's Platforms provide property managers with secure, proprietary information and tools to manage their rental businesses, including lead management, automated scheduling, leasing, communications and integration with third-party

services and hardware. Plaintiffs' Platforms encompass hundreds of unique functionalities and customizable interfaces, representing years of development and significant investment.

4. RentEngine is a direct competitor of Plaintiffs, presented as a leasing platform for property managers.

5. Despite being Plaintiffs' competitors, Defendants gained unfettered and entirely unauthorized access to Plaintiffs' Platforms by disguising themselves as legitimate, paying customers. Defendants leveraged this unrestricted access to improperly exploit Plaintiffs' Platforms for anti-competitive purposes.

6. At Defendants' behest, a subset of users with existing "profiles"[1] on Plaintiffs' Platforms created unauthorized "user accounts"—which were controlled by Defendants and for Defendants' benefit—on the existing users' Tenant Turner and ShowMojo profiles. This deceptive Trojan Horse approach concealed Defendants' entrance and enabled their exploitation of Plaintiffs' Platforms.

7. Armed with this unfettered access, Defendants proceeded to usurp and unfairly leverage Plaintiffs' confidential business information and investments in an effort to copy, enhance and compete directly with Plaintiffs' market-leading solutions, obtaining an unjust head start in the competitive analysis, design, development, testing and commercialization of a rival platform. In doing so, Defendants bypassed the substantial time, expense and trial-and-error required for independent development, including replicating the performance, security and usability considerations that Plaintiffs achieved over years of iteration.

8. Upon information and belief, Defendants exploited these credentials, under false pretenses, to systematically and repeatedly access and analyze Plaintiffs' proprietary information to: (1) accelerate the scope and timing of their own competing software, (2) facilitate and solicit customer migrations from Plaintiffs to RentEngine and (3) craft marketing and promotional content for RentEngine's products and services. These acts conferred a material head-start

---

[1] On Plaintiffs' Platforms, customers are assigned user "profiles" with administrative controls. Within the customers' user profiles, there are smaller individual accounts that link to a specific email address assignable to different parties within the customers' organizations. The allegations here are not that Defendants received entire customer profiles. Instead, the allegations are that Defendants received user accounts that were under the broader umbrella of the existing customers' user profiles. By way of analogy, the term "profiles" refers to the bucket that all other "user accounts" are held inside of.

advantage at Plaintiffs' expense by allowing Defendants to avoid the considerable time, cost and experimentation necessary to develop comparable capabilities independently.

9. Defendants engaged in these unauthorized activities from multiple locations, and through deceptive techniques designed to bypass Plaintiffs' security measures.

10. Despite receiving a cease-and-desist demand from Plaintiffs, Defendants did not discontinue their unauthorized use, disclosure and exploitation of Plaintiffs' confidential information. These actions continue to cause Plaintiffs significant and irreparable harm.

11. As a direct consequence of RentEngine's actions, Plaintiffs have been forced to divert substantial resources to investigate and remediate the unauthorized access, address customer concerns, implement heightened security measures and counter RentEngine's false and misleading public statements. These measures have disrupted Plaintiffs' business operations and undermined the value of their investments and reputation.

12. RentEngine also published misleading advertising and false statements often derived from its unauthorized access, causing ongoing and substantial harm to Plaintiffs' businesses. Plaintiffs are entitled to, among other remedies, temporary and permanent injunctive relief, damages and recovery of attorneys' fees.

13. Defendants' conduct poses an ongoing threat to the security and value of Plaintiffs' proprietary systems and competitive positions in the market. Immediate and permanent injunctive relief is necessary to prevent further imminent and irreparable harm.

## PARTIES

14. Plaintiff ShowMojo is a limited liability company incorporated under the laws of Delaware with its principal place of business at 2093 Philadelphia Pike #3780, Claymont, Delaware 19703.

15. Plaintiff Tenant Turner is a Delaware company with its principal place of business at 4820 Lake Brook Dr. Ste. 125, Glen Allen, Virginia 23060.

16. Upon information and belief, Defendant RentEngine is a limited liability company incorporated under the laws of Florida with its principal place of business at 14 NE 1st Ave, Miami, Florida 33132.

17. Upon information and belief, Defendant Alexander Stringfellow is the Co-Founder and Chief Executive Officer of RentEngine and resides and works in Miami, Florida.

## JURISDICTION AND VENUE

18. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims arising under the laws of the United States. Plaintiffs assert claims against RentEngine under the Computer Fraud and Abuse Act (18 U.S.C. § 1030(a)), the Lanham Act (15 U.S.C. § 1125(a)(1)(B)) and the Defend Trade Secrets Act (18 U.S.C. § 1336).

19. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

20. Venue is proper in this District pursuant to 28 U.S.C. §§ 127(a) and 1391(b), as RentEngine has its principal place of business located in this District and a substantial part of the events giving rise to Plaintiffs' claims against Defendants occurred in this District. Defendants have engaged in unlawful trade practices and tortious conduct against Plaintiffs in this District.

## FACTUAL ALLEGATIONS

### *ShowMojo and Tenant Turner's Proprietary Software Platforms and Terms of Use*

21. Plaintiffs ShowMojo and Tenant Turner have each developed proprietary, cloud-based software-as-a-service (SaaS) Platforms specifically designed for the property management industry. These Platforms offer a comprehensive suite of tools that allow property managers to efficiently coordinate leasing activities, manage leads, schedule showings, facilitate communication with prospective tenants and integrate with third-party services and hardware.

22. Plaintiffs have invested significant resources over many years, including millions of dollars in research and development costs, the efforts of numerous development personnel and substantial financial investment in the ongoing development, enhancement and support of the Platforms, to develop, refine, maintain and protect the confidential features and functionalities that make Plaintiffs' Platforms industry leaders.

23. Since 2013, Plaintiff Tenant Turner has dedicated millions of dollars to developing its products, forming strategic partnerships and executing market expansion plans, securing its role as a leader within the property management software industry.

24. Likewise, for more than twelve years, Plaintiff ShowMojo has expanded its market presence by investing millions in both the development and promotion of its Platform, successfully building its reputation as a premier leader in property management software.

25. Plaintiffs safeguard their Platforms and associated confidential information through robust technical, contractual and operational controls, including but not limited to: (1) role-based access controls that restrict internal dashboards, unpublished application programming interfaces ("APIs") and webhooks, analytics telemetry, lockbox orchestration screens and configuration blueprints to designated roles; (2) password protections; (3) network- and application-layer protections such as domain/IP deny lists; (4) monitoring, logging and alerting for irregular access, coupled with credential-revocation workflows; and (5) maintained authentication and authorization logs.

26. Plaintiffs further limit external dissemination by reviewing internal materials and, where appropriate, marking them with confidentiality legends or watermarks, requiring employee and contractor nondisclosure agreements and vendor confidentiality commitments, and promptly initiating legal and technical remediation upon discovery of unauthorized access.

27. Plaintiffs' Platforms and associated confidential information are not available through public websites, marketing collateral, public APIs, or customer-facing documentation. Access requires authenticated credentials and role-based permissions that Plaintiffs do not grant to competitors.

28. As part of these protections, and as further detailed below, any prospective user must accept the applicable Terms of Use before any account is provisioned or access is permitted, which prohibit competitor access, reverse engineering, benchmarking and any use to develop, market, or support a competing product or service.

29. To create user accounts on Plaintiffs' Platforms, Defendants were required to accept Tenant Turner's Customer Terms[2] and ShowMojo's Terms of Use[3] (collectively, the "Terms of Use," or "Plaintiffs' Terms of Use").

30. Plaintiffs license their Platforms exclusively through agreements that impose strict confidentiality and use restrictions, expressly prohibiting third-party access and use for analysis or development of competing software.

---

[2] *Tenant Turner Customer Terms*, TENANT TURNER, https://tenantturner.com/customer-terms (last visited Nov. 21, 2025) [hereinafter *Tenant Turner Customer Terms*].

[3] *Website Terms and Conditions of Use*, SHOWMOJO, https://hello.showmojo.com/terms-of-service/ (last visited Sept. 25, 2025) [hereinafter *ShowMojo Terms of Use*].

31. Specifically, to access the Tenant Turner Platform—whether authorized or not—the user must affirmatively accept the "Tenant Turner Customer Terms," which are expressly intended and designed to govern the relationship between Tenant Turner and its genuine, *paying customers*, not becloaked competitors seeking to carve out market share. *See* Tenant Turner Terms of Use, Introduction.[4]

32. All users accepting the "Tenant Turner Customer Terms" represent and warrant they are the customer, or have the requisite authority to bind the customer.[5]

33. Without these representations and warranties, Tenant Turner would neither contract with nor allow any user access to its Platform.

34. Defendants, masquerading as legitimate users, knowingly and fraudulently accepted Tenant Turner's Terms of Use when creating unauthorized user accounts.

35. In doing so, Defendants' acceptance of Tenant Turner's Customer Terms constitutes a fundamental misrepresentation, as it alters the character and essential terms of Tenant Turner's proposed contract, which is designed explicitly to govern its relationship with paying customers—not competitors impersonating such to obtain access.

36. Similarly, ShowMojo's Terms of Use, which are clearly posted on the ShowMojo website, make clear that by accessing or using the ShowMojo Platform, users agree to be bound by those Terms of Use. *See* ShowMojo Terms of Use § 1.[6]

37. Defendants, through creating and operating unauthorized user accounts on ShowMojo's Platform, agreed to be bound by ShowMojo's Terms of Use by guising themselves as *bona fide* ShowMojo customers.

38. Plaintiffs at all times intended for its Terms of Use to govern their relationships with legitimate customers and never intended for their Terms of Use to be accepted by or govern their relationships with an industry competitor. Indeed, both Tenant Turner's and ShowMojo's

---

[4] "By clicking a box indicating your acceptance and/or using the Services in any way, you and the entity you represent (if applicable) ('**Customer**' or '**you**') agree that you have read and agree to these Customer Terms." *Tenant Turner Customer Terms*, at Introduction (emphasis in original).

