**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:25-cv-22939**

SHOWMOJO, LLC and
TENANT TURNER, INC.,

Plaintiffs,

v.

THRESHOLD TECHNOLOGY, LLC d/b/a
RENTENGINE and ALEXANDER
STRINGFELLOW,

Defendants.
_________________________________/

**DEFENDANTS' MOTION TO COMPEL ARBITRATION OR, ALTERNATIVELY, TO DISMISS THE PLAINTIFFS' COMPLAINT**

The Defendants, Threshold Technology, LLC d/b/a RentEngine and Alexander Stringfellow, under the Federal Arbitration Act, move to compel arbitration. The Defendants alternatively move, under Federal Rule of Civil Procedure 12(b)(6), to dismiss the Third Amended Complaint ("TAC") (D.E. 57) filed by the Plaintiffs.

## INTRODUCTION

This lawsuit is not a genuine effort to remedy a legal wrong. It is brought by entrenched incumbents in the property management software industry, Tenant Turner and ShowMojo, now owned by the same private equity firm. These incumbents are using litigation to punish an emerging startup, RentEngine, for winning customers and helping those customers migrate their data from Plaintiffs to Defendants. Plaintiffs are trying to convert ordinary customer movement and onboarding, driven by customer choice and consent, into federal hacking, trade secret theft, and false advertising claims. The TAC does not plead facts that fit those statutes; it pleads dissatisfaction with lawful competition.

This is Plaintiffs' fourth attempt to plead a case. They reviewed Defendants' first motion to dismiss, understood the fatal defects, and responded by trying to fix their complaint. In doing so, they added trade secret claims founded, at least partially, on Defendants' supposed theft of an allegedly secret customer feedback forum that was publicly available and online before the litigation. After Defendants pointed this out, Plaintiffs amended yet again. But their now fourth complaint fails too.

Plaintiffs' narrative is internally implausible. They claim Defendants "stole" something valuable and discrete, yet the conduct they actually describe looks exactly like customer-directed migration and onboarding: At customers' direction, RentEngine assisted Plaintiffs' customers in switching platforms by migrating their own data from Plaintiffs' Platforms to RentEngine's. If Defendants were truly misappropriating protectible secrets such as source code, there would be no need for this repetitive, customer-consented access the TAC describes. Equally important, Plaintiffs plead no facts that Defendants ever took or used anything of value. Conspicuously absent from the TAC is any non-conclusory allegation that

RentEngine downloaded, copied, retained, or incorporated any protected material into its own, competing software.

On the merits, each of Plaintiffs' claims fails as a matter of law. The CFAA count should be dismissed because Defendants accessed the Platforms with permission. The trade-secret counts should be dismissed because Plaintiffs do not identify any alleged trade secret with the particularity required—and even under the most generous reading of the pleading, Plaintiffs allege only that Defendants saw what thousands of Plaintiffs' own customers could see: the outward-facing, visible output of a ubiquitous software program which are not trade secrets as a matter of law. Plaintiffs' remaining state-law theories fare no better because they are preempted to the extent they are based on the same alleged misappropriation. And Plaintiffs' false-advertising claims fail because, at most, they challenge non-actionable commercial puffery in two blog posts—without alleging that any customer ever saw the blog posts, relied on them, or was deceived.

On top of that, Plaintiffs brought this case in the wrong forum. They base their claims on supposed violations of their Terms of Use and even allege that Defendants agreed to those Terms. If that is true, arbitration is straightforward: both sets of Terms contain broad, mandatory arbitration provisions that require this dispute to be arbitrated. Even if Plaintiffs were somehow wrong about assent, their own theory still makes the Terms central to every key allegation. Under settled equitable estoppel principles, a plaintiff cannot rely on a contract to support its claims while at the same time evading that contract's arbitration requirement.

For those reasons, the Court should compel arbitration under Plaintiffs' Terms of Use and stay this action in favor of arbitration. In the alternative, the Court should dismiss the TAC.

## BACKGROUND

### *Procedural Background*

Plaintiffs first filed this action in June. ECF No. 1. After realizing they had named the wrong defendant, they amended the complaint but left the core factual allegations unchanged. ECF No. 28. Defendants then timely moved to dismiss that

complaint and to compel arbitration. ECF No. 34. Rather than defend their pleading, Plaintiffs elected to revise their theories. ECF No. 43. In doing so, Plaintiffs added trade-secret claims, relying heavily on an allegation that Defendants misappropriated Plaintiffs' customer feedback forum. *Id.* at ¶¶ 73–75. In Plaintiffs' own words, it was supposedly "damning" that Defendants viewed and compiled information from that forum. *Id.* at ¶ 76. Defendants promptly communicated to Plaintiffs that the entire customer feedback forum was publicly accessible online and thus could not plausibly support a trade-secret claim. Confronted with that defect, Plaintiffs did not defend their allegation; instead, they amended yet again, leading to their fourth attempt at pleading a claim.

***The TAC's Allegations***

The Plaintiffs, the Complaint alleges, are "leading providers of proprietary, cloud-based property management software platforms relied upon by real estate professionals throughout the United States." TAC at ¶ 2. Defendant RentEngine is a direct competitor. *Id.* at ¶ 4. Each of Plaintiffs' customers has a user profile on Plaintiffs' Platforms. *Id.* at ¶ 6. Those customers can provide consent for users to access Plaintiffs' Platforms by creating "user accounts." *Id.* User accounts apportioned to an email address give the person who controls the email address access to Plaintiffs' customer profile and access to Plaintiffs' Platforms. *Id.* at ¶ 6. According to Plaintiffs, every individual given a user account must "affirmatively accept" ShowMojo's and Tenant Turner's Terms of Use (collectively, the "Terms of Use"). *Id.* at ¶¶ 31, 36.

<u>The Terms of Use</u>

The Terms of Use allegedly govern the customers' access to and use of the Plaintiffs' Platforms. *See, e.g.*, *id.* at ¶¶ 31, 36. The Terms of Use, according to the Plaintiffs, "set forth strict confidentiality, security, and acceptable use requirements." *Id.* at ¶ 39. Without pointing to the exact language and in conclusory fashion, the

Plaintiffs claim that the Terms of Use "expressly" forbid use of their Platforms by competitors. *Id.* at ¶ 38; *see also id.* at n.2 and n.3 (hyperlinks to the Terms of Use).[1]

As relevant here, the Terms of Use also contain broad arbitration provisions requiring arbitration of disputes between the Plaintiffs and their customers. The arbitration provision of the Tenant Turner Terms of Use, for example, provides in relevant part that the parties "will resolve any controversies, claims, counterclaims, or other disputes between you and us or you and a third-party agent of [Tenant Turner]" through binding arbitration. Tenant Turner Terms of Use at Section 16.1. Likewise, the arbitration provision in the ShowMojo Terms of Use provides, in relevant part, that, except for certain carved-out disputes (including "claims for injunctive relief"), the parties agree "that any dispute or controversy arising out of, in relation to, or in connection with this Agreement" must be arbitrated. ShowMojo Terms of Use at Section 11.1.

