**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 1:25-cv-22939**

TENANT TURNER, INC. and
SHOWMOJO, LLC,

*Plaintiffs*,

v.

THRESHOLD TECHNOLOGY LLC d/b/a
RENTENGINE and ALEXANDER
STRINGFELLOW,

*Defendants.*

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS MOTION TO COMPEL ARBITRATION**
**OR, ALTERNATIVELY, TO DISMISS THE PLAINTIFFS' COMPLAINT**

Tenant Turner, Inc. ("Tenant Turner") and ShowMojo, LLC ("ShowMojo," and together with Tenant Turner, "Plaintiffs"), bring their opposition to Threshold Technology LLC d/b/a RentEngine ("RentEngine") and Alexander Stringfellow's ("Stringfellow," and together with RentEngine, "Defendants") Motion (the "Motion") To Compel Arbitration or, Alternatively, To Dismiss the Plaintiffs' Third-Amended Complaint (the "Complaint"). (ECF No. 63).

## INTRODUCTION

Plaintiffs' 45-page Complaint details Defendants' orchestrated scheme to masquerade as Plaintiffs' customers, unlawfully access Plaintiffs' secure, password-protected software platforms ("Plaintiffs' Platforms"), and misappropriate confidential and proprietary information to build a competing service. Defendants contend Plaintiffs failed to sufficiently state a claim.

Defendants' motion fundamentally misapprehends the applicable legal standard and mischaracterizes the substance of the Complaint. At the motion to dismiss stage, the sole question is whether Plaintiffs have alleged sufficient facts to state a claim—not whether improperly submitted extrinsic materials cherry-picked by Defendants support Plaintiffs' claims or Defendants' alternative narrative. Defendants repeatedly stray beyond the four corners of the Complaint, introduce disputed facts, and attempt to reframe their conduct as lawful competition or permitted customer migration (which it was not). The law is clear: on a motion to dismiss, the Court must accept Plaintiffs' allegations as true and draw all reasonable inferences in Plaintiffs' favor. Applying that standard, the Motion must be denied.

**Plaintiffs' Trade Secret Claims**: Defendants claim Plaintiffs have not sufficiently identified any protectable trade secret. But Plaintiffs' Complaint identifies with specificity the categories of confidential, proprietary information and trade secrets misappropriated by Defendants, including:

- [redacted];
- [redacted];
- [redacted];
- [redacted];
- [redacted].

Complaint, at ¶¶ 41, 59.a.–59.e, 75–76, 79, 96–98, 138, 192, 197, 223, and 235.

Within each category, Plaintiffs set forth detailed descriptions of the types of information misappropriated, allege that these trade secrets are not publicly available, are protected by technical and contractual safeguards, and derive substantial economic value from their secrecy. Complaint, at ¶¶ 233–234 and 247–248. At this stage, Plaintiffs need only give Defendants reasonable notice of the asserted trade secrets, and the Complaint easily meets this standard.

Additionally, Plaintiffs allege that Defendants, through a systematic campaign of deception by disguising themselves as Plaintiffs' customers and using the customers' login credentials without authorization, accessed, acquired, and used these trade secrets to accelerate RentEngine's competitive development, replicate Plaintiffs' Platforms proprietary features, and unfairly compete in the marketplace. Complaint, at ¶¶ 236–238 and 249–251. Defendants' impermissible access and use of this material, achieved through subterfuge, form the basis of Plaintiffs' federal and state trade secret claims. Plaintiffs also detail how Defendants' false representations and unauthorized

activities extended beyond any legitimate migration process, undermining Plaintiffs' customer relationships and business goodwill. Complaint, at ¶¶ 62–78, 109–110, 236, and 249.

**<u>Claims of Deception and Improper Access</u>**: Defendants argue their access to Plaintiffs' Platforms was authorized. However, the Complaint also extensively details Defendants' improper access and deceptive conduct (*see, e.g.*, Complaint, at ¶¶ 6, 34, 44–51, 109–110, and 213–226), including:

- Soliciting Plaintiffs' customers to provision competitor-controlled user accounts for RentEngine's benefit; (Complaint, at ¶¶ 1, 109–110, 236, and 249)
- Registering user accounts using fake, spoofed, and alias email addresses (including intentionally deceptive domains such as "@simplelogin.com" and "@8alias.com") to evade detection and circumvent domain-blocking protections implemented by Plaintiffs; (Complaint, at ¶¶ 48 n.8, 49 n.9, 50 n.10, 129 n.17, 196, 217, 219, and 236)
- Fraudulently accepting Plaintiffs' Terms of Use while concealing their true identity and purpose—gaining access to information Defendants were barred from obtaining; (Complaint, at ¶¶ 34, 38, 51, and 175) and
- Extracting confidential business information, monitoring internal notices, diverting customer leads, and publishing misleading public statements derived from non-public insights. (Complaint, at ¶¶ 1, 7, 64, 88, 137, 173, and 250).

Defendants' actions go far beyond ordinary business practices or mere customer attrition; they reflect systematic, intentional deception to bypass Plaintiffs' contractual and technical safeguards. Rather than directly address these allegations, Defendants invite the Court to resolve factual disputes and consider extrinsic evidence at the pleading stage—a request that is legally improper.

Defendants' attack on Plaintiffs' CFAA claim likewise fails, as it is contradicted by both the allegations and express Terms of Use prohibiting unauthorized access and credential sharing. *See* Complaint, at ¶¶ 6, 9, 51, 53–55, 109, 129 n.17, 196, and 217.

Defendants' motion to compel arbitration is equally unavailing. Plaintiffs never agreed to arbitrate disputes with a disguised competitor, and any purported agreement was procured by fraud,

rendering it unenforceable. For these reasons, and as set forth herein, Plaintiffs' Complaint easily surpasses the governing pleading threshold for each claim and withstands Defendants' motion to dismiss or compel arbitration.

