**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:25-cv-22939**

SHOWMOJO, LLC and
TENANT TURNER, INC.,

Plaintiffs,

v.

THRESHOLD TECHNOLOGY, LLC d/b/a
RENTENGINE and ALEXANDER
STRINGFELLOW,

Defendants.
___________________________________/

**REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION OR, ALTERNATIVELY, TO DISMISS THE PLAINTIFFS' COMPLAINT**

The Defendants, file their reply in further support of their Motion to Compel Arbitration or, Alternatively, to Dismiss (D.E. 63) (the "Motion").[1]

**THE COURT MUST COMPEL ARBITRATION OF THIS DISPUTE**

In the Motion, the Defendants established arbitration should be compelled because (1) the three gateway factors for arbitration are satisfied and (2) equitable estoppel prevents the Plaintiffs from simultaneously enforcing the Terms of Use and skirting the Terms' arbitration provisions. Mot. at 8–14. In their Opposition (D.E. 69), the Plaintiffs contort themselves, arguing that equitable estoppel does not apply because the Defendants are "signatories" to the Terms of Use and because, in any event, "fraud in the factum" vitiates any contractual agreement between the Parties. *See* Opp. at 19–24. This position—the Court's acceptance of which would nullify all of the Plaintiffs' claims, each of which relies on the Terms of Use—is incorrect. The Court should also reject the Plaintiffs' threadbare waiver arguments, given the plain language of the arbitration clauses and given the Defendants' consistent, explicit, and well-documented reservations of their arbitration right.

**A. The Defendants May Invoke Estoppel, Even as Alleged "Signatories."**

Despite chiding the Defendants for taking allegedly inconsistent positions (*see* Opp. at 18, 20), it is the *Plaintiffs* who seek to have it both ways. Indeed, the Plaintiffs simultaneously argue that estoppel does not apply because the Defendants are, in fact, "signatories" to the Terms of Use; that the Defendants "conceded" they are signatories; and that, regardless, the Defendants' alleged "fraud" precludes the formation of any contractual agreement. *See id.* at 19–24.

To be sure, in the Motion, the Defendants showed that the allegations of the Complaint—specifically, the allegations that the Defendants affirmatively accepted the Terms of Use (*see, e.g.*, TAC at ¶¶ 29, 34, 51(b), 175)—provide an independent basis to enforce the arbitration agreements. *See* Mot. at 14. The Plaintiffs are mistaken that these allegations foreclose estoppel. To start, the Defendants have not "conceded" that they are signatories to the Terms of Use, as the Opposition asserts.

[1] Unless otherwise indicated, all capitalized terms in this brief, which are not defined in this brief, have the meaning ascribed to them in the Motion.

*See* Opp. at 20. Instead, the Motion merely highlights that the Plaintiffs have alleged that the Defendants accepted the Terms of Use in accessing the Plaintiffs' Platforms—which is a predicate to each of the Plaintiffs' substantive claims. *See, e.g.*, Mot. at 13–14.

In any event, the Plaintiffs' theory that the Defendants are precluded from invoking estoppel is based on a misapprehension of the applicable law. It is undisputed that the Plaintiffs and the Defendants were not contractual counterparties to the Terms of Use. In fact, the Plaintiffs repeatedly allege that they "never intended for their Terms of Use to be accepted by or govern their relationships with an industry competitor." TAC at ¶ 38. Accordingly, it is illogical for the Plaintiffs to now assert that the Defendants were "signatories."