[5] "You represent and warrant that you are authorized to bind Customer." *Id.*

[6] *ShowMojo Terms of Use*, at § 1 ("By accessing or using the ShowMojo Services, however accessed, you manifest your intent and agree to be bound by this Terms of Use Agreement ('Agreement' or 'Terms of Use')").

Terms of Use expressly forbids the use of their Platforms by competitors such as Defendants. *See, e.g.*, Tenant Turner Customer Terms §§ 5.2, 5.4; ShowMojo Terms of Use § 2.

39. As a condition to accessing Plaintiffs' Platforms, all Platform users consent to these Terms of Use that set forth strict confidentiality, security and acceptable use requirements. These terms expressly prohibit, among other things:

a. Users from reselling, assigning, sublicensing, or otherwise making access to the Platforms or any of their features available to third parties. *See* Tenant Turner Customer Terms § 5.2;[7] *see also* ShowMojo Terms of Use § 2.

b. Reverse engineering, decompiling, disassembling, copying, creating derivative works from, or otherwise analyzing the Platforms—or any underlying source code, algorithms, or functionalities—for the purpose of developing, enhancing, or providing a competing product or service is strictly prohibited. *See* Tenant Turner Customer Terms §§ 5.4, 14.1; *see also* ShowMojo Terms of Use § 2.

2. These terms expressly require, among other things:

a. That the user agree to the Terms of Use. Tenant Turner Customer Terms, at Introduction ("BY CHECKING 'AGREE' WHEN SIGNING UP, YOU AGREE TO THESE CUSTOMER TERMS. IF YOU DO NOT AGREE TO THESE CUSTOMER TERMS, DO NOT CHECK THE BOX AND YOU MAY NOT ACCESS THE TENANT TURNER WEBSITE NOR THE SOFTWARE."); ShowMojo Terms of Use, at § 1 ("By accessing or using the ShowMojo Services, however accessed, you manifest your intent and agree to be bound by this Terms of Use Agreement.").

b. Representations and warranties from the user that it is Plaintiffs' customer or is "authorized to bind Customer." Tenant Turner Customer Terms, at Introduction.

40. The Platforms' Terms of Use further provide all content, data, features and workflows of the Platforms are, and remain, the exclusive confidential and proprietary property of ShowMojo and Tenant Turner. *See* Tenant Turner Customer Terms §§ 8, 9.2; *see also* ShowMojo Terms of Use §§ 2, 6.

41. Plaintiffs' proprietary systems, algorithms, data structures, user interfaces, internal dashboards, workflows and analytics are not offered to the public or on an open-source basis. All access is controlled and strictly limited to authorized users under these restrictions.

---

[7] *Tenant Turner Customer Terms*, TENANT TURNER (Aug. 26, 2024), https://tenantturner.com/customer-terms.

42. These access and use controls are critical to maintaining the secrecy and value of Plaintiffs' proprietary information and trade secrets and protecting the integrity, confidentiality and competitive value of Plaintiffs' Platforms.

43. Plaintiffs expend substantial resources to maintain and safeguard these proprietary solutions.

***Defendants' Misconduct and Unauthorized Access to Plaintiffs' Platforms***

44. Despite the express prohibitions set forth in Plaintiffs' Terms of Use, RentEngine has engaged in a systematic and deliberate scheme to improperly access and exploit Plaintiffs' Platforms and confidential information.

45. Plaintiffs discovered that RentEngine has been directly soliciting Plaintiffs' customers to provide access to their profiles on Plaintiffs' Platforms, claiming that such access is necessary for purposes such as data migration or demonstrations of RentEngine's services. Notwithstanding that Defendants' access to Platforms is improper regardless of the purpose, in reality, RentEngine's true objective was to gain unauthorized entry into Plaintiffs' secure, proprietary systems to further its own competitive interests.

46. Once provided with the customer's login credentials, RentEngine and its employees could make additional accounts under that customer profile to access and manipulate Plaintiffs' Platforms. At least one such account was created by Stringfellow, who used the account to repeatedly sign into Plaintiffs' Platforms.

47. Initially, RentEngine used its own email addresses belonging to RentEngine employees to access the Platforms, including email addresses for Stringfellow, such as "ops+[customer name]@rentengine.io". Once Plaintiffs became aware of the improper access by RentEngine, however, Plaintiffs' IT team blocked RentEngine's domain name.

48. Undeterred, to bypass the technical safeguards implemented by Plaintiffs that monitored and restricted RentEngine's access, RentEngine and Stringfellow utilized false or misleading contact information, including fictitious domains and alias email accounts, such as @gmail.com, @8alias.com and @simplelogin.com to conceal their identity, bypass Plaintiffs' monitoring and blocking tools and maintain ongoing, unauthorized access to password-protected environments, features, and confidential data without Plaintiffs' knowledge or consent. Plaintiffs

have since been monitoring for IP addresses associated with RentEngine and suspicious email addresses, and blocking the user accounts on an *ad hoc* basis.[8]

49. Defendants' use of alias accounts utilizing the domain name @simplelogin.com is particularly demonstrative of Defendants' intent to deceive Plaintiffs. SimpleLogin is a third-party service provider that allows its users to create email alias accounts that loop correspondences back to a central repository. Defendants' purpose in creating such an account is evident on SimpleLogin's primary homepage, which advertises that "[w]ith email aliases," provided through SimpleLogin's services "you can be anonymous online."[9]

50. Because, in many instances, Defendants actively concealed their identities to gain access to the password-protected platforms through SimpleLogin, 8Alias[10] and Gmail, Plaintiffs are still unsure of how many times and for how many customers Defendants gained access to the password-protected Platforms.

51. Despite Defendants' evasive tactics, Plaintiffs' internal investigation uncovered the following instances in which Defendants used customer credentials to establish unauthorized accounts on the Platforms:

a. <u>Accounts created by Defendants on the ShowMojo Platform</u>

i. On October 15, 2024, Defendants used the credentials of **Customer A**[11] to create a ShowMojo account under an email address with an "@rentengine.io" domain. The account name was "rentengine35". This account was last accessed on February 23, 2025.

ii. On February 3, 2025, Defendants used the credentials of **Customer B** to create two ShowMojo accounts under email addresses with an

[8] In fact, Defendants were unsatisfied with limiting their deception solely to using alias emails unrelated to its @rentengine.io domain name, which was blocked by Plaintiffs' efforts to secure its Platforms. For good measure, Defendants implemented usernames that, as the username itself suggests, were designed to "spoof" Plaintiffs' customer names such as: [Customer LL].**spoof**179@8alias.com. (emphasis added).

[9] *SimpleLogin*, SIMPLELOGIN.IO, https://simplelogin.io (last visited Nov. 21, 2025).

[10] It appears to Plaintiffs that 8alias.com, which provided similar services to simplelogin.io, has since been subsumed by simplelogin.io because when one attempts to visit "8alias.com" one is automatically redirected to simplelogin.io.

[11] Annexed hereto as **Exhibit A** are the definitions for each of **Customers A-NN** (the "Identified Targeted Customers").

"@rentengine.io" domain. The account names were "alexstringe30" and "alexstringfe". These accounts were last accessed on February 3, 2025.

iii. On February 20, 2025, Defendants used the credentials of **Customer C** to create a ShowMojo account under an email address with an "@rentengine.io" domain. The account name was "rentengine37". This account was last accessed on February 21, 2025.

iv. On March 4, 2025 Defendants used the credentials of **Customer D** to create a ShowMojo account under an email address with an "@rentengine.io" domain. The account name was "rentengine3750". This account was last accessed on March 6, 2025.

v. On April 3, 2025, Defendants used the credentials of **Customer E** to create a ShowMojo account under an email address with an "@rentengine.io" domain. The account name was "operations39". This account was last accessed on April 14, 2025.

vi. On April 3, 2025, Defendants used the credentials of **Customer F** to create an unauthorized ShowMojo account under an email address with an "@rentengine.io" domain. The account name was "rentengine39". This account was last accessed on May 2, 2025.

vii. On April 17, 2025, Defendants used the credentials of **Customer G** to create an unauthorized ShowMojo account under an email address with an "@rentengine.io" domain. The account name was "rentengine41". This account was last accessed on April 21, 2025.

viii. On April 23, 2025, Defendants used the credentials of **Customer H** to create an unauthorized ShowMojo account under an email address with an "@rentengine.io" domain. The account name was "rentengine4141".

b. Accounts created by Defendants on the Tenant Turner Platform

i. On April 24, 2024, Defendants used the credentials of **Customer I** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated January 10, 2024. The account was last accessed on April 16, 2025.

ii. On July 29, 2024, Defendants used the credentials of **Customer J** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated April 26, 2024. The account was last accessed on January 3, 2025.

iii. On September 11, 2024, Defendants used the credentials of **Customer K** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on January 13, 2025.

iv. On September 13, 2024, Defendants used the credentials of **Customer L** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on September 13, 2024.

v. On September 23, 2024, Defendants used the credentials of **Customer M** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on January 23, 2025.

vi. On November 20, 2024, Defendants used the credentials of **Customer N** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. This account was last accessed on December 23, 2024.

vii. On November 27, 2024, Defendants used the credentials of **Customer O** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on January 20, 2025.

viii. On December 2, 2024, Defendants used the credentials of **Customer P** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on January 23, 2025.

ix. On February 5, 2025, Defendants used the credentials of **Customer Q** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024.

x. On February 19, 2025, Defendants used the credentials of **Customer R** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants

affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on February 25, 2025.

xi. On February 28, 2025, Defendants used the credentials of **Customer S** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. This account was last accessed on March 3, 2025.

xii. On March 3, 2025, Defendants used the credentials of **Customer T** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on March 18, 2025.

xiii. On March 19, 2025, Defendants used the credentials of **Customer U** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 1, 2025.

xiv. On April 2, 2025, Defendants used the credentials of **Customer V** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024.

xv. On April 5, 2025, Defendants used the credentials of **Customer W** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 23, 2025.

xvi. On April 14, 2025, Defendants used the credentials of **Customer X** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 15, 2025.

xvii. On April 15, 2025, Defendants used the credentials of **Customer Y** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 15, 2025.