<u>Allegations Regarding RentEngine's Conduct</u>

Plaintiffs claim that dozens of their customers created user accounts for Defendants, and that upon "information and belief," RentEngine "exploited" the credentials to "accelerate the scope and timing of their own competing software." *Id.* at ¶¶ 8, 77.

Plaintiffs itemize user accounts that Plaintiffs' own customers created for RentEngine and identify the email addresses those customers used to grant Defendants access. *Id.* at ¶ 51. For the overwhelming majority of accounts, Plaintiffs allege only a short window between account creation and last access—facts that, on their face, support the common-sense inference that Defendants accessed the accounts to assist customers in migrating their own data (i.e., routine onboarding), not for any improper purpose. *See, e.g.*, *id.* at ¶¶ 51(ii) (showing account created on February 3 and last accessed that day); 51(a)(iii) (showing account created on

---

[1] The Court may consider the entirety of the Terms of Use in deciding this motion to dismiss because the Terms of Use are "central" to the Plaintiffs' Complaint. And, neither party will dispute the authenticity of the Terms of Use for the purposes of this motion. Thus, the Court may consider the Terms of Use under the incorporation-by-reference doctrine. *See, e.g.*, *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005).

February 20, 2021 and last accessed a day later); 51(b)(iv) (showing account created and accessed last on same date). The allegations show RentEngine used email addresses that clearly identified that Plaintiffs' customers were creating user accounts for RentEngine-affiliated users. *Id.*

Although Plaintiffs conclusorily allege that "activity logs" showed Defendants' conduct on the Platforms was inconsistent with data migration and instead reflected "download and viewing" of proprietary material (*id.* at ¶ 62), they never plead what, specifically, was allegedly downloaded or viewed. And the facts they do allege are fully consistent with the far more straightforward explanation: Defendants were doing what Plaintiffs' own customers directed them to do—either migrating customer data or assisting customers in generating lockbox codes for the customers' own properties at customers' direction. *Id.* at ¶ 68.

In other words, the TAC comes closest to alleging use or copying only by asserting, "upon information and belief," that Defendants viewed "confidential insights" that allegedly "inform[ed] and accelerate[d] RentEngine's product development," without pleading any non-conclusory facts that Defendants actually took, copied, or used anything. *Id.* at ¶¶ 8, 60, 77. And there is no allegation that RentEngine took anything like source code—nor could it have—because the only information it allegedly encountered was what ordinary customers could see (including what is shown in publicly accessible walkthrough videos of the Platforms).

Trade Secrets

For the first time—in this now fourth pleading—Plaintiffs assert that Defendants misappropriated Plaintiffs' trade secrets, broadly defined and followed by a vague list of five broad categories of trade secrets. *Id.* at ¶ 59.[2] Plaintiffs claim Defendants exploited Plaintiffs' "password-protected and confidential features, data flows, user interfaces and functional tools embedded within [their Platforms] that

[2] Plaintiffs have filed these alleged trade-secret categories under seal. Because of that sealing, Defendants do not quote the categories verbatim here, but summarize them as presented—while maintaining that the highly-generalized descriptions, even as pled, do not identify protectible trade-secret information and should not have been filed under seal.

comprise [their] proprietary and trade secrets including, without limitation ...” *Id.* The complaint then identifies categories but does not differentiate between the two Plaintiffs in describing them. Instead, the alleged trade secrets are presented in materially identical terms for both Plaintiffs, despite Plaintiffs being separate (and competing) entities, leaving it unclear how two different businesses purportedly possess the same trade secrets.

**Category 1: Pre-Screening Logic**. The first category can be roughly summarized as “Pre-Screening Logic.” Plaintiffs’ “pre-screening” allegations boil down to an industry-standard product feature: collecting basic applicant inputs (e.g., income, eviction/felony questions) and automatically approving/rejecting based on answers. That type of broadly-defined, generalized workflow cannot plausibly constitute a trade secret. Further, both Plaintiffs publish publicly hours of video showing exactly how a customer can create different pre-screening workflows and public-facing documentation showing pre-screening workflows.[3]

**Category 2: Notification Triggers**. This second category appears to be the general concept and timing of automated alerts to prospects and property managers (Plaintiffs’ customers) when common leasing events occur (new leads, scheduled showings, etc.). But that “how and when notifications go out” is too general to be a trade secret. Further, both Plaintiffs publish publicly hours of video showing exactly how automated alerts go out and public-facing documentation explaining the alert workflow.[4]

---

[3] Defendants cite these videos and articles—and others referenced below—only to illustrate that what Plaintiffs describe is outward-facing, publicly observable software functionality, which cannot qualify for trade-secret protection as a matter of law. *See, e.g.*, https://vimeo.com/427461939 (Tenant Turner Training Video showing how to set up pre-screening and qualifying questions); https://vimeo.com/1077617043 (Showmojo Training Video showing how to set up pre-screening and qualifying questions).

[4] *See, e.g.*, https://help.tenantturner.com/articles/6448832-lead-flow-self-access-viewings (Tenant Turner explanation of notification triggers sent); https://help.tenantturner.com/articles/3865097-manage-user-notifications (Tenant Turner explanation showing which notifications can be turned on and off as a property manager); https://vimeo.com/283406392 (full video guide of the Showmojo prospect experience and notifications they receive); https://hello.showmojo.com/leasing-knowledge-base/ (in Marketing section, explanation of ShowMojo notification prospects received).