Lastly, Defendants' suggestion that Plaintiffs have over-amended the Complaint is unfounded. The First-Amended Complaint (ECF No. 28) was filed to correct a scrivener's error in the caption (ECF Nos. 22, 26, and 28); the Second Amended Complaint (filed as of right) added claims based on newly discovered facts during expedited discovery, which included additional claims for improper acquisition and use of Plaintiffs' trade secrets (ECF No. 43); and the Third Amended Complaint (ECF No. 57) was filed pursuant to a joint schedule (ECF No. 55) following additional revelations concerning Defendants' misconduct.

Plaintiffs respectfully submit the Court should deny Defendants' Motion in full.

## I. PLAINTIFFS SUFFICIENTLY PLED THEIR CLAIMS

### A. Legal Standard

To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), a complaint "must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Wainberg v. Mellichamp*, 93 F.4th 1221, 1224 (11th Cir. 2024). Stated differently, Plaintiffs must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For purposes of a court's review, allegations in a complaint are accepted as true and are construed in the light most favorable to the plaintiff. *Newbauer v. Carnival Corp.*, 26 F.4th 931, 933 n.1 (11th Cir. 2022).

### B. The CFAA, Conversion, and Trespass Claims Are Sufficiently Pled

#### 1. Plaintiffs Pled "Without Authorization" and "Exceeded Authorized Access"

Contrary to Defendants' argument, Plaintiffs alleged Defendants acted "without

authorization" or that Defendants "exceeded authorized access." *See, e.g.*, Complaint, at ¶¶ 4, 6, 9–10, 45, 48, 51, 54–58, 109–23, 165, 169–70, 178–79 and 226. Defendants' reliance on *EarthCam, Inc. v. OxBlue Corp.*, 703 F. App'x 803 (11th Cir. 2017) to suggest Defendants' access to Plaintiffs' Platforms did not violate the CFAA is misplaced. There, the court's holding that no CFAA violation occurred, *id.* at 810, was predicated on the initial finding that (1) the relevant agreement permitted customers to share licenses and (2) the defendants lacked notice of any prohibition. *Id.* at 807. The opposite is true here.

By contrast, here, Plaintiffs' Terms of Use expressly prohibit the sharing of login credentials. *See* Tenant Turner Customer Terms §§ 5.2 ("This license is limited to you, and ***you may not*** resell it, assign it, sublicense it, lease it or ***otherwise make it available to any third party***." (emphasis added)), 8.1;[1] ShowMojo Terms of Use §§ 2, 2.c., 2.e., 2.f., 2.g. 2.j., 2.k, 4, and 6.[2]

[1] "Non-Disclosure. Each party agrees to regard and preserve as confidential all information related to the business and activities of the other party, which may be obtained by such party from any source or may be developed as a result of the Services, including financial and business information, strategy, trade secrets, know-how, technical information, specifications, past, present and future operations, partner, client, and supplier identities, and other non-public information, whether tangible, intangible, visual, electronic or otherwise, together with notes, analysis, compilations, studies and/or other documents prepared by a party, its directors, officers, employees, agents and representatives based upon, containing or otherwise reflecting such information ("**Confidential Information**"). Each party agrees to hold the Confidential Information of the other in trust and confidence and shall not disclose such information to any person, firm or enterprise, or use (directly or indirectly) any such information for its own benefit or the benefit of any other party. Even when disclosure is permitted, each party agrees to limit access to and disclosure of the other party's Confidential Information to its employees on a 'need to know' basis only. . . ."

[2] "Content on this site or content controlled by ShowMojo is provided solely for your personal, non-commercial use. Such content may not be framed, copied, reproduced, republished, uploaded, posted, transmitted, distributed, scraped, spidered and/or exploited in any way, including by email or other electronic means for commercial use without proper license agreements with ShowMojo. Such use of the content is considered theft and will be prosecuted. . . . The selection, arrangement, and layout of the Services is the sole and exclusive property of ShowMojo, and any unauthorized copying, public display, public performance, distribution, or derivation, whether in whole or in part, is expressly prohibited."

Defendants repeatedly accepted these Terms of Use (*see* Complaint ¶¶ 28, 29, 34, 39, and 51) and were aware of the prohibitions, as evidenced by their efforts to evade detection by using spoofed domains and email accounts. *See, e.g.*, Complaint ¶¶ 48 n.8, 51, 129 n.17, 196, 219, 220, and 236. Even further, in their Motion, Defendants acknowledge the Complaint alleges Defendants were signatories of the Terms of Use, do not dispute they are signatories to the Terms of Use, and even seek to enforce these Terms of Use *as signatories*. Motion, at p. 14.

*EarthCam* is therefore inapposite. By contrast, *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 229 F.Supp.3d 1284 (S.D. Fla. 2017) (Moreno, J.) is directly on point. There, the court denied a motion to dismiss CFAA claims where, as here, the defendants knowingly facilitated access in violation of the parties' agreements and internal restrictions even though the customers who accessed the plaintiff's computers did so using credentials provided consensually by the defendant. The court explained that the "fact that the consumers themselves were unaware that their actions were unauthorized is immaterial because the [operative complaint] alleges that the [defendant] knew that the [violative act] was not authorized." *Id.* at 1297.

The parallels are direct. Plaintiffs allege that Defendants: (1) using deception, secured and used credentials from the Targeted Customers (Plaintiffs' customers, as defined in the Complaint) including fraudulent user accounts, spoof domains, and concealed identities, knowing such access was *not* permitted under the Terms of Use (Complaint ¶¶ 6, 9, 51, 53–55, 109, 129 n.17, 196, and 217); (2) extracted confidential business and technical information for their own competitive advantage, aware that their conduct was expressly prohibited (Complaint ¶¶ 7, 137, 173, 197, and 207); and (3) sought to justify their conduct by asserting "customer permission"—the same argument rejected in *Tracfone* (Complaint ¶¶ 51, 55–58, 63, 70, 98, 109–10, and 196). As in *Tracfone*, Plaintiffs' factual allegations establish that Defendants knowingly exceeded

authorized access for their own benefit, satisfying the CFAA pleading standard and precluding dismissal.