The Plaintiffs' theory is also inapposite to the two grounds for the application of estoppel. *See* Mot. at 12–14. As shown in the Motion, and as this Court acknowledged in *Professional Consulting*, estoppel applies when the signatory-plaintiff must invoke the underlying agreement to assert claims against the non-signatory-defendant, or when the plaintiff alleges concerted, interdependent misconduct among signatories and non-signatories. Mot. at 12–13; *Pro. Consulting Servs. S.A.S. v. Inmigracion Pro, LLC*, 2024 WL 4103919, at *7 (S.D. Fla. Sept. 6, 2024). Both grounds apply here: the Terms of Use are the genesis of each of the Plaintiffs' claims (*see, e.g.*, Mot. at 13–14), and the Plaintiffs allege that the Targeted Customers improperly provided the Defendants with access to the Plaintiffs' Platforms, in violation of the Targeted Customers' own obligations under the Terms of Use (*id.* at 14). In short, the Plaintiffs' characterization of the Defendants as "signatories" is an effort to evade the Court's prior ruling in *Professional Consulting*, in which the Court applied equitable estoppel to compel arbitration under substantively identical facts. The Plaintiffs have simply failed to provide any basis to distinguish this precedent.

Finally, the Plaintiffs protest that "[i]t is offensive that Defendants seek to invoke equity to compel arbitration," when the Defendants have allegedly "acted in such an egregiously dishonest … manner." Opp. at 19. But the Plaintiffs' complaints

are misdirected. As the Plaintiffs note in their own Opposition, the purpose of estoppel is to prevent a signatory-plaintiff from enforcing the terms of a contract against a non-signatory-defendant, while "evad[ing]" the contract's arbitration clause. *Id.* at 20. The Plaintiffs fail to cite any authority supporting the proposition that the non-signatory's alleged "inequitable" conduct is relevant to the estoppel analysis. Perhaps more tellingly, in *Professional Consulting*, the non-signatory's alleged inequitable conduct—worse than the conduct alleged here—was no bar to the Court's application of estoppel.

**B. "Fraud in the Factum" Does Not Override Estoppel.**

The Plaintiffs alternatively argue that, even if the Defendants' alleged status as "signatories" does not foreclose estoppel, the doctrine of "fraud in the factum" vitiates any arbitration agreement between the Parties. Opp. at 20–24. The Plaintiffs' fraud-in-the-factum theory fails for two reasons.

First, the Plaintiffs' fraud theory is internally inconsistent. The Plaintiffs argue that "the contract between Plaintiffs and Defendants was never formed on account of fraud in the factum," and that any agreement between the parties is "void." *Id.* at 21–22. But because each of the Plaintiffs' claims depends on the Defendants' alleged agreement to, knowledge of, or acquiescence to the Terms of Use, the voiding of the Terms would necessarily vitiate the Plaintiffs' substantive claims. *See, e.g.*, TAC at ¶¶ 110, 112, 119, 129, 136, 145, 166, 175, 194, 203, 212, 234, 248 (examples of references to the Terms of Use in the Plaintiffs' substantive claims).[2] The Plaintiffs cannot selectively enforce the Terms. If the Defendants are signatories, as the Plaintiffs allege, then the arbitration provisions apply and require arbitration. If "fraud in the factum" voids the Terms, then the Plaintiffs do not have any substantive claims against the Defendants.

---

[2] *See also, e.g.*, *Langley v. Fed. Deposit Ins. Corp.*, 484 U.S. 86, 93 (1987) (explaining that fraud in the factum "would render the instrument entirely void"); *Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 994 n. 13 (11th Cir. 2012) ("A successful fraud in the factum claim makes the underlying contract *void ab initio* . . . ." (internal citation omitted)).

Second, the Plaintiffs' fraud theory does not override the doctrine of equitable estoppel. As is apparent from the Plaintiffs' authorities, "fraud in the factum" implicates alleged misconduct between parties in contractual privity. *See Johnson v. Expert, Inc.*, 734 F. Supp. 3d 1287, 1293 (M.D. Fla. 2024) (plaintiff alleged that the defendant misrepresented that the terms of a sales pitch mirrored the executed contract); *Cancanon v. Smith Barney, Harris, Upham & Co.*, 805 F.2d 998, 999 (11th Cir. 1986) (Spanish-speaking plaintiffs alleged that the defendants misrepresented the nature and substance of a document). That is not the situation here. The Plaintiffs fail to cite any authority showing that principles of "fraud in the factum" override the doctrine of equitable estoppel, which applies specifically to parties that are *not* in contractual privity, such as the Parties here. In sum, the Plaintiffs' self-serving theory that "fraud" vitiates only the arbitration provisions, but conveniently keeps intact the remaining Terms of Use, is an inelegant effort to overcome the reality that the Defendants are non-signatories entitled to enforce arbitration by estoppel.[3]

As in *Professional Consulting*, the Defendants meet the requirements for the application of estoppel. If the Court were to accept the Plaintiffs' allegations that the Defendants are "signatories" to the Terms of Use, then it must apply the *entirety* of the Terms to the Defendants—including the arbitration clauses.