xviii. On April 17, 2025, Defendants used the credentials of **Customer Z** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 18, 2025.

xix. On April 18, 2025, Defendants used the credentials of **Customer AA** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 22, 2025.

xx. On April 18, 2025, Defendants used the credentials of **Customer BB** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 23, 2025.

xxi. On April 18, 2025, Defendants used the credentials of **Customer CC** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 27, 2025.

xxii. On April 21, 2025, Defendants used the credentials of **Customer DD** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 28, 2025.

xxiii. On April 22, 2025, Defendants used the credentials of **Customer EE** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 23, 2025.

xxiv. On April 23, 2025, Defendants used the credentials of **Customer FF** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 23, 2025.

xxv. On April 23, 2025, Defendants used the credentials of **Customer GG** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants

affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 27, 2025.

xxvi. On April 23, 2025, Defendants used the credentials of **Customer HH** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 27, 2025.

xxvii. On April 25, 2025, Defendants used the credentials of **Customer II** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 28, 2025.

xxviii. On April 28, 2025, Defendants used the credentials of **Customer JJ** to create an unauthorized Tenant Turner account under an email address with an "@rentengine.io" domain. When creating this account, Defendants affirmatively accepted the Tenant Turner Customer Terms, dated August 26, 2024. The account was last accessed on April 28, 2025.

xxix. On April 29, 2025, Defendants used the credentials of **Customer KK** to create an unauthorized Tenant Turner account under an email address with an "@simplelogin.com" domain. Plaintiffs blocked this account before Defendants could use it to access the Platform.

xxx. On April 29, 2025, Defendants used the credentials of **Customer LL** to create an unauthorized Tenant Turner account under an email address with an "@8alias.com" domain. Plaintiffs blocked this account before Defendants could use it to access the Platform.

xxxi. On April 29, 2025, Defendants used the credentials of **Customer MM** to create an unauthorized Tenant Turner account under an email address with an "@simplelogin.com" domain. Plaintiffs blocked this account before Defendants could use it to access the Platform.

xxxii. On May 19, 2025, Defendants used the credentials of **Customer NN** to create an unauthorized Tenant Turner account under the email address astringfellow18@gmail.com. Plaintiffs blocked this account before Defendants could use it to access the Platform.

52. In response to Plaintiffs' interrogatory requests issued pursuant to Order, dated July 3, 2025 (Hon. Roy K. Altman, U.S.D.J.), and Order, dated July 17, 2025 (Hon. Enjolique A. Lett, U.S.M.J.) (ECF No. 17), Defendants admitted to soliciting access to the Platforms through

additional customer accounts (together with the Identified Targeted Customers, the "Targeted Customers") that were not previously identified by Plaintiffs, which are still being investigated.

53. Defendants' disclosure of the Targeted Customers included 70 of Plaintiffs' customers whose Platform access credentials had been solicited by RentEngine—significantly exceeding the number of compromised Identified Targeted Customers that Plaintiffs could identify during their internal investigation. The full list of Targeted Customers is annexed hereto as **Exhibit B**.

54. Upon information and belief, the additional customer accounts disclosed by Defendants but not previously identified by Plaintiffs could only have been accessed using genuine customer credentials. This was another tactic employed by Defendants to maintain undetectable, unauthorized access into proprietary systems.

55. By leveraging legitimate customer credentials and systemically creating disguised user accounts, Defendants were able to enter and use the Platforms without Plaintiffs' knowledge, effectively circumventing security measures. As a result, Plaintiffs have been unable to reliably identify, monitor, or measure the full extent of Defendants' unauthorized access or activity, leaving them without a clear understanding of the scope of the compromise to their systems, data, or customer accounts.

56. Defendants did not obtain unauthorized accounts on Plaintiffs' Platforms by accident. Instead, Defendants explicitly required Plaintiffs' existing users, the Targeted Customers, to "add ops+[targeted customer name]@rentengine.io as a user" to their "Showing software login (e.g. Tenant Turner, ShowMojo, ShowDigs)" as part of RentEngine's onboarding process.

57. Through these unauthorized accounts, Defendants received an additional benefit: Defendants' alias accounts were automatically added to the list of email addresses set to receive automated updates about Plaintiffs' internal policies.

58. Attributable to Defendants' fraudulent and unauthorized user accounts, Plaintiffs' automated email listserv distributed information directly to Defendants' alias emails about changes in Plaintiffs' lock box charges, monthly fees for additional services, monthly rates for base services, new product integrations, interested tenants and more. In short, Defendants received a vast amount of private, properly-protected information about Plaintiffs—RentEngine's competitor—to which Defendants were not entitled.

59. RentEngine's employees, agents and collaborators accessed and exploited a broad range of password-protected and confidential features, data flows, user interfaces and functional tools embedded within Plaintiffs' Platforms that comprise Plaintiffs' proprietary information and trade secrets, including without limitation:

a. [redacted]

60. Defendants have used these confidential insights to inform and accelerate RentEngine's product development, feature roadmap, design, marketing, solicitation of Plaintiffs' customers and sale of directly competing software products.

61. In response to this conduct, Plaintiffs retained a forensic technology expert to analyze available activity logs from the Platforms and assess the specific information Defendants accessed, downloaded, or viewed within the Identified Targeted Customers' accounts.

62. Forensic analysis of Platform activity logs revealed that Defendants' access and activity within the Identified Targeted Customers' accounts consistently diverged from even RentEngine's stated purpose of data migration, including extensive review of features, screens and system areas irrelevant to migration, and heavy download and viewing of proprietary materials.

63. Unlike normal customer activity, Defendants repeatedly and systematically accessed internal dashboards, configuration screens, proprietary scheduling logic and lockbox interfaces—some accounts remaining active for over 300 days. For instance, Tenant Turner's logs indicate RentEngine repeatedly and extensively accessed the account of **Customer I** through the unauthorized account ops@rentengine.io for 318 days between April 24, 2024 and May 2, 2025.

64. Throughout this time, RentEngine's activities on Tenant Turner's Platform included, among other things, editing properties (e.g., taking rentals on/off the wait list), diverting leads and communications to RentEngine's systems and changing descriptions to redirect users to RentEngine's website (e.g., "Schedule a showing here: https://www.rentengine.io/listings/3148"), thereby directly undermining Tenant Turner's business relationships.

65. Additionally, Tenant Turner has an arrangement with SentriLock, the manufacturer of the lock boxes utilized for showings of rental properties, where SentriLock will send unique codes for individual showings.

66. The unique lockbox codes feature for the SentriLock lock boxes is a security measure to track access to the rental properties. Generating SentriLock unique lockbox codes is completely unnecessary for and unrelated to data migration.

67. Yet, RentEngine regularly visited the SentriLock pages on the Plaintiffs' Platforms and generated unique SentriLock codes for many of the Identified Targeted Customers' accounts.

68. RentEngine visited the SentriLock page where the lockboxes for **Customer I** were stored on 212 occasions between January 29, 2025 and April 29, 2025.

69. RentEngine generated unique lockbox codes to enable access to **Customer I**'s properties 107 times between January 29, 2025 and April 29, 2025.

70. RentEngine, through its unauthorized account ops@rentengine.io for **Customer I**, visited the lockbox code generation pages forty days in 2025, specifically, February 1, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 24, 25 and 26, March 4 and 20, and April 7, 8, 9, 10, 11, 14, 15, 16, 17, 18, 21, 22, 23, 24, 25, 28 and 29.

71. Similarly, RentEngine visited the SentriLock page where the lockboxes for **Customer Q** were stored on 56 different occasions between February 5, 2025 and February 19, 2025, and generated lockbox codes 21 times.

72. Additionally, Defendants identified and produced, *inter alia*, two screenshots of SentriLock lock box data (the "SentriLock Screenshots") in response to Section 1(e) of the Omnibus Order, dated August 22, 2025 (Hon. Roy K. Altman, U.S.D.J.) (ECF No. 30), which required Defendants to "return to Plaintiffs all originals, copies, or other reproductions in any form whatsoever, any record, document, data, or material that was imaged or copied from the Plaintiffs' Websites (excluding customer account data provided by the Defendants' current or prospective customers) (the "Plaintiffs' Information")." *See* Bates No. RENTENGINE 035675; RENTENGINE 035676.

73. In addition to Defendants' clear anticompetitive purposes in tampering with the Plaintiffs' Platforms, Defendants' generation of SentriLock codes is a major security issue as Defendants are copying property access codes from the Plaintiffs' Platforms and then sharing them via RentEngine, resulting in a breakdown of the security protocols around showing times and geolocation functionality.

74. Defendants also produced to Plaintiffs password-protected screenshots of various views of both of the Plaintiffs' Platforms (the "Platform Screenshots") representing them to be Plaintiffs' Information under Section 1(e) of the Omnibus Order, dated August 22, 2025 (Hon. Roy K. Altman, U.S.D.J.) (ECF No. 30). *See* Bates No. RENTENGINE 035672; RENTENGINE 035668.

75. The Platform Screenshots depict hundreds of unique, password-protected screens, including internal graphical interfaces, analytics dashboards, configuration routes and specialized functional tools developed by Plaintiffs for their Platforms. These screens are not accessible to

external users or competitors and contain proprietary designs, system layouts and operational features.

76. By accessing, cataloging and annotating these internal screens, Defendants conducted a painstaking and detailed comparative analysis of Plaintiffs' Platforms. Defendants systematically studied core workflows, data flows, security controls and the organizational logic underlying Plaintiffs' software.

77. Defendants spent untold additional hours reviewing, analyzing and mapping configuration data, report formats, customer lists and integration endpoints. On information and belief, Defendants used this confidential and proprietary information to replicate numerous password-protected processes within RentEngine's competing product, aiming to accelerate its own development, reduce costs and secure competitive advantage.

78. Plaintiffs' investigative efforts have been obstructed by Defendants' refusal to provide essential fulsome system artifacts, further preventing a complete analysis and emphasizing Defendants' apparent efforts to conceal the full scope of their misconduct within Plaintiffs' Platforms.