**Category 3: Application Programming Interface**. This third category—though framed broadly—appears to target Plaintiffs' APIs: the set of rules and access points a platform provides so other software can communicate with it. As an initial matter, RentEngine is not alleged to have seen any source code, so whatever Plaintiffs mean here necessarily concerns information available to customers or otherwise exposed through the product. And further, both Plaintiffs publish public-facing documentation showing their API.[5]

**Category 4: Internal Insight Reports**. This fourth category appears to concern customer-facing metrics or reports that customers could create when using their accounts. But Plaintiffs never identify what, specifically, is supposed to be secret. Further, both Plaintiffs publicly describe their reporting features, including the key inputs and outputs, in online materials.[6]

**Category 5: Schedule Showing Logic**. Plaintiffs are effectively claiming that the rules and configurations that govern how showings get scheduled are proprietary. They do not allege RentEngine accessed the underlying code implementing that logic. Further, both Plaintiffs publish publicly hours of video showing exactly how scheduling logic works and documents discussing the same.[7]

<u>False Advertising</u>

Finally, Plaintiffs claim Defendants engaged in false advertising based on two blog posts (the "Blog Posts"). TAC at ¶¶ 79-90. Plaintiffs claim the posts were misleading because RentEngine described Plaintiffs' features as "basic," "limited" or

---

[5] For example, ShowMojo's and Tenant Turner's API endpoints and schemas are publicly available here: https://docs.showmojo.com/docs/showmojo-api-public/legacy; https://help.tenantturner.com/articles/8899736-tenant-turner-api.

[6] *See, e.g.*, https://hello.showmojo.com/leasing-knowledge-base/ (ShowMojo at the reporting section); https://help.tenantturner.com/reports (Tenant Turner).

[7] *See, e.g.*, https://vimeo.com/427461939 (Tenant Turner); https://help.tenantturner.com/articles/1707331-account-settings-viewings (Tenant Turner); https://help.tenantturner.com/articles/3077854-general-availability-for-users (Tenant Turner); https://vimeo.com/1077617043 (ShowMojo); https://hello.showmojo.com/leasing-knowledge-base/ (Showmojo at the scheduling section).

"standard" rather than allegedly truthfully calling them "comprehensive," "advanced" or "dynamic." *Id.*

Causes of Actions

Plaintiffs bring eleven causes of action for violations of the CFAA, Tortious Interference with Contract, Unjust Enrichment, Lanham Act False Advertising, FDUTPA, Unfair Competition, Conversion, Trespass to Chattels, Fraud, Federal Trade Secret Act ("DTSA"), and Florida Trade Secret Act ("FUTSA").

**THE COURT SHOULD COMPEL ARBITRATION**

As a threshold matter, the Court must compel arbitration of this dispute under the arbitration provisions in the Terms of Use for two reasons. First, the Plaintiffs' allegations bring this dispute squarely within the doctrine of equitable estoppel, which allows non-signatories to an arbitration agreement (such as the Defendants) to enforce an arbitration agreement between signatories (such as the Plaintiffs and the customers at issue in this case). *See Pro. Consulting Servs. S.A.S. v. Inmigracion Pro, LLC*, 2024 WL 4103919, at *6–*9 (S.D. Fla. Sept. 6, 2024) (Altman, J.). Second, Plaintiffs now allege that Defendants agreed to the Terms of Use so, should equitable estoppel not apply, this dispute must be arbitrated.

## A. Legal Standard

The Federal Arbitration Act provides, in relevant part, that a party may petition a federal court "for an order directing that [an] arbitration proceed in the manner provided for in" a written agreement to arbitrate. 9 U.S.C. § 4. If the court concludes that a dispute is arbitrable, then, upon request of a party, the court must stay the case pending the resolution of the arbitration. *See* 9 U.S.C. § 3.[8]

As this Court acknowledged in *Professional Consulting Services S.A.S.*, the Court must consider three factors in deciding whether to compel arbitration: whether "(1) a written agreement exists between the parties containing an arbitration clause;

[8] The Terms of Use expressly provide that the FAA applies to the arbitration agreements memorialized in the Terms. *See* Tenant Turner Terms of Use at Section 16.1; ShowMojo Terms of Use at Section 11.1. Accordingly, in moving to compel arbitration, the Defendants will apply the FAA.

(2) an arbitrable issue exists; and (3) the right to arbitration has not been waived." *Professional Consulting Services S.A.S.*, 2024 WL 4103919, at *4 (citation omitted). If the Court concludes that these three factors are satisfied, "we must then decide whether non-signatories (like the Defendants) can enforce" the agreement. *Id.* In conducting this analysis, the Court applies state-law principles of contract formation. *Id.*

**B. The Defendants Satisfy All Requirements for Compelling Arbitration.**

The Defendants readily satisfy all requirements for an order compelling arbitration. First, there are valid written agreements to arbitrate in the Terms of Use. Second, the Plaintiffs' claims are arbitrable under the plain language of those agreements. Third, the Defendants have not waived their right to arbitration. Fourth, and finally, the Defendants, as non-signatories to the Terms of Use, may properly enforce the arbitration agreements against the Plaintiffs under equitable estoppel.

**1. The Defendants satisfy the three gateway factors for arbitration.**

The first factor, whether there exists a valid written agreement containing an arbitration clause, is easily satisfied. The Plaintiffs cannot genuinely dispute that the Terms of Use, which contain the arbitration agreements, are valid contracts. Indeed, the Terms of Use are a centerpiece of the Complaint, and the Plaintiffs allege that their customers assented to, and that they and the Defendants violated, the Terms of Use. *See, e.g.*, TAC at ¶¶ 28, 36, 39, 44, 98, 103, 119. The Plaintiffs even allege, in Count II (for tortious interference with contract), that "Plaintiffs have valid, existing agreements with their customers concerning the use of Plaintiffs' Platforms." *Id.* at ¶ 126. This factor is satisfied. *See, e.g.*, *Trinidad v. Hilton Grand Vacations, Inc.*, 2024 WL 5483100, at *2 (M.D. Fla. Oct. 1, 2024), *R&R adopted* (explaining that there was a valid arbitration agreement when the parties' agreement satisfied all elements for the formation of a contract).

Regarding the second factor, whether an arbitrable issue exists, the Court "look[s] to the plain language of the arbitration clause to determine its scope." *Professional Consulting Services S.A.S.*, 2024 WL 4103919, at *5 (citation omitted).

Here, under the plain language of the arbitration provisions, each of the Plaintiffs' claims is arbitrable.

First, as noted, the arbitration provision in the Tenant Turner Terms of Use requires arbitration of "any controversies, claims, counterclaims or other disputes between you and us or you and a third-party agent of [Tenant Turner] . . . ." Tenant Turner Terms of Use at Section 16.1. This arbitration provision—which does not even require a nexus between a claim and the Terms of Use, and which simply mandates arbitration of "any" disputes between the signatories—covers the Plaintiffs' claims here. *See, e.g.*, *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1221 (11th Cir. 2000).