**2. Consent Does Not Make Access Authorized**

Defendants' reliance upon *Van Buren v. United States*, 593 U.S. 374 (2021) is misplaced. Defendants argue that because Targeted Customers *consensually* provided login credentials to Defendants, their access was *authorized*. This is incorrect. Targeted Customers do not have unrestricted rights to Plaintiffs' Platforms; their licenses are expressly limited and restricted to the paying Targeted Customer who "*may not . . . make it available to any third party*." Tenant Turner Customer Terms § 5.2; *see also* ShowMojo Terms of Use § 6 ("Content on this site or content controlled by ShowMojo is provided solely for your personal, non-commercial use. Such content may not be . . . exploited in any way, . . . *without proper license agreements with ShowMojo*.") (emphasis added).

Thus, *consent* from licensees is immaterial where those customers themselves lacked authority to extend access. Consent from the licensor is what matters. The scope of the customers' authorization does not allow sharing with Defendants or any third party without the appropriate license. Defendants never possessed any such license. Accordingly, Defendants' access was unauthorized by the terms of Plaintiffs' Terms of Use and within the meaning of the CFAA. Even assuming *arguendo* Defendants had some initial authorization for migration activity from the Targeted Customers (which, again, was not consent from Plaintiffs), the Complaint alleges Defendants also exceed any permitted access misappropriating non-public information for competitive purposes. Complaint ¶¶ 45, 62, 66, 110, 236, and 249.

Because Defendants' challenge to Plaintiffs' conversion and trespass-to-chattel claims are predicated on the same unauthorized access arguments, Plaintiffs' conversion and trespass-to-

chattel claims are likewise sufficiently pled.

### C. The Trade Secret Claims Are Sufficiently Pled

Defendants incorrectly argue that: (1) Plaintiffs do not allege protectable trade secrets or reasonable efforts to maintain secrecy; (2) Plaintiffs do not allege Defendants misappropriated trade secrets; and (3) Plaintiffs' common law claims (tortious interference with contract, unjust enrichment, trespass to chattels, fraud, FDUTPA, and unfair competition) are preempted. Each of these arguments fail. Defendants' reliance on extrinsic evidence, including Plaintiffs' Vimeo channel, is also improper at the motion to dismiss stage.

#### 1. Plaintiffs' Trade Secret Claims Are Sufficiently Pled

Defendants claim Plaintiffs fail to identify their trade secrets with sufficient specificity. This is incorrect. "To survive a motion to dismiss, 'the plaintiff need only allege sufficient facts to plausibly show a trade secret was involved and to give the defendant notice of the material it claims constituted a trade secret.'" *Taxinet, Corp. v. Leon*, 2018 WL 3405243, at *3 (S.D. Fla. July 12, 2018) (Moreno, J.). Plaintiffs' trade secrets are not "broadly defined" or provided via a "vague list" as Defendants suggest. Motion, at p. 5. Defendants' arguments focus on only the titles of categories that Plaintiffs divide their secrets into, and ignore that the categories include the following detailed allegations:

(1) [redacted]

(2) [redacted]

[redacted];

(3) [redacted];

(4) [redacted]; and

(5) [redacted]

Complaint, at ¶ 59.a.–59.e. Plaintiffs' thorough account of each category places Defendants on sufficient notice of "what aspect" of the trade secret they misappropriated. *VVIG, Inc. v, Alvarez*, 2019 WL 5063441, at *4 (S.D. Fla. Oct. 9, 2019) (Altonaga, J.).

Moreover, Defendants' cited caselaw is easily distinguished. In *VVIG, Inc. v. Alvarez*, the Court determined the plaintiff had not alleged their trade secret with sufficient particularity as "[s]imply put, 'all information' concerning a product is not a trade secret." 2019 WL 5063441, at *3 (internal citation omitted). Plaintiffs do not consider "all information" on their Platforms as trade secrets, but rather the Complaint discusses five discrete components of their Platforms (which they have taken extraordinary measures to protect) and the Complaint provides specific parameters for what constitutes a trade secret within each. On that basis, Defendants have been appropriately apprised of what aspects of Plaintiffs' trade secrets they misappropriated.

Defendants also rely on *Decurtis LLC v. Carnival Corp.*, 2021 WL 1968327 (S.D. Fla. Jan. 6, 2021) (Torres, M.J.), *R&R adopted as modified*, 2021 WL 1540518 (S.D. Fla. Apr. 20, 2021) (Scola, J.) and *Taxinet*, 2018 WL 3405243. In *Decurtis*, the court dismissed plaintiff's trade secret

claims as the purported trade secrets were "financial, business, scientific, technical, economic, and engineering information." 2021 WL 1968327, at *4. Similarly, the *Taxinet* court dismissed trade secret claims, which included "confidential business information, processes, techniques, software applications, and business characteristics, including present, future, and proposed services, and business model." 2018 WL 3405243, at *3. Defendants argue that Plaintiffs' articulation of its trade secrets is general like in *Decurtis* and *Taxinet*, however, the Complaint is much more specific than was the case in *VVIG*, *Decurtis*, or *Taxinet*. *See* Complaint, at ¶ 59.

Unlike the generalities rejected in Defendants' cited cases, here, the Complaint details each trade secret, the protections afforded, and why they qualify as such. Defendants' attempt to recast these as "broad titles" ignores the granular allegations provided. Further, the Complaint's trade secret allegations demonstrate that Defendants' misappropriation granted them a significant and unfair head start, directly to Plaintiffs' detriment. Rather than honestly and independently developing RentEngine, Defendants circumvented the substantial time, expense, and experimentation required to create features comparable to those in Plaintiffs' Platforms. Complaint, ¶¶ 7–8, 98–99, 233, 240, and 247. The costs avoided by Defendants as a result of their misappropriation underscore the considerable economic value of Plaintiffs' trade secrets.