**C. The Defendants Did Not "Waive" Their Arbitration Rights.**

The Plaintiffs' waiver arguments are undeveloped and meritless. First, the Plaintiffs concede that Tenant Turner's Terms authorize the parties to seek injunctive relief in court without waiving their arbitration rights. *See* Opp. at 25; Mot.

---

[3] In a variation of their appeals to "equity," the Plaintiffs assert that the Defendants should not be able to avail themselves of the benefits of equitable estoppel because they are allegedly "compromised." Opp. at 24. The Plaintiffs' assertion, however, is irrelevant to the required legal analysis, as courts routinely apply estoppel even when a non-signatory defendant has been accused of fraud or other misconduct. *See, e.g.*, *Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1399 (S.D. Fla. 2014) (plaintiff alleged that the defendants committed RICO and usury violations, among other misconduct); *Eco Green Int'l, LLC v. Acapital, S.R.O.*, 2025 WL 3769709, at *4 (Fla. 3d DCA Dec. 31, 2025) (plaintiff alleged violations of Florida RICO).

at 11. Despite the Plaintiffs' assertion that ShowMojo's Terms do not contain a similar provision, those Terms contain a nearly *identical* carve-out for injunctive-relief proceedings. *See* ShowMojo Terms of Use at Section 11.2. As explained in the Motion, the entirety of the proceedings before September 12, 2025—when the Defendants first moved to compel arbitration and to dismiss (D.E. 34)—involved the litigation of the Plaintiffs' PI Motion. Mot. at 11. Accordingly, the Plaintiffs' assertion that the Defendants "waived" their arbitration rights by not invoking their rights during those early proceedings (*see* Opp. at 24–25) is inconsistent with the very text of the arbitration provisions.

Second, the Defendants moved for arbitration at the earliest possible opportunity—their deadline to respond to the Plaintiffs' original Complaint. Mot. at 12; D.E. 34. This situation is therefore unlike the Plaintiffs' only case, in which the Eleventh Circuit upheld the district court's waiver determination when the defendants invoked arbitration only *after* losing various motions to dismiss, filing frivolous appeals, and moving to arbitrate "just over eighteen months" after the filing of the complaint. *Davis v. White*, 795 F. App'x 764, 767, 769 (11th Cir. 2020).

Lastly, the Plaintiffs' complaints of "prejudice" are meritless. *See* Opp. at 25. As an initial matter, the Defendants' participation in the injunction proceedings is consistent with the carve-outs in the Terms of Use. Moreover, since they first moved for arbitration (D.E. 34), the Defendants have repeatedly and explicitly reserved their right to arbitrate, both in court filings and in virtually every communication to the Plaintiffs' counsel about this case. *See* Mot. at 11. Accordingly, the purported reliance interests cited by the Plaintiffs, but not meaningfully discussed by them (Opp. at 25), are not the product of any inconsistent actions by the Defendants; they are, instead, the product of the Plaintiffs' own decisions. *See also* Mot. at 12.

## <u>THE PLAINTIFFS' CLAIMS FAIL UNDER RULE 12(b)(6)</u>

### A. The CFAA Claims Fail.

Plaintiffs reassert that "Defendants acted 'without authorization' or that Defendants 'exceeded authorization'" when they allegedly accessed Plaintiffs' Platforms, and therefore they violated the CFAA. Opp. at 4-5. Plaintiffs also argue

that it does not matter that their customers consensually granted Defendants access to the Platforms because "*consent* from licensees is immaterial where those customers themselves lacked authority to extend access." *Id.* at 7. These arguments both fail for the reasons discussed below.