***RentEngine's False and Misleading Advertising***

79. RentEngine is willfully exploiting its unauthorized access to Plaintiffs' proprietary Platforms to gain unfair and improper insight into Plaintiffs' software architecture, functionality and user interface. RentEngine has further misappropriated images and depictions of Plaintiffs' interfaces and features, copying them without Plaintiffs' consent.

80. RentEngine features these unlawfully obtained materials in its own marketing brochures, blog posts and social media campaigns, presenting them in a manner deliberately calculated to mislead potential and current customers. By doing so, RentEngine seeks not only to bolster its own competitive position, but also to disparage and misrepresent the nature, quality and sophistication of Plaintiffs' offerings in the marketplace.

81. For example, on March 19, 2025, RentEngine posted a blog titled "Tenant Turner vs RentEngine," allegedly comparing the features of RentEngine and Tenant Turner through a side-by-side infographic (the "March 19 Blog").[12]

[12] Nina Fouche, *Tenant Turner vs RentEngine*, RENTENGINE (Mar. 19, 2025), https://www.rentengine.io/blog/tenant-turner-vs-rentengine.

**Get to know RentEngine and Tenant Turner**

| | rentengine | Tenant Turner |
|---|---|---|
| **Marketing & Syndication** | Advanced syndication, auto-catches any issues. | Standard listing syndication |
| **Scheduling** | Modern flow w/ Smart Scheduling & Smart Assign | Basic flow w/ calendar sync. |
| **AI Responses** | AI handles most questions, custom snippets | Text and email sent to new leads only. |
| **CRM** | Smart CRM: fully tracks leads, comms, feedback | List of prospects |
| **Lead Nurturing** | Consistent, human-sounding follow ups to convert | One follow-up after 48 hours |
| **Communication** | Two-way calling & texting w/AI, automatic CRM sync | Basic texting, not connected to CRM |
| **Reporting** | Custom reports, agent tracking, lead benchmarks. | Basic owner reports and lead activity |
| **API** | Full & free open API | Paid API (limited functions) |

82. The March 19 Blog prominently featured multiple images of Tenant Turner's proprietary interface, which could only have been acquired through accessing Tenant Turner's password-protected Platform.

83. The March 19 Blog paired these misappropriated images with a series of false and misleading statements regarding the nature, capabilities and features of Tenant Turner's Platform, including, but not limited to:

a. Describing Tenant Turner's reporting capabilities as limited to "basic owner reports and lead activity," whereas Tenant Turner provides comprehensive reports including owner reports, lead activity reports, rental reports, DOM reports and viewing reports;

b. Mispresenting that Tenant Turner only offers standard listing syndication when Tenant offers advanced syndication for premium listing agreements;

c. Incorrectly stating that Tenant Turner offers an unbranded, basic scheduling flow when Tenant Turner offers branding options for both company names and company logos;

d. Stating that Tenant Turner only integrates with SentriLock and Codebox, when Tenant Turner also integrates Igloo and supports combination locks;

e. Falsely asserting that Tenant Turner only offers a paid API that is limited to a handful of functions, when Tenant Turner offers free API that has all lead events and showing information available;

f. Claiming that Tenant Turner's CRM only provides a list of prospects, when it actually provides a list of prospects with qualification details, as well as status and feedback;

g. Falsely stating that Tenant Turner's built-in texting feature is not synced to lead information or property information, when the messaging system on the platform is linked to lead and property information.

84. Additionally, on March 30, 2025, RentEngine also posted a blog titled "ShowMojo vs Rent Engine," allegedly comparing the features of RentEngine and ShowMojo through a side-by-side infographic.[13]

**Get to know RentEngine and ShowMojo**

| | rentengine | ShowMojo |
|---|---|---|
| Marketing & Syndication | Advanced syndication, auto-catches any issues. | Standard listing syndication |
| Scheduling | Modern flow w/ Smart Scheduling & Smart Assign | Basic, unbranded, partial smart scheduling & smart assign |
| AI Responses | AI handles most questions, custom snippets | Text and email sent to new leads only; auto-reply with listing link |
| CRM | Smart CRM: fully tracks leads, comms, feedback | List of leads |
| Lead Nurturing | Consistent, human-sounding follow ups to convert | None |
| Communication | Two-way calling & texting w/AI, automatic CRM sync | Basic texting, not connected to CRM |
| Reporting | Custom reports, agent tracking, lead benchmarks. | Basic downloadable reports for lead count and showings |
| API | Full & free open API | None |
| Lockboxes | SentriLock, CodeBox and leading smart deadbolts | Codebox and their proprietary brand of lockboxes |
| Customer Support | US-based technical support 7 days/week | Business hours-only support |

Side-by-side comparison of RentEngine and ShowMojo's capabilities

85. The March 30 Blog prominently featured multiple images of ShowMojo's proprietary interface, which could only have been acquired through accessing ShowMojo's password-protected Platform.

86. The March 30 Blog paired these misappropriated images with a series of false and misleading statements regarding the nature, capabilities and features of ShowMojo's Platform, including, but not limited to:

a. Stating that ShowMojo provides only "basic, unbranded, partial smart scheduling and smart design," when in fact ShowMojo offers advanced scheduling features that include multiple branding options, page headers, company logo integration, watermarking and Autonomous Scheduling;

b. Claiming that ShowMojo offers "no lead nurturing," while ShowMojo actually provides Dynamic Prospect Notifications designed to nurture prospects who have engaged with listings;

c. Describing ShowMojo's reporting capabilities as limited to "basic downloadable reports for lead count and showing," whereas ShowMojo provides comprehensive

[13] Nina Fouche, *ShowMojo vs RentEngine*, RENTENGINE (Mar. 30, 2025), https://www.rentengine.io/blog/showmojo-vs-rentengine.

reports including listing activity, trend analysis, digital access data and detailed listing performance metrics;

d. Falsely asserting that ShowMojo has "no API," despite ShowMojo's provision of a listing API, report export API and webhooks for leads and showings, enabling extensive data exchange and system integration;

e. Stating that ShowMojo supports only CodeBox and proprietary lockboxes, when ShowMojo also supports third-party options such as SentriLock, PointCentral and VaultLock;

f. Misrepresenting ShowMojo's calendar integrations as limited to Google and Office 365, when ShowMojo in fact supports CalDAV-compatible calendars, including iCloud and Fastmail;

g. Claiming ShowMojo's customer support is "limited to business hours only," despite ShowMojo's 24/7 chatbot availability and access to a comprehensive knowledge base;

h. Incorrectly stating that lead nurturing in ShowMojo is limited to emails sent only after 24 hours if a prospect did not schedule, when in reality ShowMojo's Dynamic Prospect Notifications provide trigger-based emails for events such as rent reductions or the availability of new, similar listings.

87. RentEngine also posted blogs titled "The Best ShowMojo Alternatives," [14] "The Best Tenant Turner Alternatives," [15] and "How much does RentEngine cost?" [16] setting forth inaccurate pricing and service offerings about Plaintiffs (collectively, with the March 30 Blog, the March 19 Blog, the "RentEngine Blogs").

88. The false and misleading statements in the RentEngine Blogs were published for the express purpose of influencing consumers to purchase RentEngine's competing services and to divert current and prospective customers away from Plaintiffs.

89. Further exacerbating the impact to Plaintiffs, Google and Bing's artificial intelligence tools fell victim to the "primacy effect," alternatively known as the "first-mover bias," and relied on the RentEngine Blogs as authoritative sources and thus republished in summary form

---

[14] Nina Fouche, *The Best ShowMojo Alternatives*, RENTENGINE, https://www.rentengine.io/blog/showmojo-alternatives.

[15] Nina Fouche, *The Best Tenant Turner Alternatives*, RENTENGINE, https://www.rentengine.io/blog/tenant-turner-alternatives.

[16] Nina Fouche, *How much does RentEngine cost? (2025)*, RENTENGINE, https://www.rentengine.io/blog/how-much-does-rentengine-cost-2025-49155.

the false information about Plaintiffs' services and fees and expanded the reach of RentEngine's damaging misrepresentations.

90. Through these acts, RentEngine intentionally caused confusion and harm in the marketplace, materially damaging Plaintiffs' business reputation, goodwill and competitive standing.

***Plaintiffs' Cease and Desist Demand and RentEngine's Continued Misconduct***

91. Shortly after uncovering evidence of RentEngine's wrongful conduct, Plaintiffs, through counsel, sent a formal cease and desist letter to Stringfellow on May 19, 2025.

92. The cease and desist letter demanded that RentEngine immediately cease all unlawful activities, return all proprietary information belonging to Plaintiffs, and preserve all documents relevant to these matters. The letter specifically detailed RentEngine's actions and placed it on clear notice of ongoing legal violations and the harm caused to Plaintiffs' businesses.

93. On May 23, 2025, Stringfellow responded by email, stating: "We acknowledge receipt of your letter. We will review internally and take corrective action, if any. Cheers, Alex."

94. Despite clear notice and the acknowledgment of the cease and desist demand, on June 12, 2025, Plaintiffs' IT team reported three new unauthorized login attempts from RentEngine associated email addresses on May 29, 2025. These attempts were detected and blocked by Plaintiffs.

***RentEngine's Unfair and Unlawful Conduct Has Caused Plaintiffs Serious and Irreparable Harm***

95. RentEngine's repeated and deliberate misconduct has caused, and continues to cause, serious harm to Plaintiffs' businesses.

96. Plaintiffs devote substantial resources to developing and safeguarding their proprietary information, software, data and business methods. The integrity and competitive value of these assets are critical to Plaintiffs' market position.

97. The secrecy of Plaintiffs' proprietary information, software, data and business methods confers independent economic value by improving conversion rates, retention and security, accelerating integrations, reducing unit costs and shortening development cycles.

98. By improperly accessing Plaintiffs' Platforms with fraudulently created user accounts, RentEngine accessed Plaintiffs' confidential features and information, in clear violation of Plaintiffs' Terms of Use, which enabled Defendants to bypass months or years of

experimentation and partner-testing and to rapidly mirror proprietary orchestration flows and report structures.

99. As a direct result of Defendants' misappropriation, Defendants unjustly avoided substantial development costs and achieved a material head-start in product design, feature breadth, onboarding/migration capabilities and marketing.