The arbitration provision in the ShowMojo Terms of Use likewise requires arbitration of the Plaintiffs' claims. As discussed above, that arbitration provision requires arbitration of any disputes between the signatories "arising out of, in relation to, or in connection with this Agreement," including any claims, "whether in tort, contract, statutory, or otherwise," related to the agreement. ShowMojo Terms of Use at Section 11.1. "[T]he phrase 'arising out of or relating to' the contract has been interpreted broadly to encompass virtually all disputes between contracting parties." *Schatt v. Aventura Limousine & Transp. Serv., Inc.*, 2010 WL 4942654, at *4 (S.D. Fla. Nov. 30, 2010) (citation omitted). Here, the Plaintiffs' claims "arise out of," "relate to," or are "connected to" the Terms of Use because, as noted, each claim relies on the allegation that the Plaintiffs' customers, in alleged concert with the Defendants, violated the confidentiality, access, and security provisions of the Terms of Use. Because these claims directly arise from, or at a minimum relate to, the Terms of Use, the Plaintiffs' claims are arbitrable. *See, e.g.*, *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 758 (11th Cir. 1993), *abrogated on other grounds*; *Olsher Metals Corp. v. Olsher*, 2003 WL 25600635, at *6 (S.D. Fla. Mar. 26, 2003), *aff'd*, 90 F. App'x 383 (11th Cir. 2003); *iDoc Holdings, Inc. v. Goethals*, 2021 WL 2895635, at *4 (S.D. Fla. July 9, 2021).

Third, and finally, the Defendants have not waived their right to arbitration. In determining whether there has been a waiver, the Court must first "decide if,

under the totality of the circumstances, the party has acted inconsistently with the arbitration right." *Sherrard v. Macy's Sys. & Tech. Inc.*, 724 F. App'x 736, 739 (11th Cir. 2018). "This occurs when the party substantially invokes the litigation machinery prior to demanding arbitration." *Id.* The Court must then address "whether, by doing so, that party has in some way prejudiced the other party." *Id.* at 739–40. In assessing prejudice, the Court "may consider the length of delay in demanding arbitration and the expense incurred by" the non-movant. *Id.* at 740.

The Defendants have not waived their right to arbitration within the meaning of these standards. As the docket of the case reflects, the Plaintiffs filed their Complaint in June, and filed a Motion for a Preliminary Injunction (the "PI Motion") on July 1, 2025. D.E. 1, 7. Crucially, over the past few months, the litigation of this case has focused exclusively on the resolution of the Plaintiffs' PI Motion (which the parties agreed to resolve by stipulation) and on the exchange of discovery requests related only to the PI Motion. *See, e.g.*, D.E. 18, 30. Once Defendants filed their initial motion to compel arbitration (D.E. 34), Defendants told Plaintiffs in no uncertain terms that they would not engage in further discovery unless it was for settlement purposes and that they would renew their request for arbitration should Plaintiffs amend their complaint. That is exactly what Defendants have done.

Apart from the fact that the Defendants have not "substantially invoke[d] the litigation machinery" (*Sherrard*, 724 F. App'x at 739), the litigation activity to date is, in fact, consistent with the arbitration provisions, which expressly provide for pre-arbitration injunctive relief, and which expressly state that any such activity will not constitute a waiver of the right to arbitration. *See* Tenant Turner Terms of Use at Section 16.1 ("In addition, you and we retain the right to apply to any court of competent jurisdiction for provisional relief, including . . . preliminary injunctions, *and any such request shall not be deemed incompatible* with these Customer Terms, nor *a waiver of the right to have disputes submitted to arbitration as provided in these Customer Terms*." (emphasis added)); ShowMojo Terms of Use at Section 11.2 (similar).

Moreover, the Plaintiffs cannot show any "prejudice" given that the Defendants brought this motion at the earliest possible opportunity—i.e., their deadline to respond to the Complaint (*see* D.E. 19, D.E. 34) and renewed it once Plaintiffs filed the operative pleading—and given that they have not caused the Plaintiffs to expend substantial resources in prosecuting the case in this Court besides filing initial pleadings. There is, in short, no waiver here. *See, e.g.*, *Lupo v. Winghouse of Daytona Beachside, LLC*, 2013 WL 12161805, at *3 (M.D. Fla. Jan. 25, 2013) (no waiver when the defendants "asserted their right to arbitrate less than four (4) months into this litigation," because the parties had not engaged in substantial discovery; the defendants' actions had been "purely defensive"; and the defendants had not sought affirmative relief); *Bill Gosling Outsourcing Corp. v. Nation Motor Club, LLC*, 2020 WL 209275, at *1 (S.D. Fla. Jan. 14, 2020) (no waiver when the "defendant's first response to the Complaint was the instant Motion to Compel Arbitration"). As a result, all three gateway factors are satisfied.

**2. The Defendants may enforce arbitration under equitable estoppel.**

The Court must next "decide whether non-signatories (like the Defendants)" can enforce the arbitration provisions, a question also controlled by state law. *Pro. Consulting Servs. S.A.S.*, 2024 WL 4103919, at *4. The Eleventh Circuit has recognized that one of the mechanisms by which non-signatories (such as the Defendants) may enforce an arbitration provision is through the doctrine of equitable estoppel. *See, e.g.*, *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1354 (11th Cir. 2017). As this Court has acknowledged, "equitable estoppel exists so that 'a signatory plaintiff [cannot] sue to essentially enforce its rights under a contract and, at the same time, evade an arbitration agreement in the contract, simply by naming as defendants parties who were not signatories to the contract.'" *Pro. Consulting Servs. S.A.S.*, 2024 WL 4103919, at *9 (alteration in original).

Estoppel applies under two circumstances: "*one*, when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the non[-] signatory," or "*two*, 'when

there are allegations of concerted action by both a non[-]signatory and one or more signatories to the contract . . . .'" *Id.* at *7 (emphasis and alterations in original). Notably, either circumstance is sufficient to justify estoppel. *See id.* at *8.

The Court's analysis in *Professional Consulting Services S.A.S.* is instructive here. There, the plaintiff alleged that it entered into a contract with a company, InteRedes, to develop a customer relationship management ("CRM") software for the plaintiff and one of the plaintiff's clients, which software would house proprietary information. *Id.* at *1. The contract contained a confidentiality provision, which generally prohibited the parties from disclosing their confidential information with "third parties," and an arbitration provision. *Id.* The plaintiff further alleged that one of InteRedes's principals, Marin, shared the proprietary data from the CRM software with third-party competitors, in violation of the contract between the plaintiff and InteRedes. *Id.* at *2. The Court held that these facts justified the application of estoppel, allowing the non-signatory defendants to enforce arbitration.