Defendants' characterization of the asserted trade secrets as merely "readily ascertainable software features" is unsupported. Defendants do not cite to a single case decided on a 12(b)(6) motion to support their argument and Defendants also rely upon out-of-circuit, non-controlling caselaw. *See Warehouse Sols., Inc. v. Integrated Logistics, LLC*, 2014 WL 12647878 (N.D. Ga. July 7, 2014) (summary judgment), *aff'd*, 610 F. App'x 881 (11th Cir. 2015) (same); *Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*, 21 F.4th 1267 (11th Cir. 2021) (appeal of motion for new trial, judgment as a matter of law, and permanent injunction); *IDX Sys. Corp. v. Epic Sys. Corp.*,

285 F.3d 581 (7th Cir. 2002) (reviewing grant of summary judgment); *Broker Genius, Inc. v. Zalta*, 280 F.Supp.3d 495 (S.D.N.Y. 2017) (preliminary injunction).

Eleventh Circuit authority does not endorse Defendants' categorical view that "visible outputs" can never be trade secrets. To the contrary, courts have recognized that where users are licensees subject to applicable terms of use, disclosure of program specifications to those users does not *per se* forfeit trade-secret protection. *See, e.g.*, *AirWatch LLC v. Mobile Iron, Inc.*, 2013 WL 4757491, at *4 (N.D. Ga. Sept. 4, 2013) (denying defendant's motion to dismiss and holding that when "users were still licensees, subject to the terms of the [relevant terms of use]," then "the disclosure of the program's specifications to those users does not *per se* forfeit the program's trade secret status."). Courts likewise protect "software configurations" that implement other third-party platforms as trade secrets. *Verbena Prods. LLC v. Del Toro*, 2022 WL 910666, at *2–3 (S.D. Fla. Mar. 29, 2022) (denying motion to dismiss trade secret claims) (Scola, J.). In applying the higher standard on a motion for summary judgment, the *Xtec, Inc. v. Cardsmart Techs., Inc.*, 2014 WL 10268426, at *7 (S.D. Fla. May 15, 2014) (Rosenbaum, J.) court held, "a software compilation and the *overall design* of a software program may be protectable as a trade secret" under appropriate circumstances. (emphasis added). *See also XTec, Inc. v. Hembree Consulting Servs., Inc.*, 2015 WL 3797165, at *11 (S.D. Fla. June 18, 2015) (Altonaga, J.) (denying a motion for partial summary judgment for the same reason); *Decision Insights, Inc. v. Sentia Grp., Inc.*, 311 F. App'x 586, 593–94 (4th Cir. 2009) (remanding to consider whether a software compilation was a trade secret on summary judgment); *Harbor Software, Inc. v. Applied Sys., Inc.*, 936 F. Supp. 167, 172 (S.D.N.Y. 1996) (denying summary judgment and holding "[c]ase law supports the proposition that the overall *design* of a software program may be protectable as a trade secret, even if the individual *components* of that program are common knowledge in the programming

industry") (emphasis in original). In short, Defendants' categorical "visible output" rule is not the bright-line test that they suggest.

Here, as in *AirWatch LLC*, Plaintiffs' Terms of Use protect the Platforms' visible specifications as trade secrets. *See* Tenant Turner Customer Terms, at §§ 5.1 and 5.2; ShowMojo Terms of Use § 6. Additionally, consistent with *Verbena Prods. LLC*, Plaintiffs identify third-party platform configurations as trade secrets. Complaint, at ¶ 21, 59.d, 75, 77, 83.d., and 86.e.

Moreover, Plaintiffs allegations plainly illustrate that their trade secrets are not purely visible outputs. Though some of the features are viewable by customers, the back-end software that supports the visible output is included in the allegations of the Complaint. Complaint, at ¶ 59.a.-59.e. Not only that, but many of the trade secrets, pled with specificity in the Complaint, are not viewable by customers at all, such as "[redacted]," (Complaint, at ¶ 59.c.), "[redacted]," (Complaint, at ¶ 59.d.), and "[redacted]" (Complaint, at ¶ 59.e.).

**2. Plaintiffs Sufficiently Allege Misappropriation**

Defendants' additional claim that Plaintiffs have not alleged misappropriation must also be rejected. To state a claim for misappropriation of trade secrets, Plaintiffs must plead factual allegations that show acquisition, disclosure, or use. *Compulife Software Inc. v. Newman*, 959 F.3d

1288, 1311 (11th Cir. 2020). "A person misappropriates a trade secret by *acquisition* when he acquires it and 'knows or has reason to know that the trade secret was acquired by improper means.'" *Id.* (emphasis in original). Plaintiffs allege Defendants acquired their trade secrets by fraudulently misrepresenting their identities as Plaintiffs' customers and thereafter acquired unauthorized access to Plaintiffs' Platforms and the trade secrets contained therein. *See, e.g.*, Complaint, at ¶¶ 82, 85, 249, and 251. Plaintiffs also show that Defendants did more than simply "access," Plaintiffs' Platforms, which Defendants insist is all the Complaint contains. Among other things, Defendants took screenshots of Plaintiffs' Platforms, thus acquiring their system specifications and logics, which Defendants could later use, and did use, for purposes of developing a competing product. *See* Complaint, at ¶¶ 72, 74, 75, 117, 168, 197, 207, 236, and 249. Defendants arguments focus almost entirely on "use," but the plain terms of the DTSA and FUTSA allow for misappropriation under a disjunctive test where misappropriation may be proven by "acquisition," "disclosure," or "use," and merely insisting that "use" is not shown is not sufficient to defeat a trade secret claim. Plaintiffs have sufficiently alleged misappropriation.