*First,* Plaintiffs advocate for an impermissibly broad application of the CFAA. It is undisputed (1) that Plaintiffs' customers provided Defendants with access to Plaintiffs' systems and (2) that Plaintiffs' customers had access to Plaintiffs' Platforms (*i.e.*, there were no "off-limits" areas of the Platforms). Plaintiffs argue that these undisputed facts are inapposite because "Plaintiffs' Terms of Use expressly prohibit the sharing of login credentials." Opp. at 5. In other words, Plaintiffs rely entirely on private policies that they drafted and can change at any time to attach criminal liability to Defendants' alleged conduct. Plaintiffs' position directly contradicts the policy considerations underlying the CFAA and the Supreme Court's decision in *Van Buren v. United States*, 593 U.S. 374, 380 (2021).[4]

In *Van Buren*, the U.S. government charged a police officer with violating the CFAA on the grounds that the officer violated an internal department policy against using a law enforcement database for an improper purpose. *Id.* at 380. The majority rejected the government's argument in large part because ruling that violating a workplace policy could trigger CFAA liability "would attach criminal penalties to a breathtaking amount of commonplace computer activity." *Id.* at 393.[5]

In particular, the Third Circuit dealt with a highly analogous situation in *NRA Group, LLC v. Durenleau,* 154 F.4th 153 (3d Cir. 2025). In *Durenleau*, the NRA argued that two former employees violated the CFAA by violating internal NRA

---

[4] *Van Buren* was decided in 2021 and expressly abrogated the Eleventh Circuit's *United States v. Rodriguez*, 628 F.3d 1258 (11th Cir. 2010). *EarthCam* and *Tracfone* were both decided in 2017. To the extent that *EarthCam* or *Tracfone* rely on *Rodriguez* (both do) or otherwise conflict with *Van Buren,* they are inapposite.

[5] The Supreme Court's sensitivity to finding a CFAA violation based on the violation of private policies is reflected in several circuit courts as well. *See, e.g.*, *United States v. Valle*, 807 F.3d 508, 527 (2d Cir. 2015); *WEC Carolina Energy Sols. LLC v. Miller*, 687 F.3d 199, 206 (4th Cir. 2012).

policies. Specifically, one of the employees who was working remotely shared her NRA credentials with the other employee, allowing that employee to log into the NRA systems on behalf of the remote employee. The Third Circuit rejected the NRA's argument that this violation of an internal policy could constitute a violation of either the "without authorization" or "exceeds authorization" prongs of the CFAA. In reaching this decision, the Court relied on *Van Buren* and emphasized the dangers of "allow[ing] criminal liability to turn on the vagaries of private polices that are lengthy, opaque, subject to change and seldom read." *Id.* (quoting *Nosal*, 676 F.3d at 860). *Id.* at 169. The Third Circuit also explained that the NRA's approach would inappropriately "permit[ ] a system owner to use private use policies to dictate the contours of a statute Congress wrote." *Id.* (internal citations omitted).

Plaintiffs' reliance on their Terms of Use ignores this core theme regarding the CFAA's applicability. Indeed, Plaintiffs make no effort to distinguish or otherwise engage with *Van Buren*, opting simply to state that "Defendants' reliance upon *Van Buren* . . . is misplaced" (Opp. at 7), and referring back to the Terms of Use. This is fatal to their CFAA claim. *Van Buren* is binding Supreme Court precedent and, while *Durenleau* is not binding, the decision aligns with both *Van Buren* and several other federal circuit courts, and was rendered after analysis of a highly analogous situation.