100. At all relevant times, RentEngine has been, or should have been, fully aware that its conduct was forbidden because RentEngine agreed to the Plaintiffs' Terms of Use, yet systematically exploited Plaintiffs' confidential systems to accelerate the development and promotion of its own competing offerings.

101. Moreover, RentEngine has been, or should have been, fully aware that its conduct was forbidden because RentEngine's own Terms of Use contain substantially similar provisions that would be violated by its conduct.

102. Plaintiffs have suffered and continue to suffer significant business and reputational injuries, including loss of customer relationships and goodwill, harm to their industry standing, and a reduction in market share.

103. In addition to violating Plaintiffs' Terms of Use, RentEngine and Stringfellow have also knowingly solicited, encouraged and assisted Plaintiffs' customers in activities that directly violate the restrictions and terms of access established by Plaintiffs. *See* Tenant Turner Customer Terms §§ 5.2, 5.4; ShowMojo Terms of Use §§ 2(c), (g), (h), (i), (j) and (k). By orchestrating these violations, RentEngine seeks to obtain an unfair competitive advantage, while substantially undermining Plaintiffs' contractual rights, customer relationships and goodwill.

104. The ongoing conduct by RentEngine has necessitated costly investigations, technical remediation, legal intervention and other internal and external expenditures, placing further burdens on Plaintiffs' resources.

105. Absent immediate and continued judicial relief, Plaintiffs face the continued risk of unauthorized access, and the erosion of their competitive advantage and business relationships.

106. Plaintiffs therefore bring this action to prevent ongoing harm and seek appropriate remedies to address the serious injuries RentEngine's conduct has caused.

## CAUSES OF ACTION

## COUNT I

**(Violations of Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a))**
**(Against RentEngine)**

107. Plaintiffs incorporate by reference paragraphs 1-106, as though fully set forth herein.

108. Plaintiffs' Platforms reside, among other places, on computer systems, networks and servers owned, operated and controlled by Plaintiffs, located in Ohio, Iowa and/or other states, which RentEngine accessed from and used in the United States. Such computers, servers and computer networks function with individual data processing devices, are used in or affect interstate and foreign commerce and communication, and are therefore a "protected computer" under 18 U.S.C. § 1030(e)(2).

109. As described above, RentEngine's authorization to access Plaintiffs' Platforms was procured by fraud—i.e., by fundamentally changing the nature of the Terms of Use through Defendants substituting itself into the agreement in place of the Targeted Customers—which was contrary to Plaintiffs' intent for and understanding of the Terms of Use, and as required by the Terms of Use. In furtherance of that fraud, Defendants trafficked in access credentials by inducing Plaintiffs' customers to provision competitor-controlled logins (e.g., ops+[customer name]@rentengine.io) and by creating alias accounts through anonymizing domains (e.g., @simplelogin.com, @8alias.com) to evade Plaintiffs' technical safeguards.

110. Further, to the extent any of the Targeted Customers gave Defendants access to Plaintiffs' Platforms with a limited scope in mind, e.g., solely for the purpose of data migration (an act that is still against the relevant Terms of Use), Defendants acts exceeded the Targeted Customers' intended scope by deconstructing Plaintiffs' Platforms for Defendants' analysis and benefit. Using the competitor-controlled and alias accounts described above, Defendants repeatedly reviewed the features and tools on Plaintiffs' Platforms available behind the Platforms' password protections, accessed areas of Plaintiffs' Platforms that have no apparent data migration purpose, and obtained confidential customer lists, product analytics, data and other non-public information.

111. Specifically, RentEngine has intentionally accessed without authorization Plaintiffs' Platforms and computers, through their admitted directing of Targeted Customers to create unauthorized accounts on their existing profiles.

112. Such access violates Plaintiffs' Terms of Use.

113. Through RentEngine's unauthorized access of Plaintiffs' Platforms through Plaintiffs' computers or computer networks, RentEngine has been obtaining information that is confidential and proprietary, and which provides a competitive advantage to RentEngine.

114. One example of Defendants' receipt of confidential and proprietary information by virtue of its unauthorized access is the automatic notifications sent to the unauthorized user accounts created at Defendants' behest and for Defendants' benefit.

115. Specifically, Plaintiffs' Platforms generate and send automated messages to all users of its Platforms to notify such users of changes in services, price, or of developing features and tools.

116. Defendants received these automated messages in their unauthorized user accounts, thereby providing them confidential information to changes in Plaintiff's policies that they had no right to receive and allowing Defendants an opportunity to position itself strategically in response to such confidential information.

117. Additionally, as demonstrated by Plaintiffs' activity in the Plaintiffs' Platforms, the Platform Screenshot and the SentriLock Screenshot, RentEngine used wrongfully obtained information about Plaintiffs' customers and product analytics data to improperly and systematically target Plaintiffs' customers.

118. By obtaining, using and exploiting access to Plaintiffs' Platforms and confidential features, RentEngine has developed, marketed and enhanced its own directly competing software products, and solicited Plaintiffs' customers to migrate away from Plaintiffs' services, further undermining Plaintiffs' contractual and business relationships.

119. RentEngine knowingly and improperly has been using Plaintiffs' Platforms to copy, enhance and/or develop a competing property management software product, which is in clear violation of the Plaintiffs' Terms of Use. *See, e.g.*, Tenant Turner Customer Terms § 5.4; ShowMojo Terms of Use § 2(j).

120. RentEngine knowingly and with the intent to defraud Tenant Turner and ShowMojo, has been accessing the above-described protected software and computers without

Plaintiffs' authorization or in excess of any authorization, and by such conduct has been furthering the intended fraud.

121. Undoubtedly, RentEngine has obtained something of value far exceeding $5,000 in a single calendar year.

122. As a result of this unauthorized access, Plaintiffs have suffered a continuing loss, consisting of, at least, the costs to investigate and respond to the unauthorized access, including the cease and desist letter, ongoing efforts to create security protocols that prevent Defendants raiding of Plaintiffs' Platforms through its use of alias email domain names (e.g., @gmails, @8aliases and @simplelogins), costs of remediation and the ongoing expenses of addressing unauthorized access and customer migration, which exceed $5,000.

123. Moreover, the allegations above may represent just the tip of the proverbial iceberg. Defendants' document production has been deficient in a number of respects, which prevents Plaintiffs from fully assessing the extent and nature of Defendants' unauthorized access to Plaintiffs' Platforms. Despite continuing attempts to reach an effective and consensual resolution to these production issues, Defendants obstinately refuse to produce the artifacts requested by Plaintiffs, despite due demand. Unless and until Defendants rectify this issue, Plaintiffs will be prevented from fully understanding the scope and nature of Defendants' unauthorized access.

124. Through these actions, RentEngine violated at least 18 U.S.C. § 1030(a)(2) and (a)(4).

## COUNT II

**(Tortious Interference with Contract)**
**(Against RentEngine)**

125. Plaintiffs incorporate by reference paragraphs 1-124, as though fully set forth herein.

126. Plaintiffs have valid, existing agreements with their customers concerning the use of Plaintiffs' Platforms. These agreements include express terms limiting access, confidentiality and restrictions on sharing credentials or using the Platforms for the benefit of third parties.

127. At all relevant times, RentEngine was aware, or reasonably should have been aware, of the existence, validity and binding terms of the agreements between Plaintiffs and their customers, as well as the prohibitions on third-party access and sharing of credentials contained

therein, as RentEngine agreed to Plaintiffs' Terms of Use by creating and operating accounts on the Platforms.

128. RentEngine has willfully and intentionally interfered with these contractual relationships by actively encouraging, soliciting and inducing the Targeted Customers to create unauthorized user accounts on Plaintiffs' Platforms for Defendants' benefit, in direct violation of the contractual provisions prohibiting such conduct.

129. Indeed, in RentEngine's "onboarding checklist," which on information and belief is distributed to each of its prospective clients, RentEngine expressly requires that its new customer, often Plaintiffs' existing customer, add RentEngine to its existing Tenant Turner or ShowMojo account.[17] Such an act is a violation of both Tenant Turner's and ShowMojo's Terms of Use.

130. Additionally, as demonstrated by Plaintiffs' activity in the Plaintiffs' Platforms, the Platform Screenshot, and the SentriLock Screenshot, RentEngine used wrongfully obtained information about Plaintiffs' customers and product analytics data to improperly and systematically target Plaintiffs' customers.

131. RentEngine's conduct goes much further than simple competition.

132. RentEngine has been knowingly receiving, using and benefitting from access credentials wrongfully obtained from Plaintiffs' customers and, through such improper access, repeatedly accessing Plaintiffs' proprietary Platforms without authorization or consent.

133. By obtaining, using and exploiting access to Plaintiffs' Platforms and confidential features, RentEngine has developed, marketed and enhanced its own directly competing software products, and solicited Plaintiffs' customers to migrate away from Plaintiffs' services, further undermining Plaintiffs' contractual and business relationships.

134. As a direct and proximate result of RentEngine's tortious acts, Plaintiffs have sustained monetary damages, including but not limited to lost revenues, costs of investigation and remediation, loss of business reputation and goodwill, and the ongoing expenses of addressing unauthorized access and customer migration. Plaintiffs have incurred and will continue to incur substantial damages, including attorneys' fees, in an amount to be determined at trial.

[17] Specifically, in its onboarding checklist Defendants request that its new prospective customer "Please add [spoof of targeted customer user name]@rentengine.io as a user (e.g., Tenant Turner, ShowMojo, ShowDigs)—We will not be using another one aside from RentEngine."

135. Additionally, RentEngine's conduct has caused, and will continue to cause, immediate and irreparable harm to Plaintiffs for which there is no adequate remedy at law. Plaintiffs are entitled to injunctive relief and all other remedies authorized by law.

**COUNT III**

**(Unjust Enrichment)**
**(Against RentEngine)**

136. Plaintiffs incorporate by reference paragraphs 1-135, as if fully set forth herein.

137. RentEngine is deriving substantial economic benefit by unlawfully accessing and exploiting Plaintiffs' proprietary software Platforms and confidential business information without authority, license, or compensation.