The Court first concluded that "the Plaintiffs 'rely on the terms of the written agreement in asserting [their] claims'" because it was "the Contract—and not some other written instrument or law—that prohibits InteRedes, Marin, and the Defendants from using this information for their own economic benefit." *Id.* at *7 (alteration in original). Indeed, "if the Contract between [the plaintiff] and InteRedes was *never* executed, there wouldn't have been proprietary software for the Defendants to misappropriate and, accordingly, there would be no cause of action for the Plaintiffs to assert against the Defendants." *Id.* at *8 (emphasis in original). The Court alternatively held that estoppel applied based on the second circumstance—concerted, interdependent misconduct—because the Plaintiffs alleged that InteRedes facilitated the misappropriation to the non-signatory defendants. *Id.*

The same result should follow here. As is evident from the face of the Complaint, the Terms of Use (and, specifically, their confidentiality, access, and security provisions) are the genesis of each of the Plaintiffs' claims. Indeed, each count of the Complaint invokes, relies upon, or otherwise references the Terms of Use to support the Plaintiffs' claims. *See, e.g.*, TAC at ¶¶ 110, 112, 119, 129, 136, 145, 166,

175, 194, 203, 212, 234, 248. As in *Professional Consulting*, if the Plaintiffs and their customers had never entered into the Terms of Use, there would be no confidentiality, access, or security obligations to enforce in the first place. *See* 2024 WL 4103919, at *8. Separately, estoppel is appropriate based on allegations of concerted, interdependent misconduct because the Plaintiffs allege that their customers facilitated the misappropriation of confidential information to the Defendants—either knowingly or, as the Complaint alleges, under false pretenses. *See* TAC at ¶ 16. For either of these reasons, estoppel applies. *See Professional Consulting* at *6–*8; *see also, e.g.*, *Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1401–04 (S.D. Fla. 2014) (Scola, J.).

**3. The Defendants may enforce arbitration as signatories based on Plaintiffs' allegations.**

Even if equitable estoppel were unavailable, the Court should still compel arbitration because Plaintiffs now affirmatively allege that Defendants accepted the Terms of Use. TAC at ¶¶ 29, 34, 51(b), 175. Because the three gateway factors have been satisfied and Plaintiffs allege Defendants were signatories, this dispute must be resolved in arbitration.

## <u>THE COURT SHOULD DISMISS THE PLAINTIFFS' CLAIMS</u>

Alternatively, even if the Court does not compel arbitration, it should dismiss the TAC under Rule 12(b)(6).

### A. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022) (cleaned up). "To do so, a facially plausible claim must allege facts that are more than merely possible, and a plaintiff's factual allegations that are merely consistent with a defendant's liability will not be considered facially plausible." *Id.* (same). A claim is "facially plausible" only "'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* "And if allegations are indeed more conclusory than factual," they are not entitled to an assumption of truth. *Id.*

**B. The CFAA, Conversion, and Trespass Claims Fail**

This motion begins by addressing the Plaintiffs' first group of claims, which overlap: violation of the CFAA (Count I); conversion (Count VII); and trespass to chattels (Count VIII). As discussed below, neither of these claims states a cause of action and, accordingly, the Court should dismiss them.

**1. The alleged conduct does not fall within the CFAA as a matter of law.**

The Plaintiffs allege that RentEngine violated two provisions of the CFAA: § 1030(a)(2) and § 1030(a)(4). TAC at ¶ 124.

Although the CFAA is "primarily a criminal statute" (*Power Equip. Maint., Inc. v. AIRCO Power Servs., Inc.*, 953 F. Supp. 2d 1290, 1295 (S.D. Ga. 2013)), the statute provides a private right of action when, as relevant here, the plaintiff has suffered a loss of "at least $5,000 in value[.]" *See* 18 U.S.C. §§ 1030(g), 1030(c)(4)(A)(i)(I). As relevant here, § 1030(a)(2) provides that a CFAA violation occurs when a person "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer[.]" 18 U.S.C. § 1030(a)(2)(C). And § 1030(a)(4) provides that a CFAA violation occurs when a person "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period[.]" Here, the Plaintiffs fail to state a claim under any theory—whether under a theory that RentEngine acted "without authorization" or "exceeded authorized access." *See IBI Grp. (Fla.), Inc. v. B&S Eng'g Consultants, LLC*, 2017 WL 7311866, at *2 (M.D. Fla. June 27, 2017) (CFAA contemplates two types of "accessers").

First, the Plaintiffs have failed to plausibly allege that RentEngine acted "without authorization." Although the CFAA does not define the term "authorization," the Eleventh Circuit has addressed the meaning of the term in

circumstances similar to those alleged here. *See EarthCam, Inc. v. OxBlue Corp.*, 703 F. App'x 803 (11th Cir. 2017). In *EarthCam, Inc.*, similar to here, the plaintiff alleged that the defendant violated the CFAA when it "accessed the account webpage of an EarthCam customer" and "captured and downloaded screenshots of the graphical user-interface running on [the customer's] account webpage." *Id.* at 806. It was undisputed, however, that the customer consensually "provided [the defendant's] personnel his account login credentials to" troubleshoot certain issues on the account. *Id.* The Eleventh Circuit affirmed the district court's grant of summary judgment for the defendant on the CFAA claim. *See id.* at 806–10. The court affirmed the district court's order, first, because the defendant "had accessed the account webpage with [the customer's] authorization." *Id.* at 807. The court also concluded that the defendant's purported violation of the plaintiff's terms of use did not support a CFAA claim, at least, in part, because the terms did not prohibit customers from sharing their login credentials. *See id.* at 807–10.

The same result should follow here, and the Court should dismiss the CFAA claim. First, as in *EarthCam, Inc.*, it is undisputed that the Plaintiffs' customers provided RentEngine with their login credentials, whether for data-migration purposes or any other reason, such as to generate lock-box codes. Either way, RentEngine's use of consensually provided access credentials to access the Plaintiffs' Platforms makes the alleged access "authorized." *See id.* at 807 ("The district court found no CFAA violation given this evidence, reasoning that the OxBlue Defendants had accessed the account webpage with [the customer's] authorization."). Indeed, the Third Circuit recently reached a similar conclusion, holding that an employee's use of consensually provided login credentials from her co-worker did not support a CFAA violation. *See NRA Grp., LLC v. Durenleau*, 2025 WL 2449054, at *9 (3d Cir. Aug. 26, 2025) ("No doubt [employees] violated NRA's policies, but as employees they had access to the systems: [employee 1] by the fact of her employment, and [employee 2] with [employee 1's] credentials. No one hacked anything by deploying code to enter a part of NRA's systems to which they had no access.").