**3. Plaintiffs' Claims Are Not Preempted**

FUTSA does not preempt Plaintiffs' claims for tortious interference of contract, unjust enrichment, conversion, trespass to chattel, fraud, or portions of the FDUTPA and unfair competition claims. FUTSA preempts only claims where "trade secret misappropriation alone" is the alleged wrong. *Measured Wealth Private Client Grp., LLC v. Foster*, 2020 WL 3963716, at *5 (S.D. Fla. July 13, 2020) (Singhal, J.) (To determine whether preemption is appropriate, "the Court must evaluate whether allegations of trade secret misappropriation alone comprise the underlying wrong; if so, the cause of action is barred by § 688.008."); *Am. Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc.*, 390 F.Supp.2d 1170, 1181 (M.D. Fla. 2005) (Only if a plaintiff's

"allegations of trade secret misappropriation *alone* comprise the underlying wrong" will the court dismiss other claims as preempted) (emphasis in original). If, as is the case here, "there are material distinctions between the[] claims and the FUTSA claim" then "dismissal on the ground of preemption" is not warranted. *Am. Honda Motor Co., Inc.* at 1181; *see also B&D Nutritional Ingredients, Inc. v. Unique Bio Ingredients, LLC*, 2017 WL 8751753, at *3 (S.D. Fla. Feb. 10, 2017) (Cohn, J.).

Plaintiffs' ancillary claims arise from conduct distinct from misappropriation:

- **Tortious Interference** – Defendants accessed and exploited Plaintiffs' Platforms, independent of acquiring, disclosing, or using its trade secrets, in ways that are expressly against the Terms of Use, which induced breach of customer contracts. *See* Complaint, at ¶¶ 127–133.

- **Unjust Enrichment** – Defendants facilitated its customer acquisition by accessing the entirety of Plaintiffs' Platforms, which Plaintiffs were never compensated for and this conduct stands apart from Plaintiffs' trade secret claims. *See* Complaint, at ¶¶ 8, 134, and 138.

- **Conversion and Trespass to Chattels –** Defendants exercised dominion and control over performance metrics, product analytics, and internal data, not all of which is under the umbrella of Plaintiffs' trade secrets. Complaint, at ¶¶ 196–197. The entirety of the Platforms are not trade secrets, and the Complaint identifies Defendants' intentional interference with Plaintiffs' possessory interest in the Platforms as a whole. Complaint, at ¶¶ 202–211.

- **Fraud –** Plaintiffs identify fraudulent wrongs aside from those related to Defendants' acquisition, disclosure, and use of Plaintiffs' trade secrets, particularly, Defendants' fraudulent misrepresentations allowed them to gain general access and furthered their migration activities, which, again, is still against Plaintiffs' Terms of Use. *See, e.g.*, Complaint, at ¶ 226.

- **FDUTPA** – The FDUTPA claim encompasses conduct that does not depend on

Plaintiffs' trade secret claims. The wrong is the mischaracterization of Plaintiffs' Platforms and the misleading justifications provided to Targeted Customers as Defendants sought access—not the misappropriation of trade secrets therein. *See, e.g.*, Complaint, at ¶¶ 83, 86, 162, 165–167.

- **Unfair Competition –** Similarly, the unfair competition claim is premised on wrongs aside from trade secret misappropriation, namely, interference with contractual relationships, misleading representations concerning Plaintiffs, solicitation of Targeted Customers, and bad-faith acts undertaken to retain a competitive advantage at Plaintiffs' expense. *See* Complaint, at ¶¶ 173, 176, 178, 180, and 182.

Because these claims are grounded in independent wrongful acts, they are not preempted under FUTSA.

#### 4. Defendants' Reference to Plaintiffs' Vimeo Channel May Not Be Considered

Finally, Defendants' arguments based on material from Plaintiffs' Vimeo channel are outside the pleadings and may not be considered on a motion to dismiss. *Robert L. Strauss, P.A. v. Gemini Ins. Co.*, 742 F.Supp.3d 1184, 1196 (S.D. Fla. 2024) (Middlebrooks, J.) ("Ordinarily, a court is limited to considering only the claims in the four corners of the complaint, including any attachments thereto, when ruling on a motion to dismiss."). The channel provides general customer support and marketing videos, not the proprietary information at issue. The Court should disregard these extrinsic materials.

### D. Plaintiffs Sufficiently Pled Their False Advertising Claims

Defendants seek dismissal of Plaintiffs' Lanham Act, FDUTPA, and unfair competition claims—grouped as "false advertising"—arguing: (1) the Blog Posts are non-actionable puffery; (2) Plaintiffs do not allege reliance or consumer harm; and (3) Plaintiffs do not plead recoverable damages. Each of these arguments fail.

**1. The Blog Posts Go Beyond Puffery**

Defendants argue their Blog Posts are mere puffery, but Plaintiffs allege specific, factually false statements, such as representing that Plaintiffs' Platforms lack features that they, in fact, possess. *See, e.g.*, Complaint, at ¶¶ 83.c.,83.d., 83.e., 83.f., 83.g., 86.a., 86.b., 86.d., 86.e., 86.f., 86.g., and 86.h. Representing that a software product lacks functions that it actually has is not mere puffery, instead, it is textbook false advertising because they are "commercial claims that are literally false as a factual matter." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1261 (11th Cir. 2004). Not only do Defendants' Blog Posts represent that Plaintiffs' Platforms lack functionalities they actually possess, but they also misstate the ability of the Platforms' functionalities. The Blog Posts do not simply declare "RentEngine is superior" and move on—they make demonstrably false statements about capabilities being "basic," "standard," and "limited" where the functionalities are, in reality, advanced, customizable, and fulsome. *E.g.*, Complaint, at ¶¶ 83 and 86.

**2. Plaintiffs Need Not Allege Consumer Reliance or Harm Where Falsity Is Pled**

There are two avenues toward showing an advertisement is false or misleading, a plaintiff may satisfy the element if, one, "the challenged advertisement is literally false, or," two "if the challenged advertisement is literally true, but misleading." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). "[O]nce a court deems an advertisement to be literally false, the movant *need not present evidence of consumer deception*." *Id.* (emphasis added). Because Plaintiffs show that the Blog Posts were "literally false" as opposed to "literally true, but misleading," Plaintiffs are "not required to present evidence of consumer deception." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010). Thus, Defendants' argument for dismissal based on non-allegations of consumer reliance fails as a matter of law.