*Second,* even if the CFAA did apply to private policies, Defendants strongly disagree with Plaintiffs' interpretations of the Terms of Use. Plaintiffs do not point to any language that "expressly" forbids access by individuals authorized by Plaintiffs' own customers. Instead, they cite—at a high level—a "no license to third party" provision in the Tenant Turner Terms and vague "permitted use" clauses from the ShowMojo Terms; they then leap to the proposition that based on those opaque clauses that customers cannot share credentials with agents they deputize to act on their behalf (e.g., to migrate or manage their data). Opp. at 5. Plaintiffs' interpretation would transform opaque licensing and use clauses into an express ban on customer-authorized agent access—without any language addressing credential sharing, authorized users, or customer-delegated access.

The CFAA was adopted to prevent criminal activity such as the deployment of code to enter a computer system—*i.e.*, hacking. This criminal statute is not applicable here. Defendants did not deploy code to hack into a computer system to which they had no access; they were invited in by individuals who were themselves authorized to access the Platforms—namely, Plaintiffs' own customers. For the reasons above, the "CFAA is the wrong tool for [Plaintiffs'] project." *NRA*, 154 F.4th at 170.

**B. The Trade Secret Claims Fail and Other Claims are Preempted.**

First, Plaintiffs' trade secret claims fail because they plead "broad categories" of information that, in substance, amount to Plaintiffs' entire Platforms. In their Opposition, Plaintiffs conveniently fail to address that that they define the alleged trade secrets as "password-protected and confidential features, data flows, user interfaces and functional tools embedded within [their Platforms] that comprise [their] proprietary and trade secrets including without limitation …" TAC at ¶ 59. "Couching specific" categories within this sweeping, platform-wide definition is insufficient because it fails to provide fair notice of what, exactly, Plaintiffs contend are the protectable secrets at issue and what Defendants supposedly misappropriated. *VVIG, Inc. v. Alvarez*, 2019 WL 5063441, at *4 (S.D. Fla. Oct. 9, 2019). And while Plaintiffs claim their categories are "detailed" (Opp. at 8–9), the TAC offers jargon without meaningful particulars; read fairly, it asserts that virtually everything about the Platforms—pre-screening logic, notification triggers, APIs, internal insight reports, and scheduling logic—constitutes a trade secret. That is not enough: Plaintiffs must identify the alleged secrets with particularity, and layering technical buzzwords onto an "entire platform" theory does not cure the pleading defect.

Second, Plaintiffs all but concede that the "trade secrets" they say Defendants misappropriated are the Platforms' visible functions available to thousands of Plaintiffs' users. Opp. at 12. But the law strongly suggests that visible output and functionality shown to software users cannot be a trade secret, because widespread dissemination of a software's features and functions necessarily reveals it. *Warehouse Sols., Inc. v. Integrated Logistics, LLC*, 610 F. App'x 881, 885 (11th Cir. 2015) (holding

that dissemination of software to users "necessarily revealed the information [plaintiff] alleges to be secret (i.e., the program's 'features and functions')").

Further, Plaintiffs' generalized allegation that they restricted access to the Platforms via passwords cannot salvage the claim. A protectable trade secret requires reasonable measures to maintain secrecy of the alleged secret. *Taxinet, Corp. v. Leon*, 2018 WL 3405243, at *3 (S.D. Fla. July 12, 2018). If Plaintiffs truly "had wanted to ensure that its users understood the highly counterintuitive notion that its trade secrets encompassed information that was readily discernable by—or freely disclosed to—each and every user, it would have been reasonable to do something more to notify users of the software's confidentiality" than having them sign a clickwrap terms of use. *Broker Genius v. Zalta*, 280 F. Supp. 3d 495, 521 (S.D.N.Y. 2017).

Plaintiffs assert that many of their alleged trade secrets are "not viewable by customers at all," (Opp. at 12) but that assertion only underscores the pleading defects. It is undisputed that Defendants accessed the Platforms only through customer-provided credentials and saw only what those customers could see—nothing more. Plaintiffs' vague references to non-customer-facing information therefore do not connect to any plausible allegation of misappropriation and only highlight that Plaintiffs have not identified, with particularity, what "non-viewable" secret Defendants could have or supposedly did obtain.