138. Through its unauthorized access and use of Plaintiffs' Platforms, RentEngine obtained valuable data, information regarding the Platforms features, customer information and proprietary business logic, all of which Defendants used to facilitate product development, customer acquisition and revenue generation.

139. RentEngine has not compensated Plaintiffs for this unauthorized use and exploitation of Plaintiffs' proprietary Platforms.

140. As a result, RentEngine has been unjustly enriched at Plaintiffs' expense.

141. This unjust enrichment gives rise to a contract implied by law, entitling Plaintiffs to equitable relief and restitution under the common law of Florida for the losses sustained and benefits conferred upon RentEngine through its unauthorized use of Plaintiffs' Platforms.

142. Plaintiffs have incurred and will continue to incur substantial damages, including attorneys' fees, in an amount to be determined at trial.

143. Unless further enjoined, RentEngine will continue to benefit and profit from its unjust enrichment, causing Plaintiffs immediate and irreparable harm.

144. Plaintiffs are entitled to restitution, equitable relief, damages and such other relief as the Court deems just and proper.

## COUNT IV

**(Lanham Act: False Advertising & Promotion, 15 U.S.C. § 1125(a)(1)(B))**
**(Against RentEngine)**

145. Plaintiffs incorporate by reference paragraphs 1-144, as if fully set forth herein.

146. RentEngine has engaged in false advertising and promotion of its competing property management software services in interstate commerce, including the false disparagement of Plaintiffs' products, services and commercial activities.

147. RentEngine has made and continues to disseminate false or misleading statements of fact regarding the characteristics and qualities of Plaintiffs' Platforms and/or software, including but not limited to: presenting misleading comparisons purporting that RentEngine's platform is superior, falsely representing the capabilities, performance, security and reliability of Plaintiffs' Platforms, and misrepresenting the authenticity and origin of content or features "sourced" from Plaintiffs in the RentEngine Blogs.

148. RentEngine publicly issues these false and misleading representations regarding Plaintiffs' software and business to the general public, to property management professionals, to current and prospective customers, and to the broader marketplace, through various channels, including blog posts, social media posts and other marketing campaigns, which remain accessible online.

149. RentEngine's statements are false or misleading, as they misrepresent the nature, characteristics, qualities and origin of its own services and Plaintiffs' products, and contain material inaccuracies and disparaging statements regarding the performance and features of Plaintiffs' Platforms.

150. RentEngine's false representations were likely to and did, in fact, deceive a substantial segment of the intended audience, including property management customers and industry professionals.

151. The deception was material and likely to influence, and did influence, the purchasing decisions and perceptions regarding Plaintiffs' and RentEngine's products and services.

152. RentEngine disseminates these false statements and misrepresentations in interstate commerce through its website, social media and other promotional efforts directed at property managers, industry professionals and the public throughout the United States. Further, the parties

compete directly in the property management software market, with their goods and services offered for sale in interstate commerce.

153. Defendants misrepresentations caused ongoing harm to Plaintiffs.

154. Even further, the artificial intelligence ("AI") search tools on Google and Bing relied on the Blog Posts, which was or should have been anticipated given AI's reliance on the primacy effect or first-mover bias.

155. Therefore, Defendants' earlier-occurring misrepresentations cannot be effectively remedied by Plaintiffs' subsequent attempts to counteract the false narratives online, as the earlier-occurring misrepresentation is weighed more heavily as an authority to Google and Bing's AI models, which perpetuate these harmful falsehoods.

156. Given the foregoing, Defendants' misrepresentations are harmful insofar as visits to the RentEngine Blogs are calculable, but they are also harmful because AI search tools parrot back the same misrepresentations about Plaintiffs' Platforms to any party that stopped short of counting as a view of the RentEngine's Blogs and, instead, settled for a summary provided by Google or Bing's AI summary.

157. As a direct and proximate result, Plaintiffs have suffered and continue to suffer economic and reputational injury, including lost sales and business opportunities, harm to customer relationships and goodwill, diversion of customers, increased expenditures to counteract and remedy RentEngine's false statements, the diminution in the value of Plaintiffs' Platforms and other damages. Plaintiffs have incurred and will continue to incur substantial damages, including attorneys' fees, in an amount to be determined at trial.

158. Unless enjoined, Plaintiffs will suffer immediate and continuing irreparable harm and injury, including loss of reputation and impairment of goodwill.

159. Plaintiffs are entitled to injunctive relief, damages and all other remedies under 15 U.S.C. § 1125(a) and applicable law.

## COUNT V

**(Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") Fla. Stat. §§ 501.201 *et seq.*)**
**(Against RentEngine)**

160. Plaintiffs incorporate by reference paragraphs 1-159, as if fully set forth herein.

161. Section 501.204(1) of the FDUTPA declares that "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful.

162. RentEngine engages in unfair and deceptive acts by making and disseminating false or misleading statements of fact regarding the characteristics and qualities of Plaintiffs' Platforms and/or software, including but not limited to: presenting misleading comparisons purporting that RentEngine's platform is superior, falsely representing the capabilities, performance, security and reliability of Plaintiffs' Platforms, and misrepresenting the authenticity and origin of content or features "sourced" from Plaintiffs in the RentEngine Blogs.

163. RentEngine's unlawful, unfair and fraudulent conduct has caused, or is likely to cause or have caused, confusion among members of the consuming public who are Plaintiffs' prospective customers.

164. As a direct and proximate result of RentEngine's unfair and deceptive acts, Plaintiffs have suffered and continue to suffer economic and reputational injury, including lost sales and business opportunities, harm to customer relationships and goodwill, diversion of customers, increased expenditures to counteract and remedy RentEngine's false statements and other damages. Plaintiffs have incurred substantial damages because of RentEngine's false statements made in its Blogs, and will continue to incur substantial damages as the information in the RentEngine Blogs is populated into Google and Bing's AI search tools and proliferated as authoritative information via a "primacy effect," including attorneys' fees, in an amount to be determined at trial.

165. RentEngine has been engaging in further unfair and deceptive conduct by providing the Targeted Customers with false and misleading justifications for requesting access to Plaintiffs' password-protected Platforms, asserting that such access was necessary for activities such as data migration or software demonstrations (which again, would still be impermissible).

166. Defendants' misrepresentations deceived the Targeted Customers into providing login credentials, thereby violating the Targeted Customers' existing agreements with Plaintiffs and subjecting those Targeted Customers to potential legal liability under the Platforms' Terms of Use.

167. Defendants' misrepresentations about their identities deceived Plaintiffs, resulting in Defendants accessing Plaintiffs' Platforms through the Targeted Customers' accounts.

168. As demonstrated by Defendants' activity in the Plaintiffs' Platforms, the Platform Screenshot and the SentriLock Screenshot, RentEngine used wrongfully obtained information about Plaintiffs' customers and product analytics data to intentionally, improperly and systematically target Plaintiffs' customers.

169. By obtaining, using and exploiting access to Plaintiffs' Platforms and confidential features, RentEngine has developed, marketed and enhanced its own directly competing software products, and solicited Plaintiffs' customers to migrate away from Plaintiffs' services, further undermining Plaintiffs' contractual and business relationships.

170. As a result of RentEngine's misrepresentations, RentEngine obtained unauthorized access to Plaintiffs' confidential and proprietary Platforms and information, causing direct harm to Plaintiffs, including monetary damages for lost revenue, investigative and remedial expenses, loss of business reputation and goodwill and ongoing costs associated with addressing unauthorized access and customer migration.

171. Without an order extending the present injunctive relief, Plaintiffs will suffer immediate and continuing irreparable harm and injury, including loss of reputation and impairment of goodwill.

## COUNT VI

**(Unfair Competition)**
**(Against RentEngine)**

172. Plaintiffs incorporate by reference paragraphs 1-171, as if fully set forth herein.

173. Through the conduct described above, RentEngine has engaged and is continuing to engage in unfair competition under the common law of Florida. Such conduct includes, but is not limited to: unauthorized access to Plaintiffs' Platforms and confidential business information, interference with Plaintiffs' contractual relationships, false and misleading representations concerning Plaintiffs, improper solicitation of the Targeted Customers and actions undertaken in bad faith to obtain and retain a competitive advantage at Plaintiffs' expense.

174. Plaintiffs have valid, existing agreements with their customers concerning the use of Plaintiffs' Platforms. These agreements include express terms limiting access, confidentiality and restrictions on sharing credentials or using the Platforms for the benefit of third parties.

175. Given RentEngine accepted Plaintiff's Terms of Use, RentEngine was and is aware, or reasonably should have been aware, of the existence, validity and binding terms of the

agreements between Plaintiffs and the Targeted Customers, as well as the prohibitions on third-party access and sharing of credentials contained therein.

176. RentEngine has been willfully and intentionally interfering with these contractual relationships by actively encouraging, soliciting through direct messaging and video call and inducing the Targeted Customers to provide login credentials to Plaintiffs' Platforms as an express requirement of RentEngine's onboarding process, in direct violation of the contractual provisions prohibiting such conduct.

177. RentEngine has been knowingly receiving, using and benefitting from access credentials wrongfully obtained from Plaintiffs' customers—including updates to Plaintiffs' Terms of Use, pricing and changes to services on Plaintiffs' Platforms—and, through such improper access, repeatedly accessing Plaintiffs' Platforms without authorization or consent.

178. By obtaining, using and exploiting access to Plaintiffs' Platforms and confidential features, RentEngine has been developing, marketing and enhancing its own directly competing software products, and soliciting the Targeted Customers to migrate away from Plaintiffs' services, further undermining Plaintiffs' contractual and business relationships.

179. In fact, RentEngine's marketing efforts have consistently emphasized its capabilities and processes related to onboarding and migration.[18] Of course, onboarding and migration are necessary components to a business model predicated on providing service to property managers who require integration of their vast databases; however, when combined with RentEngine's other actions consistent with Plaintiffs' allegations, the focus on onboarding becomes all the more insidious.

180. Further, RentEngine has been engaging in false advertising and promotion of its competing property management software services in interstate commerce, including the false disparagement of Plaintiffs' products, services and commercial activities.