Moreover, as in *EarthCam, Inc.*, the Plaintiffs' Terms of Use did not prohibit the Plaintiffs' customers from creating or sharing access credentials for Defendants. None of the provisions that the Plaintiffs cite in the Complaint prohibits, expressly or even inferentially, the creation or sharing of access credentials. *See* Tenant Turner Terms of Use at §§ 5.2 (customer may not make *license* available to third party), 5.4 (customer may not use the Platform to develop a competing product or service), 14.1 (customer may not attempt to discover "the source code or underlying algorithms or know-how of any of the Site"), 8.1 (confidentiality provision, prohibiting parties from disclosing each other's "Confidential Information"), 9.2 (Tenant Turner retains all ownership rights over the Platform); *see also* ShowMojo Terms of Use at §§ 2 ("Permitted Use and User Content," which does not prohibit sharing of access credentials, despite prohibiting multiple other activities), 6 (customer may not exploit ShowMojo's information for commercial use without a license agreement). Accordingly, the Plaintiffs may not use the purported breach of the Terms of Use to bolster their CFAA claim when, as they allege here, the Defendants accessed the Platforms with the customers' access credentials and, thus, when they acted with authorization. *See EarthCam, Inc.*, 703 F. App'x at 807; *Durenleau*, 2025 WL 2449054, at *9. In sum, RentEngine's alleged use of consensually provided access credentials is not an "unauthorized" access within the meaning of the CFAA.

Second, however couched, the Plaintiffs' CFAA claim is based on conduct that is not within the scope of the statute. The essence of the Plaintiffs' CFAA claim is that the customers improperly—whether knowingly or under the Defendants' "false pretenses"—shared or created access credentials for RentEngine, in violation of the Terms of Use. But the Supreme Court has held that this conduct—which relates not to the issue of authorized access, but to the improper *use* of information to which a person has authorized access—does not violate the CFAA. In *Van Buren*, the Supreme Court, in interpreting the phrase "exceeds authorized access" in the CFAA, held that the statute does not apply to allegations concerning the improper use of (rather than unauthorized access to) information: "In sum, an individual 'exceeds authorized access' when he accesses a computer with authorization but then obtains information

located in particular areas of the computer—such as files, folders, or databases—that are off limits to him." *Van Buren v. United States*, 593 U.S. 374, 396 (2021). The statute does not apply, however, when the accesser is authorized to access the information, "even though he obtained information . . . for an improper purpose." *Id.*

Here, the Plaintiffs allege that their customers had authorized access to all relevant portions of the Platforms, and their CFAA violation centers on the assertion that the customers effectively misappropriated the Plaintiffs' information by sharing their credentials with RentEngine, in violation of the Terms of Use. These allegations do not state a CFAA claim as a matter of law. *See id.*; *United States v. Nosal*, 676 F.3d 854, 864 (9th Cir. 2012) (affirming dismissal of indictment for aiding-and-abetting violation of the CFAA because the defendant's "accomplices had permission to access the company database and obtain the information within," which did not satisfy the definition of "'without authorization, or exceeds authorized access'" as a matter of law); *Oracle Am., Inc. v. Serv. Key, LLC*, 2012 WL 6019580, at *5 (N.D. Cal. Dec. 3, 2012) (dismissing CFAA claims under § 1030(a)(2) and (a)(4) because, although the defendant allegedly misappropriated information, the plaintiff alleged that the defendant was authorized to access the information); *Frady*, 2015 WL 1470852, at *11 (M.D. Fla. Mar. 31, 2015) (similar).

**2. The conversion and trespass-to-chattels claims fail.**

Counts VII and VIII of the Complaint respectively allege claims for conversion and trespass to chattels against RentEngine. To state a conversion claim, a plaintiff must plausibly allege "an 'act of dominion wrongfully asserted over another's property inconsistent with his ownership therein.'" *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009). Similarly, for trespass to chattels, the plaintiff must plausibly allege "'the intentional use of, or interference with, a chattel which is in the possession of another, without justification.'" *Bland v. United States*, 2019 WL 13215052, at *3 (M.D. Fla. June 14, 2019) (these torts are "essentially the same").

Each of these claims is based on the same conduct underlying the Plaintiffs' CFAA claim: i.e., the Defendants' allegedly unauthorized access to the Platforms. *See, e.g.*, TAC at ¶¶ 194, 205. Because the Plaintiffs have failed to plausibly allege that

the Defendants acted without authorization or in excess of authorization for all of the reasons shown above, these derivative claims necessarily fail to state a claim. *See, e.g.*, *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 838–39 (N.D. Cal. 2014) (trespass-to-chattels claim was insufficient when it was "based on [] alleged unlawful conduct with regard to the CFAA," which did not state a claim).

**C. The Trade-Secret Claims Fail.**

The legal analysis under both the DTSA and FUTSA is similar; to survive a motion to dismiss, a plaintiff must plausibly allege that (1) it possessed trade secrets it took reasonable steps to protect secrecy; and (2) that the defendant misappropriated those trade secrets. *Decurtis LLC v. Carnival Corp.*, 2021 WL 1968327, at *4 (S.D. Fla. Jan. 6, 2021), *R&R adopted as modified*, 2021 WL 1540518 (S.D. Fla. Apr. 20, 2021).

**1. Plaintiffs fail to allege they possessed trade secrets and reasonably kept them secret.**

To survive a motion to dismiss, a plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate the trade secret from matters of general knowledge in the trade." *Id.* (cleaned up). "All information concerning a product is not a trade secret." *VVIG, Inc. v. Alvarez*, 2019 WL 5063441, at *4 (S.D. Fla. Oct. 9, 2019) (same). And a plaintiff cannot satisfy its burden by providing a broad definition and following it with more specifics because "[c]ouching specific terms within a sweeping definition" fails to notify Defendants of "which trade secret or secrets they allegedly misappropriated." *Id.* In other words, a plaintiff can only survive a motion to dismiss when a complaint identifies trade secrets related to something specific, like a specific client, a specific project or a specific customer. *Decurtis*, 2021 WL 1968327, at *7; *Taxinet, Corp. v. Leon*, 2018 WL 3405243, at *3 (S.D. Fla. July 12, 2018). For example, in *Decurtis*, the court granted the defendant's motion to dismiss, where Plaintiff merely mentioned "broad categories of information" associated with project Trident such as "software, prototypes, hardware, database structures, operations procedures, and testing plans." *Decurtis*, 2021 WL 1968327, at *7. And in *Taxinet*, Judge Moreno granted a motion to dismiss where the

complaint defined the trade secrets as "confidential business information, processes, techniques, software applications, and business characteristics"; even though the plaintiff described his products with specificity "Taximeter, GPS Navigation System, a Tracking System with a panic button, a Payment Gateway for credit cards, and a future booking system", the trade secret claims still failed because plaintiff did "not lay out ... which of these 'trade secrets' were impermissibly used[.]" *Id.* (alterations added).