When alleged that an advertisement is literally false, a plaintiff still "must still establish materiality" by demonstrating that "the defendants' deception is likely to influence the purchasing decision." *Id.* A plaintiff may do so "by showing that 'the defendants misrepresented an inherent quality or characteristic of the product.'" *Id.* Plaintiffs' Platforms serve property managers across the United States through their scheduling, marketing, CRM, lead nurturing, communication, lockbox, and other customer support tools. Complaint, at ¶¶ 83 and 86. Defendants' Blog Posts made materially false representations as to *each* of the foregoing categories, *each* of which is material to property managers' purchasing decisions. The materiality requirement is easily satisfied due to the breadth of Defendants' false statements.

Moreover, for the FDUTPA claim, as Defendants are Plaintiffs' direct competitor, Plaintiffs need not establish consumer reliance; competitive injury is sufficient. *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F.Supp.2d 1314, 1322 (M.D. Fla. 2007) ( ". . . when the party alleging misleading advertising is a competitor of the defendant in selling the goods or services to which the misleading advertisement relates, an allegation of competition is permitted to 'stand-in' for the element of direct reliance that a consumer is obligated to plead."); *see also Workplace Corp. v. Office Depot*, 1990 WL 106727, at *1 (M.D. Fla. 1990). Plaintiffs repeatedly allege Defendants are their competitors. *E.g.*, Complaint, at ¶¶ 31, 35, 38, and 58. Accordingly, Defendants' argument for the dismissal of the FDUTPA claim for lack of consumer reliance also fails as a matter of law.

**3. Plaintiffs Sufficiently Pled Damages**

Finally, Defendants' argument that Plaintiffs fail to allege FDUTPA damages ignores the distinction between consumer-versus-business FDUTPA claims and business-versus-business FDUTPA claims. The "FDUTPA provides for both declaratory and injunctive relief and for monetary damages, but such damages are limited to the 'actual damages' a plaintiff incurs as a

result of a defendant's deceptive or unfair act." *Fin-S Tech, LLC v. Surf Hardware Int'l-USA, Inc.*, 2014 WL 12461349, at *11 (S.D. Fla. Jan. 7, 2014) (Ryskamp, J.). In business-versus-business suits, courts permit recovery of lost profits as "actual damages" where lost profits reflect the direct and foreseeable harm from misleading advertising and unfair competition. *Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, 558 F.Supp.3d 1275, 1283–86 (S.D. Fla. 2021) (Altonaga, J.) (finding "the accepted definition of actual damages in a consumer's FDUTPA case is meaningless in a competitor's case, where actual lost profits are the competitor's actual damages. . . It makes considerable sense to permit a corporate-competitor plaintiff to seek lost profits damages when there is no transaction giving rise to the oft-used expectancy measure of damages" and held that "a corporate-competitor plaintiff may seek lost profits damages under the FDUTPA."); *see also Digiport, Inc. v. Foram Dev. BFC, LLC*, 314 So.3d 550, 554 (Fla. 3d DCA 2020) (same).

Defendants identify cases where courts have declined to recognize lost profits as actual damages under the FDUTPA in business-versus-business actions. However, as the court in *Tymar* observed, many of those decisions "did not engage in a significant analysis of the issue," and often relied on precedents rooted in the very different context of consumer transactions. *Tymar*, 558 F.Supp.3d at 1284. The *Tymar* and *Digiport* approach is faithful to FDUTPA's text and intent, and squarely aligns with both common sense and the practical realities faced by businesses combatting unfair trade practices in the marketplace. Plaintiffs have sufficiently alleged recoverable damages under the FDUTPA and Defendants' arguments, once more, fail. Complaint, at ¶ 170.

**<u>II. DEFENDANTS' MOTION TO COMPEL ARBITRATION SHOULD BE DENIED</u>**

Ironically, given Defendants' attempts to feign ignorance of Plaintiffs' Terms of Use in the portion of its Motion seeking to dismiss the Complaint, Defendants offer two primary bases for compelling arbitration: (1) they invoke equitable estoppel, arguing it requires arbitration; and (2)

they contend they are parties to Plaintiffs' Terms of Use that include arbitration clauses. Both arguments are deficient because of Defendants' misconduct and the Court should deny the motion to compel arbitration.

**A. Legal Standard**

Under the Federal Arbitration Act, a party may seek an order compelling arbitration pursuant to a written arbitration agreement. 9 U.S.C. § 4. If the dispute is arbitrable, the court must stay proceedings pending arbitration upon request. 9 U.S.C. § 3. This Court applies three factors to determine whether to compel arbitration: (1) the existence of a written agreement with an arbitration clause; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration has been waived. *Pro. Consulting Servs. S.A.S. v. Inmigraction Pro, LLC*, 2024 WL 4103919, at *4 (S.D. Fla. Sept. 6, 2024) (Altman, J.). Only if these factors are met does the Court address whether non-signatories can enforce the arbitration provision, which is governed by state law. *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1354 (11th Cir. 2017).

**B. Defendants Cannot Invoke the Doctrine of Equitable Estoppel—They Are Signatories**

It is offensive that Defendants seek to invoke equity to compel arbitration, essentially as a third-party beneficiary to Plaintiffs' Terms of Use, when the doctrine of equity is rooted in principles of fairness and justice, and Defendants have acted in such an egregiously dishonest and anti-competitive manner. However, Defendants' analysis glosses over a basic fact of this case: Defendants are, in fact, *signatories* to Plaintiffs' Terms of Use. *Signatory*, BLACK'S LAW DICTIONARY (12th ed. 2024). The Complaint details the countless times Defendants agreed to Plaintiffs' Terms of Use to furtively gain access to Plaintiffs' Platforms, thus, rendering Defendants signatories to Plaintiffs' Terms of Use. *See, e.g.*, Complaint, at ¶¶ 34, 51.b., and 175. Although,

evidently, Defendants *primarily* consider themselves non-signatories to the Terms of Use (*see* Motion, at pp. 8, 9, and 12), they are inconsistent with this position and, conversely, assert their status as signatories when they consider it expedient to do so. *See* Motion, at p. 14 ("The Defendants may enforce arbitration as signatories . . ."). The application of equitable estoppel requires assessing "whether a *non-signatory* to an agreement" can rely upon the arbitration clause contained in the relevant agreement to force a case into arbitration. *Kroma*, 845 F.3d at 1354. Defendants concede and rely upon their status as signatories and, therefore, may not invoke the doctrine of equitable estoppel.