Finally, the Opposition confirms that various claims are preempted. Where there are no "material distinctions" between various claims and the FUTSA claims, those claims are preempted. *Taxinet*, 2018 WL 3405243 at *4. While Plaintiffs painstakingly attempt to distinguish their common law claims from the FUTSA claim (Opp. at 14), they all appear, at bottom to rest on the same underlying wrong alleged in the FUTSA claim and thus are preempted. Mot. at 22-23.

### C. The False Advertising Claims Fail.

First, the Blog Posts are not actionable because the complained-of language is mere opinion. Plaintiffs' false-advertising theory rises or falls on Defendants' subjective, comparative characterizations that Plaintiffs' Platforms are "basic," "standard," or "limited." Opp. at 16. Those are paradigmatic non-actionable

opinion/puffery: they are inherently relative and are not the sort of representations that can be proven true or false. Courts in this District routinely dismiss false-advertising claims premised on exactly this kind of vague or highly "subjective" product-superiority rhetoric. *Fineman v. Ferragamo USA Inc.*, 672 F. Supp. 3d 1302, 1313 n.7 (S.D. Fla. 2023) (collecting cases).

Second, the FDUTPA claim fails because Plaintiffs do not plead recoverable "actual damages." To be sure, Plaintiffs cite one decision from this Court suggesting lost profits may be recoverable in certain circumstances. But the more text-faithful reading is that FDUTPA's limitation to "actual damages" excludes speculative future lost profits and alleged harm to goodwill, which are consequential damages. Courts in this District have recognized that FDUTPA does not permit consequential damages. *Sub-Zero, Inc. v. Schuster*, 2018 WL 8369106, at *4 (S.D. Fla. Sept. 4, 2018); *Casa Dimitri Corp. v. Invicta*, 270 F. Supp. 3d 1340, 1352 (S.D. Fla. 2017). Because Plaintiffs' TAC does not allege any cognizable "actual damages," the FDUTPA claim should be dismissed.

Finally, their reliance arguments fail as well. For the Lanham Act claim, they have not alleged anything Defendants said was literally false, so they must necessarily show consumer deception and they have not alleged any. Even if they only needed to plead materiality (Opp. at 17), the TAC fails on that element too. A handful of vague consumer reviews is insufficient to plead materiality, *see Epson Am., Inc. v. Safe Space*, 2024 WL 4555880, at *4 (S.D. Fla. Sept. 13, 2024)) and here, Plaintiffs fail to allege a single consumer was misled (let alone saw) the Blogs; thus they have not adequately alleged materiality. And, because FDUTPA requires causation, and Plaintiffs do not claim any customer left them to go to Defendants *because* of the Blog Posts, the FDUTPA claim fails too. *See Hennegan v. Arriola*, 855 F. Supp. 2d 1354, 1361 (S.D. Fla. 2012).

## CONCLUSION

For the reasons above, and those reasons outlined in the Motion, the Court should compel arbitration and stay this case, or alternatively, dismiss it for failure to state a claim.

Dated: January 14, 2026
Miami, Florida

Respectfully submitted,

**NEIMAN MAYS**
**FLOCH & ALMEIDA, PLLC**

**Brandon S. Floch**
**Bryan A. Almeida**

Brandon S. Floch, Esq.
Florida Bar No. 125218
bfloch@nmfalawfirm.com
Bryan A. Almeida, Esq.
Florida Bar No. 1005558
balmeida@nmfalawfirm.com

100 Southeast Third Avenue, Suite 805
Fort Lauderdale, FL 33394
Telephone: (305) 434-4943

**MARCUS RASHBAUM**
**PINEIRO & MEYERS LLP**

Michael A. Pineiro, Esq.
Florida Bar No. 41897
mpineiro@mrpfirm.com

One Biscayne Tower
2 S. Biscayne Blvd., Ste. 2530
Miami, Florida 33131
Telephone: (305) 400-4260

*Counsel for the Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed on January 14, 2026 on the CM/ECF which will give notice to all parties in the action.

**/s/ Brandon S. Floch**