181. RentEngine has been making and disseminating false or misleading statements of fact regarding Plaintiffs' Platforms and/or software, including but not limited to: falsely

[18] *See Onboarding with RentEngine: Full-service & Fast*, RENTENGINE, https://www.rentengine.io/blog/rentengine-onboarding, (last visited Nov. 21, 2025) ("During onboarding, our team will carefully migrate all of the following for you: 1. active listings 2. lockboxes 3. scheduled showings 4. user accounts[.] When your team comes into work on Monday morning, everything will be ready to go.").

representing the capabilities, performance, security, and price of Plaintiffs' Platforms and misrepresenting the authenticity and origin of content or features "sourced" from Plaintiffs.

182. RentEngine further published false and misleading representations regarding Plaintiffs' software and business to the general public, to property management professionals, to current and prospective customers and to the broader marketplace, through the RentEngine Blogs, targeted emails, webinars, direct calls and presentations to customers and prospects and in other marketing materials and advertising campaigns.

183. RentEngine's statements are false or misleading, misrepresenting the nature, characteristics, qualities and origin of its own services and Plaintiffs' products, and contain material inaccuracies and disparaging statements regarding the performance and features of Plaintiffs' Platforms.

184. RentEngine's false representations were and are likely to and did, in fact, deceive a substantial segment of the intended audience.

185. The deception was and is material and likely to influence, and did influence, the purchasing decisions of customers and other market participants.

186. RentEngine has been disseminating these false statements and misrepresentations in interstate commerce through its website, email and online advertising campaigns, presentations, social media and other promotional efforts directed at property managers, industry professionals and the public throughout the United States.

187. RentEngine's conduct constitutes unfair competition under Florida law.

188. As a direct and proximate result, Plaintiffs have suffered, and continue to suffer, irreparable harm, loss of reputation, impairment of goodwill and pecuniary damages. Plaintiffs have incurred and will continue to incur substantial damages, including attorneys' fees, in an amount to be determined at trial.

189. Without ongoing injunctive relief, RentEngine will continue its acts of unfair competition, resulting in immediate and irreparable injury to Plaintiffs.

190. Plaintiffs are entitled to injunctive relief, damages and all other remedies as provided by law for unfair competition under the common law of Florida.

## COUNT VII

**(Conversion)**
**(Against RentEngine)**

191. Plaintiffs incorporate by reference paragraphs 1-190, as if fully set forth herein.

192. At all relevant times, Plaintiffs were and are the rightful owners of the Platforms, including all content, data structures, features, user interfaces, workflows and other proprietary, confidential business information contained therein.

193. Plaintiffs have the immediate and exclusive right to possess, use and control the Platforms, which are password-protected and restricted to authorized users only, in order to preserve the Platforms' integrity, confidentiality and commercial value.

194. Without Plaintiffs' knowledge or authorization, RentEngine intentionally solicited Plaintiffs' customers to provide login credentials, and used false identification and deceptive means to gain and maintain unauthorized access to Plaintiffs' password-protected Platforms, in direct violation of Plaintiffs' Terms of Use.

195. RentEngine's employees, agents and collaborators repeatedly used unlawfully obtained credentials to access secure and confidential features, data flows, user interfaces and functional tools within Plaintiffs' Platforms.

196. Defendants further created unauthorized accounts for Plaintiffs' customers' existing profiles (using 'spoof' alias email accounts designed to mimic Targeted Customers' email addresses) for Defendants benefit, to access secure and confidential features, data flows, user interfaces and functional tools within Plaintiffs' Platforms.

197. RentEngine has been exploiting the information obtained from these unauthorized sessions to inform the design, development, marketing and sale of its directly competing software products. RentEngine's misconduct further includes the copying, extraction and dissemination of proprietary screenshots, performance metrics, product analytics, internal data and watermarked images, all sourced from within Plaintiffs' secure environments.

198. By these actions, RentEngine wrongfully exercised dominion and control over the Plaintiffs' Platforms, in a manner inconsistent with Plaintiffs' right to exclusive possession, use and control.

199. As a direct and proximate result of RentEngine's wrongful conduct, Plaintiffs have been deprived of their exclusive use and possession of the Platforms, and have suffered and

continue to suffer actual damages, including but not limited to loss of competitive advantage, reputational harm and pecuniary damages. Plaintiffs have incurred and will continue to incur substantial damages, including attorneys' fees, in an amount to be determined at trial.

200. Without continued injunctive relief, RentEngine will continue to improperly access Plaintiffs' Platforms in a manner inconsistent with Plaintiff's rights, and Plaintiffs will continue to suffer irreparable harm, loss of reputation, impairment of goodwill and pecuniary damages.

201. Because Defendants' actions were willful, malicious and unlawful, Plaintiffs are entitled to recover punitive damages to the full extent permitted under the law.

## COUNT VIII

**(Trespass to Chattels)**
**(Against RentEngine)**

202. Plaintiffs incorporate by reference paragraphs 1-201, as if fully set forth herein.

203. At all relevant times, Plaintiffs were and are the rightful owners of the Platforms, including all content, data structures, features, user interfaces, workflows and other proprietary, confidential business information contained therein, pursuant to the Platforms' Terms of Use.

204. Plaintiffs' proprietary Platforms are password-protected and strictly limited to authorized users. These access and use controls are critical to protecting the integrity, confidentiality and competitive value of Plaintiffs' Platforms, and Plaintiffs expend substantial resources to maintain and safeguard these proprietary solutions.

205. Without Plaintiffs' knowledge or authorization, RentEngine has been intentionally accessing Plaintiffs' Platforms by soliciting the Targeted Customers' credentials and using deceptive means to gain and maintain such access, in violation of the Plaintiffs' Terms of Use.

206. RentEngine's employees, agents and collaborators have been repeatedly using unlawfully obtained credentials to access a range of secure and confidential features, data flows, user interfaces and functional tools within Plaintiffs' Platforms.

207. RentEngine has been exploiting the information, customer lists and product analytics obtained for its own benefit, using it to enhance and market its directly competing software products, and publicly disseminating proprietary screenshots, performance data and internal information obtained from within Plaintiffs' password-protected environments.

208. RentEngine's intentional, unauthorized use of Plaintiffs' property has been interfering with Plaintiffs' possessory interest in their Platforms, and substantially undermining their competitive position and confidentiality.

209. Plaintiffs have incurred and will continue to incur substantial damages as a result of RentEngine's conduct, including attorneys' fees, in an amount to be determined at trial.

210. Unless further enjoined, RentEngine will continue to diminish the value and utility of the Platforms.

211. Because RentEngine's actions were willful, malicious and unlawful, Plaintiffs are entitled to recover punitive damages to the full extent permitted under the law.

## COUNT IX

**(Common Law Fraud)**
**(Against All Defendants)**

212. Plaintiffs incorporate by reference paragraphs 1-211, as if fully set forth herein.

213. RentEngine and Stringfellow have created fictitious domains and alias email accounts to conceal their identity and maintain ongoing, unauthorized access to the Platforms without Plaintiffs' knowledge or consent.

214. Initially, Defendants created profiles using email addresses clearly associated with RentEngine as specifically detailed in Paragraph 47 herein.

215. After these email addresses associated with RentEngine were denied access, Mr. Stringfellow used alternative email addresses, such as "astringfellow18@gmail.com."

216. On May 19, 2025, Mr. Stringfellow used the credentials of **Customer NN** to create an account on the Tenant Turner Platform using "astringfellow18@gmail.com." Using this account, Mr. Stringfellow attempted to log into the Tenant Turner Platform twice on May 19, 2025.

217. Additionally, Defendants used alias email addresses designed to, as the username suggests, spoof Plaintiffs' existing customers' names in an attempt to circumvent Plaintiffs' security protocols.

218. On April 29, 2025, Defendants used the credentials of **Customer KK** to create an authorized Tenant Turner account using the email address "[Customer MM].overfull256@simplelogin.com."

219. On April 29, 2025, Defendants used the credentials of **Customer LL** to create an unauthorized Tenant Turner account using the email address "[Customer LL].com.spoof179@8alias.com."

220. On April 29, 2025, Defendants used the credentials of **Customer MM** to create an authorized Tenant Turner account using the email address "[Customer MM].polygon780@simplelogin.com."

221. RentEngine's and Stringfellow's misrepresentations are material because the use of fake account information allowed RentEngine to bypass the technical safeguards implemented by Plaintiffs to monitor and restrict RentEngine's access.

222. The misrepresentations are also material because Defendants received automated email notifications sent to their unauthorized user accounts detailing Plaintiffs' change in price structure, new offerings and prospective tenants.

223. The misrepresentations are also material because Defendants received Plaintiffs' proprietary and confidential customer lists, customer preferences, product features and functionalities and product and customer analytics.

224. RentEngine and Stringfellow have been intending for these false representations to mislead Plaintiffs, and Plaintiffs have in fact been misled into believing these fictitious email accounts held by RentEngine actually belonged to legitimate customers of Plaintiffs.

225. RentEngine's and Stringfellow's representations are false and misleading. Rather than belonging to legitimate customers for authorized access, the fictious email accounts were utilized by RentEngine to unlawfully access Plaintiffs' Platforms.

226. By obtaining, using and exploiting access to Plaintiffs' Platforms and confidential features, RentEngine has developed, marketed and enhanced its own directly competing software products, and solicited Plaintiffs' customers to migrate away from Plaintiffs' services, further undermining Plaintiffs' contractual and business relationships.

227. In light of Defendants' persistent use of pseudonymous accounts to obscure their identities, there may be fictitious email accounts controlled by Defendants that are still unknown to Plaintiffs.

228. The aforementioned misrepresentations have harmed and continue to harm Plaintiffs by depriving them of the exclusive use of their proprietary technology, causing loss of competitive advantage, reputational harm and pecuniary damages. Plaintiffs have incurred and will

continue to incur substantial damages, including attorneys' fees, in an amount to be determined at trial.

229. Plaintiffs are entitled to compensatory and punitive damages, as well as all other available remedies and relief as set forth in the Prayer for Relief.