Plaintiffs' purported categories fail to identify protectible trade secrets because they are the kinds of "broad categories of information" that do not put Defendants on notice of what, specifically, they are alleged to have misappropriated. Here, Plaintiffs' theory is, in substance, that Defendants misappropriated Plaintiffs' entire platform. They define their alleged trade secrets as their "password-protected and confidential features, data flows, user interfaces and functional tools embedded within [their Platforms] that comprise [their] proprietary and trade secrets ***including without limitation***" (TAC at ¶ 59), then list five sweeping categories that, taken together, amount to the whole platform. Just as the courts in *DeCurtis* and *Taxinet* dismissed trade-secret claims where the alleged secrets were defined at too high a level of generality (even where plaintiffs gestured at "specific characteristics of the business model"), so too should this Court dismiss counts premised on similarly overbroad, platform-wide descriptions. The TAC falls short because it effectively alleges that everything connected to the "logic" of Plaintiffs' Platforms is secret—an assertion of secrecy by label rather than by particularized identification. That is insufficient.

In addition, the appearance and functionality of Plaintiffs' software—*i.e.*, the five categories alleged above—cannot constitute trade secrets where hundreds, if not thousands, of users can see, use, share, and discuss those features in the ordinary course. Put simply, "[t]hings that any user or passer-by sees at a glance," including the program features Plaintiffs identify in paragraph 59, are not trade secrets. *Fin. Info. Techs., LLC v. iControl Sys., USA, LLC,* 21 F.4th 1267, 1273 (11th Cir. 2021) ("But aspects of computer software that *are* readily ascertainable don't qualify [as trade secrets]."); *Warehouse Sols., Inc. v. Integrated Logistics, LLC*, 2014 WL

12647878 (N.D. Ga. Jul. 7, 2014), *aff'd,* 610 F. App'x 881 (11th Cir. 2015) ("Other courts have similarly distinguished between source code and the visible output of a software program and concluded that the appearance and functionality of the software program are not trade secrets."); *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) ("[D]etails that ordinary users of the software could observe without reverse engineering" are not trade secrets.).

And Plaintiffs cannot plausibly argue that confidentiality or use provisions in their Terms of Use somehow transformed readily ascertainable software features into trade secrets. As one court put it, if Plaintiffs "had wanted to ensure that its users understood the highly counterintuitive notion that its trade secrets encompassed information that was readily discernable by—or freely disclosed to—each and every [software] user, it would have been reasonable to do something more to notify users of the software's confidentiality" than simply requiring assent to a clickwrap Terms of Use with a confidentiality provision. *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 521 (S.D.N.Y. 2017). In short, even under the most generous reading of the complaint, Plaintiffs allege only that the outward-facing, visible output of their software Platforms—seen and used by thousands of individuals every day—constitutes a trade secret. That is not protectible as a matter of law.

**2. Plaintiffs fail to proffer any non-conclusory factual allegations that Defendants misappropriated Plaintiffs' trade secrets.**

Even if Plaintiffs had identified protectible trade secrets (they have not), their claims would still fail because, under both DTSA and FUTSA, a plaintiff must plead factual allegations showing a defendant misappropriated a specific trade secret—not a generalized assertion that a competitor took "the platform" or its overall "logic."

To show misappropriation, a plaintiff needs to plead factual allegations showing that a trade secret was acquired, disclosed, or used. *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 (11th Cir. 2020). Here, Plaintiffs do not plead facts showing that Defendants acquired, disclosed, or used any trade secret. This is not a typical "employee-departs-and-takes-files" case—there is no allegation that Stringfellow worked for Plaintiffs, extracted proprietary information, and used it to

launch a competing software company. The allegations suggest the opposite: Defendants built an independent platform and accessed Plaintiffs' systems only to assist customers who chose to switch. At most, Plaintiffs claim that upon "information and belief," RentEngine "exploited" customer credentials to "accelerate the scope and timing of their own competing software." TAC at ¶¶ 8, 77. In other words—as their "upon information and belief" allegations underscore—Plaintiffs have no facts identifying what Defendants supposedly took, how they supposedly took it, or whether it was ever used at all. They plead no comparison between their products and Defendants' software, and no allegation that any RentEngine developer downloaded, copied, or used anything from Plaintiffs. At bottom, Plaintiffs recast potential viewing of a website as "misappropriation," but that does not state a claim as a matter of law. *See PrismHR, Inc. v. Worklio,* 2019 WL 13189471, at *6 (S.D. Fla. Feb. 8, 2019) ("[I]t is not clear from the Complaint how [defendant] misappropriated the Trade Secrets. There is no allegation that [defendant] actually used the Trade Secrets … Access does not mean acquisition."); *Am. Registry, LLC v. Hanaw*, 2013 WL 6332971, at *4 (M.D. Fla. Dec. 5, 2013) (dismissing trade-secret claim where complaint was devoid of facts that defendants used the trade secrets in developing competing company); *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 568 F. Supp. 2d 1369, 1377 (M.D. Fla. 2008) (finding that access alone without use was insufficient to allege misappropriation).

**3. The common law claims are preempted to the extent they overlap with the trade-secret claims.**

Any common law claims that rest on the same nucleus of allegations as Plaintiffs' trade secret misappropriation theories are preempted under FUTSA. *Measured Wealth Priv. Client Grp., LLC v. Foster*, 2020 WL 3963716, at *5 (S.D. Fla. July 13, 2020). That inquiry requires a claim-by-claim analysis to determine whether each common-law theory targets the same "underlying wrong" as the FUTSA claim. *Id.* The tortious interference count, Count II, is preempted under FUTSA because the gravamen of that count is that Defendants induced customers to share or create login credentials and then used those login credentials to "exploit" access and use Plaintiffs'