Assessing the purpose of the equitable estoppel doctrine further demonstrates that Defendants' status as signatories dictates the doctrine's inapplicability. The reason behind the equitable estoppel doctrine is succinctly supplied in *Pro. Consulting Servs.*: "equitable estoppel exists so that 'a signatory plaintiff [cannot] sue to essentially enforce its rights under a contract and, at the same time, evade an arbitration agreement in the contract, simply by naming as defendants parties *who were not signatories* to the contract.'" *Pro. Consulting Servs.*, 2024 WL 4103919, at *9 (emphasis added). Ultimately, "[t]he lynchpin for equitable estoppel is equity and the point of applying it to compel arbitration is to prevent a situation that would fly in the face of fairness." *Id.* It would be manifestly unjust to force the instant case into arbitration as Defendants *are signatories* to the relevant Terms of Use—a fact which Defendants do not dispute—when, under well-settled law, equitable estoppel may be invoked only by a non-signatory.

### C. A Contract Was Not Formed Due to Fraud in the Factum—Accordingly, Defendants Cannot Enforce the Arbitration Clause

Adding to the inequity of forcing this case into arbitration is Defendants' logically inconsistent positions on whether they are signatories depending on outcomes they consider

favorable; meanwhile, Plaintiffs' position is clear: Defendants are signatories, but arbitration is inappropriate as Plaintiffs never intended to contract with Defendants; the contract between Plaintiffs and Defendants was never formed on account of fraud in the factum.

**1. Defendants' Conduct Constitutes Fraud in the Factum**

It is black letter law that a contract is not formed without mutual assent.[3] Defendants' attempt to compel arbitration fails because their conduct amounts to fraud in the factum,[4] which negates contract formation, including a contract's arbitration clause. Fraud in the factum is "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents." *Langley v. Fed. Deposit Ins. Corp.*, 484 U.S. 86, 93 (1987); *see also Puskas v. Goodleap, LLC*, 2023 WL 10947154, at *2 (M.D. Fla. June 5, 2023) ("To assert a claim for fraud in the factum then, a plaintiff must allege either that the plaintiff never intended to sign a contract

[3] The Tenant Turner Customer Terms are governed by Virginia state law and the ShowMojo Terms of Use are governed by Delaware state law. Tenant Turner Customer Terms § 18.2; ShowMojo Terms of Use § 11.1.

Both Delaware and Virginia require mutual assent for contract formation. If the Court's analysis determines that, instead, Florida law applies, the same mutual-assent requirement exists under Florida law**.**

In Delaware "a valid contract exists when (1) *the parties intended that the instrument would bind them*, demonstrated at least in part by its inclusion of all material terms; (2) these terms are sufficiently definite; and (3) the putative agreement is supported by legal consideration." *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018) (emphasis added).

Under Virginia law, "findings of the existence of the elements required for contract formation—offer and acceptance, *mutuality of intent*, mutuality of obligation, a meeting of the minds—involve mixed questions of fact and law." *Somers v. W.D. Campbell and Son, Inc.*, 2025 WL 1161348, at *2 (Va. Ct. App. Apr. 22, 2025) (emphasis added).

"In Florida, a valid contract requires offer, acceptance, consideration and sufficient specification of essential terms. While there is no requirement that a contract be signed by the parties, there must be sufficient proof that the parties actually agreed to arbitrate." *Laine v. JetSmarter, Inc.*, 2019 WL 1900339, at *2 (S.D. Fla. Apr. 29, 2019) (Bloom, J.) (internal quotation marks and citation omitted).

[4] Fraud in the factum is alternatively known as "fraud in the execution." *See, e.g.*, *Johnson v. Expert, Inc.*, 734 F.Supp.3d 1287, 1293 (M.D. Fla. 2024).

or that the 'character' of the executed contract, not just a term in the contract, materially differs from the contract that the plaintiff intended to sign."). If there is fraud in the factum "there is no effective manifestation of assent and no contract at all." Restatement (Second) of Contracts § 163; *see also Cancanon v. Smith Barney, Harris, Upham & Co.*, 805 F.2d 998, 1000 (11th Cir. 1986). ("Where misrepresentation of the character or essential terms of a proposed contract occurs, assent to the contract is impossible. In such a case there is no contract at all.").

Defendants' fraudulent acceptance of the Terms of Use, which was a misrepresentation that related to the very nature of the proposed contract itself, renders the agreement between Plaintiffs and Defendants void and the dispute must be resolved by the Court rather than sent to arbitration. In effect, the first requirement of the *Pro. Consulting Servs.* test is missing here. The *Pro. Consulting Servs.* court set forth the three-factor test to determine whether arbitration is appropriate, the first of those is "(1) a written agreement *exists* between the parties containing an arbitration clause." *Pro. Consulting Servs.*, 2024 WL 4103919, at *4 (emphasis added). Because Defendants are insisting on enforcing it "between the parties" in this formulation of their theory, and "there is no contract at all" for fraud in the factum, Defendants' theory fails again.

In this case, Defendants are signatories to the agreement, but the underlying agreement is ineffective as Plaintiffs were party to an agreement they never intended to create. Simply asking *why is it that Defendants had to disguise themselves to enter Plaintiffs' Platforms?* provides a telling answer: Because under no circumstances would Plaintiffs knowingly contract with Defendants, their competitor, and Plaintiffs would never willingly grant them access to their Platforms. Moreover, given Defendants' deceptive creation of accounts on Plaintiffs' Platforms, Plaintiffs did not and could not know they were dealing with Defendants—particularly when Defendants used spoof accounts to cloak their true identity. *See, e.g.*, Complaint, at ¶¶ 48 n.8, 49,

50, and 129. Certain terms in any agreement are considered the most essential, not the least of which is *who* the contracting parties are. Plaintiffs entered an agreement with their customers understanding that their customers were the ones accessing Plaintiffs' Platforms. Defendants substituting themselves for the intended customers by the use of fraudulent domains changes the agreement in such a fundamental way that the underlying agreement is void for fraud in the factum.