**COUNT X**

**(Defend Trade Secrets Act, 18 U.S.C. § 1836)**
**(Against RentEngine)**

230. Plaintiffs incorporate by reference paragraphs 1-229, as if fully set forth herein.

231. Plaintiffs assert claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. ("DTSA"), which authorizes this Court to act in equity to enjoin actual and threatened misappropriation of trade secrets.

232. Plaintiffs own trade secrets within the meaning of 18 U.S.C. § 1839(3), used in, and intended for use in, interstate commerce, including non-public categories of proprietary information and trade secrets, as set forth in Paragraph 59.

233. These trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable by, persons who can obtain economic value from their disclosure or use. Among other advantages, they enable faster product development, improved conversion and retention, differentiated security controls, reduced unit costs and confer a substantial competitive head start by obviating months or years of experimentation, partner testing and trial-and-error.

234. Plaintiffs take and have taken reasonable measures to maintain the secrecy of the foregoing trade secrets, including role based access controls; password protections; network and application layer protections, such as domain/IP deny lists; monitoring, logging and alerting for irregular access, coupled with credential revocation workflows; maintaining authentication and authorization logs; and conditioning access on express acceptance of Plaintiffs' Terms of Use.

235. In connection with the development and conduct of their businesses and Platforms, Plaintiffs expended substantial time, labor and money to research and create proprietary methods, strategies, technologies, processes, products, integrations, marketing plans and procedures and other non-public information regarding customer preferences, pricing methods, product needs, sales, volumes and strategies.

236. Defendants misappropriated Plaintiffs' trade secrets by "improper means," 18 U.S.C. § 1839(6), including deception and misrepresentation to create and operate disguised, unauthorized user accounts under existing customer profiles; inducing Plaintiffs' customers to provision competitor-controlled logins; spoofing and anonymizing alias domains to bypass domain blocks; exfiltrating proprietary screenshots and lockbox artifacts; repeatedly generating unique lockbox codes unrelated to any legitimate migration; and compiling internal notes and competitive analyses from non-public, password-protected views.

237. Defendants used and disclosed Plaintiffs' trade secrets without consent to scope, design and promoted competing offerings; published misleading comparative content; solicited customer migrations; and accelerated Defendants' feature roadmap and go-to-market timeline.

238. RentEngine and its employees knew or had reason to know that the trade secret information was acquired through improper means and have used, and will continue to use, this information in competing with Plaintiffs in interstate commerce.

239. Plaintiffs have at all times maintained protectable trade secret interests in the foregoing information and took reasonable steps to protect its secrecy.

240. Defendants' misappropriation was and is knowing, willful, malicious, intentional and in bad faith. Plaintiffs have suffered, and will continue to suffer, substantial damages, including competitive harm, lost revenues and goodwill, unjust enrichment, increased remediation and security costs and erosion of the value of their trade secrets, in amounts to be determined at trial. Defendants' misuse has conferred a material head-start advantage by allowing Defendants to avoid the time, cost and experimentation necessary to develop comparable capabilities independently.

241. Unless RentEngine is further and permanently enjoined from misusing, converting, disclosing and misappropriating Plaintiffs' proprietary and trade secret information, Plaintiffs will suffer immediate and irreparable injury, loss and damage for which there is no adequate remedy at law.

242. Pursuant to 18 U.S.C. § 1836(b)(3), Plaintiffs seek preliminary and permanent injunctive relief, including: (a) cessation of any acquisition, access, use, or disclosure of Plaintiffs' trade secrets; (b) return, destruction and certification of non-retention of all Plaintiffs' proprietary information in any form; and (c) preservation and forensic inspection, by a Court-appointed neutral, of Defendants' devices, systems, cloud tenants, repositories, email/alias services and

platforms to identify and quarantine Plaintiffs' trade secrets and deliver all relevant system artifacts and logs.

243. Plaintiffs seek monetary relief for actual losses and for unjust enrichment not addressed by an actual-loss award, or, in the alternative, a reasonable royalty for any continued use of Plaintiffs' trade secrets, together with exemplary (double) damages and attorneys' fees for willful and malicious misappropriation under 18 U.S.C. § 1836(b)(3)(C)–(D).

**COUNT XI**

**(Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001)**
**(Against RentEngine)**

244. Plaintiffs incorporate by reference paragraphs 1-243, as if fully set forth herein.

245. Pursuant to the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, *et seq.*, ("FUTSA") this Court may act in equity to enjoin threatened misappropriation of trade secrets.

246. Plaintiffs possess trade secrets within the meaning of Fla. Stat. § 688.002(4), including non-public categories of proprietary information, as set forth in Paragraph 59.

247. These trade secrets derive independent economic value from not being generally known or readily ascertainable by proper means and confer competitive advantages, including faster product development, improved conversion and retention, differentiated security controls, lower unit costs and a substantial head-start effect.

248. Plaintiffs take reasonable measures to maintain the secrecy of their trade secrets, including technical, contractual and operational controls such as including role-based access controls; password protections; network and application layer protections, such as domain/IP deny lists; monitoring, logging and alerting for irregular access, coupled with credential revocation workflows; maintaining authentication and authorization logs; and conditioning access on express acceptance of Plaintiffs' Terms of Use.

249. Through misrepresentation and inducement of breaches of duty, Defendants improperly accessed Plaintiffs' trade secrets via unauthorized accounts on Plaintiffs' password-protected Platforms by creating disguised and alias accounts, inducing customers to provision competitor-controlled logins (e.g., ops+[customer name]@rentengine.io), using anonymizing domains (e.g., @simplelogin.com, @8alias.com) to bypass domain blocks, exfiltrating proprietary screenshots and lockbox artifacts and repeatedly generating lockbox codes

unrelated to any legitimate migration purpose. Such conduct constitutes "improper means" under Fla. Stat. § 688.002(1).

250. Defendants have used and disclosed Plaintiffs' trade secrets without consent to scope, design and promote competing offerings; published misleading comparative content; diverted leads and solicit customer migrations; and to accelerate Defendants' feature roadmap and go-to-market timeline—evidenced by prolonged unauthorized sessions, retention and labeling of proprietary artifacts and continued access attempts after explicit notice.

251. Defendants knew or had reason to know that Plaintiffs' trade secrets were acquired by improper means and that any use or disclosure was unauthorized.

252. Plaintiffs have at all times maintained protectable trade secret interests in the foregoing information and took reasonable steps to protect its secrecy.

253. Defendants' misappropriation is knowing, willful, malicious, intentional and in bad faith.

254. As a direct and proximate result of Defendants' misappropriation, Plaintiffs have suffered and will continue to suffer substantial damages, including actual losses, unjust enrichment, competitive harm, lost revenues and goodwill, increased remediation and security costs and erosion of the value of their trade secrets, in amounts to be determined at trial. *See* Fla. Stat. § 688.004(1).

255. Absent further injunctive relief, Plaintiffs will suffer immediate and irreparable harm for which there is no adequate remedy at law, including loss of secrecy and control, reputational harm and impairment of goodwill. *See* Fla. Stat. § 688.003(1)–(2).

256. Plaintiffs are entitled to preliminary and permanent injunctive relief prohibiting any acquisition, access, use, or disclosure of Plaintiffs' trade secrets; requiring the return, destruction and certification of non-retention of all Plaintiffs' proprietary information; imposing preservation and forensic inspection (by a Court-appointed neutral) of Defendants' devices, systems, cloud tenants, repositories, email/alias services and platform; and, in the alternative and only if warranted by exceptional circumstances, conditioning any limited future use upon payment of a reasonable royalty for a period no longer than necessary. *See* Fla. Stat. § 688.003(3).

257. Plaintiffs also seek monetary relief, including actual losses and unjust enrichment (or, in the alternative, a reasonable royalty), exemplary damages up to twice the award for willful

and malicious misappropriation and attorneys' fees as permitted by Fla. Stat. §§ 688.004(2) and 688.005.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for this Court to enter judgment granting the following relief:

1. Injunctive Relief:
    a. The continuance of the preliminary injunctive relief set forth in the Omnibus Order and thereafter the issuance of a permanent injunction;
    b. Prohibiting Stringfellow and RentEngine, its officers, agents, employees and all persons acting in concert with them from accessing, using, disclosing, or retaining any of Plaintiffs' proprietary or confidential information;
    c. Prohibiting further interference with Plaintiffs' contractual, business, or client relationships;
    d. Requiring Defendants to immediately return, purge and certify the destruction of all proprietary and confidential material obtained from Plaintiffs;
    e. Prohibiting Defendants from making any false, misleading, or disparaging statements about ShowMojo, Tenant Turner, or their products and services.
    f. Appointment of a neutral forensic examiner under a Court-approved protocol to image and inspect Defendants' devices, cloud tenants, repositories, email and alias services (including SimpleLogin or similar) and collaboration platforms; identification and quarantine of Plaintiffs' trade secrets; and delivery of all system artifacts/logs withheld to date.
    g. Immediate return of all originals, copies, derivatives, or summaries of Plaintiffs' Information and certification of destruction and non-retention.
2. Damages in an amount to be proven at trial, including but not limited to: compensatory, actual, consequential and special damages;
3. Statutory damages, liquidated damages and equitable enhancements as permitted by law;
4. Disgorgement of all ill-gotten gains, profits and benefits received by RentEngine as a result of its misconduct;
5. Punitive and exemplary damages as permitted by law;

6. Attorneys' fees and costs as provided by contract and law;
7. Pre-judgment and post-judgment interest on all amounts awarded; and

Such other relief as the Court deems just and proper in law or equity.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action on all issues so triable as of right.

Respectfully submitted,

Date: November 21, 2025

/s/ *Aaron S. Weiss*
Aaron S. Weiss (FBN 48813)
**CARLTON FIELDS, P.A.**
700 N.W. 1st Ave., Suite 1200
Miami, Florida 33136
Tel: (305) 530-0050
aweiss@carltonfields.com

Robert S. Friedman*
Emily D. Anderson*
Meghan M. Stuer*
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 634-3081
Fax: (917) 438-6162
rfriedman@sheppardmullin.com
emanderson@sheppardmullin.com
mstuer@sheppardmullin.com
*Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*