proprietary information. TAC at ¶ 133; *Measured Wealth*, 2020 WL 3963716, at *6 ("[A] muckle of cases support[] dismissal of tortious interference claims as preempted."). Similarly, the unjust enrichment claim (Count III, ¶ 138), the conversion claim (Count VII, ¶ 195), and the trespass claim (Count VIII, ¶ 206) are indistinguishable from the FUTSA claim and should also be dismissed. *New Lenox Indus., Inc. v. Fenton*, 510 F. Supp. 2d 893, 910 (M.D. Fla. 2007) (unjust enrichment preempted); *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1295 (S.D. Fla. 2018) (conversion preempted). The fraud claim (Count IX, ¶ 223) is also preempted as the gravamen of that claim is that Defendants used deception to enter the Platforms and then "received proprietary and confidential customer lists, customer preferences, product features" as a result. *Id.* Finally, the portions of the FDUTPA claim (Count V, ¶ 169) and Unfair Competition claim (Count VI, ¶ 178) that relate to misappropriation of trade secrets are also preempted. *Sentry Data Sys., Inc.*, 361 F. Supp. 3d at 1295 (dismissing FDUTPA and unfair competition claims that were like those here: based on the taking of the "same trade secrets and proprietary information as the misappropriation of trade secret claims."). Those portions of the FDUTPA and Unfair Competition claims related to false advertising fail for the reasons set forth in the next section.

***

Because Plaintiffs define trade secrets at a platform-wide level (largely describing visible outputs available to ordinary users), plead only conclusory "information and belief" allegations of acquisition or use, and then recycle that same misappropriation theory across their remaining tort counts, the DTSA and FUTSA claims fail and the overlapping portions of the other claims are preempted.

**D. The False Advertising Claims Fail.**

The Plaintiffs' claims under the Lanham Act and FDUTPA share substantially similar elements. *KeyView Labs v. Barger*, 2020 WL 8224618, at *8 (M.D. Fla. Dec. 22, 2020). To prevail on a Lanham Act false advertising claim, a plaintiff must establish: (1) the challenged advertisements were false or misleading, (2) the advertisements deceived, or had the capacity to deceive, consumers, (3) the deception

was material to purchasing decisions, (4) the misrepresentation affected interstate commerce, and (5) the plaintiff suffered, or is likely to suffer, injury as a result. *Id.*

The claims fail at the outset because none of the allegedly "false" statements is actionable. Statements of opinion or puffery are not actionable under the Lanham Act, FDUTPA, or Florida common law. *Warren Tech., Inc. v. UL LLC*, 962 F.3d 1324, 1328 (11th Cir. 2020). When read in context, RentEngine's Blog Posts are nothing more than "highly subjective claims of product superiority" that constitute classic commercial puffery. *KeyView Labs, Inc.*, 2020 WL 8224618, at *10 (collecting cases). The Plaintiffs' own allegations confirm as much: they complain that RentEngine described the Plaintiffs' Platforms as offering only "basic" reports and scheduling (rather than "comprehensive" or "advanced"), a "limited" API (rather than "full"), and a CRM that was merely a "list of leads" instead of a "smart" CRM. TAC at ¶¶ 79-90. These comparative assertions are quintessential puffery—precisely the type of claims courts consistently hold non-actionable in order to avoid chilling commercial speech.

The claims also fail because the Plaintiffs do not allege that any customers actually saw, read, or relied upon the Blog Posts. Both the Lanham Act and FDUTPA require allegations that the challenged statements deceived consumers and materially affected purchasing decisions. *N. Am. Med v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008). The Eleventh Circuit has dismissed similar claims where plaintiffs could not identify a single consumer exposed to the allegedly misleading statements. *Pop v. Lulifama*, 145 F.4th 1285, 1292 (11th Cir. 2025) (affirming dismissal where plaintiff "did not identify a single Instagram post that he or any putative class members saw and relied upon"). The Plaintiffs' failure to identify even one consumer who saw the posts underlying both their Lanham Act and FDUTPA claims is independently fatal.

The FDUTPA claim also fails because the Plaintiffs allege no consumer harm. Although a plaintiff need not be a consumer to bring a FDUTPA claim, it must still allege an injury to consumers. *Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 212 (Fla. 4th DCA 2019). The only supposed consumer harms alleged are vague references to "confusion among members of the consuming public" and the possibility

that the Plaintiffs' customers could face "potential legal liability" under the Plaintiffs' own Terms of Use. TAC at ¶¶ 163, 166. The Plaintiffs plead no actual instance of confusion, and speculative "potential liability" contingent on the Plaintiffs' own enforcement decisions does not qualify as consumer harm.

Nor do the Plaintiffs allege recoverable damages. The only damages even arguably pled—"diverted sales and harmed goodwill"—are consequential damages, which are not recoverable under FDUTPA. *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1352 (S.D. Fla. 2017). The Plaintiffs do not allege any diminution in the market value of their Platforms—the proper measure of damages under FDUTPA—and therefore cannot state a claim.

Finally, the Plaintiffs' common law unfair competition claims (to the extent they stem from false advertising) fail for the same reasons. Each rests on the same allegedly false Blog Posts that the Plaintiffs do not and cannot allege were ever seen by consumers. Courts apply the same analysis across Lanham Act, FDUTPA, and common law unfair competition claims. *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012).

In short, because the statements at issue are non-actionable puffery, because the Plaintiffs fail to allege consumer reliance, consumer harm, or recoverable damages, and because their common law claims (to the extent they are founded on false advertising) rise and fall with their statutory claims, the Plaintiffs' Lanham Act, FDUTPA, and unfair competition claims all fail as a matter of law and should be dismissed.

## CONCLUSION

For the above reasons, the Court should compel arbitration of this dispute or, alternatively, dismiss the Plaintiffs' Complaint under Rule 12(b)(6).

**CERTIFICATE OF CONFERRAL**

We hereby certify that, we conferred by email and multiple phone calls with the Plaintiffs' counsel regarding the motion to compel arbitration. The Plaintiffs oppose this request.

Dated: December 12, 2025
Miami, Florida

Respectfully submitted,

**NEIMAN MAYS**
**FLOCH & ALMEIDA, PLLC**

**Brandon S. Floch**
**Bryan A. Almeida**

Brandon S. Floch, Esq.
Florida Bar No. 125218
bfloch@nmfalawfirm.com
Bryan A. Almeida, Esq.
Florida Bar No. 1005558
balmeida@nmfalawfirm.com

201 S. Biscayne Blvd., Suite 1300
Miami, Florida 33131
Telephone: (305) 434-4943

**MARCUS RASHBAUM**
**PINEIRO & MEYERS LLP**

Michael A. Pineiro, Esq.
Florida Bar No. 41897
mpineiro@mrpfirm.com

One Biscayne Tower
2 S. Biscayne Blvd., Ste. 2530
Miami, Florida 33131
Telephone: (305) 400-4260

*Counsel for the Defendants*