**2. Fraud in the Factum Precludes Arbitration**

In the Eleventh Circuit, "a true claim of fraud in the execution [a.k.a. fraud in the factum] does not bind the parties to arbitration." *Johnson*, 734 F.Supp.3d at 1293 (citing *Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 994–95 (11th Cir. 2012)). Instead, when a defendant's conduct amounts to fraud in the factum, the issue is decided by the courts rather than an arbitrator notwithstanding an arbitration clause in the relevant agreement. *Cancanon*, 805 F.2d at 1000.

This situation does not qualify as fraudulent inducement—the fraud runs deeper than that. Fraudulent inducement occurs when "a party understands the nature of the contract they are executing but contends that there has been some material misrepresentation as to the obligations arising thereunder." *Johnson*, 734 F.Supp.3d at 1293. Defendants conduct is not akin to that of classic fraudulent inducement, Defendants neither misstated their ability to perform a specific task, *see Output, Inc. v. Danka Bus. Sys., Inc.*, 991 So.2d 941, 945–46 (Fla. 4th DCA 2008), nor did they misrepresent systematic capabilities. *See D & M Jupiter, Inc. v. Friedopfer*, 853 So.2d 485, 487 (Fla. 4th DCA 2003). In short, Defendants did not misrepresent "a material fact that [Plaintiffs] relie[d] on to its detriment." *Daley v. Carnival Corp.*, 2015 WL 12743772, at *2 (S.D. Fla. July 7, 2015) (Ungaro, J.). Rather, Defendants fraudulently procured Plaintiffs' agreement to the Terms of Use by misrepresenting their identity, which is quintessential fraud in the factum: "fraud in the factum occurs when a party procures another party's signature without knowledge of the

instrument's true nature or contents." *Id.*

Plaintiffs' Terms of Use are designed to apply to a customer relationship. Plaintiffs intended to, and did, enter an agreement with the Targeted Customers and at all times believed their agreements to be with Targeted Customers. However, Defendants, as wolves in sheep's clothing, covertly substituted themselves in as a party without Plaintiffs' consent and now seek to leverage clauses never intended to apply to Plaintiffs' relationships with its competitors to defeat Plaintiffs' forum selection. Plaintiffs, like the plaintiffs in *Cancanon*, believed they had an agreement that was something different from what it was, and fell victim to Defendants' fraud in the factum. It is axiomatic that "[a] plaintiff's choice of forum is entitled to deference, and there is a presumption in favor of a plaintiff's choice of forum, particularly where the plaintiffs are citizens of the United States." *Wilson v. Island Seas Invs., Ltd.*, 590 F.3d 1264, 1269 (11th Cir. 2009). That presumption should control here when Defendants' arguments to defeat Plaintiffs' selection are this compromised.

**D. Defendants Waived The Right To Arbitrate**

Even if Defendants had a right to enforce the arbitration clauses in Plaintiffs' Terms of Use (which they do not), they waived that right. Defendants' conduct was inconsistent with any intent to arbitrate.

At the outset, Plaintiffs were granted expedited discovery (ECF No. 11) not only to prepare for the preliminary injunction hearing, but also to uncover the scope of Defendants' scheme and prevent spoliation (ECF No. 8). Defendants' first appearance in this action was a joint motion to extend the dates for the expedited discovery and extend a reciprocal right to Defendants to take discovery, yet they made no reservation of their right to seek arbitration. (ECF No. 16). They likewise made no such reservation in the subsequent Stipulated Order resolving both the

preliminary injunction motion and expedited discovery. (ECF No. 30). The parties then negotiated a protective order and ESI stipulation, with Defendants again failing to reserve any right to arbitrate until after the Stipulated Order had been reduced to the Omnibus Order and the Rule 16 conference had occurred.

Additionally, while Tenant Turner's Terms of Use have a carve out for injunctive relief being resolved by the courts rather than through arbitration, ShowMojo's Terms of Use do not, so Defendants' conduct was inconsistent with an intent to invoke ShowMojo's Terms of Use.

Defendants' assertion that Plaintiffs suffered no prejudice from their delay is incorrect. The Stipulated Order required participation in a Rule 16 conference and that Defendants be produced for deposition by the end of 2025, which Defendants later refused to do. Plaintiffs' counsel expressly communicated at the time that the right to take Defendants' depositions promptly was imperative and central to entering into the Stipulated Order. Plaintiffs agreed to the Stipulated Order based on those guarantees; without them, Plaintiffs would have already deposed Defendants and avoided likely future motion practice. Defendants' belated assertion of the arbitration clause, after substantive engagement in litigation, warrants a finding of waiver. *Davis v. White*, 795 F. App'x 764, 768–69 (11th Cir. 2020) (holding a party "acted inconsistently with its right to arbitrate" where it participated in litigation).

## **III. CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request that the Court deny Defendants' Motion in full.

Date: January 5, 2026

By: *s/ Aaron S. Weiss*
Aaron S. Weiss (FBN 48813)
aweiss@carltonfields.com
Carlton Fields, P.A.
700 N.W. 1st Ave., Ste. 1200
Miami, Florida 33136
Telephone: (305) 530-0050

*s/ Emily D. Anderson*
Robert S. Friedman*
rfriedman@sheppardmullin.com
Emily D. Anderson*
emanderson@sheppardmullin.com
Meghan M. Stuer*
mstuer@sheppardmullin.com
Sheppard, Mullin, Richter & Hampton LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 634-3081

*Admitted Pro Hac Vice

*Counsel for Plaintiffs*