UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 25-cv-22939-RKA

| | |
|---|---|
| TENANT TURNER, INC., and SHOWMOJO, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>THRESHOLD TECHNOLOGY, LLC, doing business as RENTENGINE, and ALEXANDER STRINGFELLOW,<br><br>Defendants. | Miami, Florida<br><br>May 26, 2026<br><br>Pages 1 to 57 |

TRANSCRIPT OF **DISCOVERY HEARING**

HELD BEFORE THE HONORABLE ENJOLIQUÉ A. LETT

UNITED STATES MAGISTRATE JUDGE

LANCE W. STEINBEISSER, FCRR, RPR, FPR-C
Transcriber
United States District Court
400 North Miami Avenue
Miami, Florida 33128
305.523.5633

Proceedings recorded by mechanical stenography from a digital audio recording; transcript produced by computer-aided transcription.

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

JOHN GRAVANTE III, ESQ.
Jayaram Law
3800 Northeast 1st Avenue, Suite 500
Miami, Florida 33137
john@jayaramlaw.com
516-441-0961

ON BEHALF OF THE DEFENDANTS:

BRANDON S. FLOCH, ESQ.
CHRISTOPHER D. JOYCE, ESQ.
Neiman Mays Floch & Almeida PLLC
100 Southeast Third Avenue, Suite 805
Miami, Florida 33394
bfloch@nmfalawfirm.com
305-434-4943

(Call to the Order of the Court.)

THE COURTROOM DEPUTY: Calling Case 25-cv-22939-Judge Altman, Tenant Turner, Inc., versus ShowMojo, LLC, et al.

Will all parties announce for the record, beginning with the plaintiff.

MR. GRAVANTE: Good morning, Your Honor. John Gravante on behalf of the plaintiffs.

THE COURT: Good morning, Attorney Gravante.

MR. FLOCH: Good morning, Your Honor. Brandon Floch on behalf of the defendants. And with me, to my left, is Mr. Christopher Joyce.

THE COURT: Good morning, Counsel.

So we are here this morning on the parties' joint motion for a discovery hearing, which is Docket Entry No. 96, and the order granting that discovery hearing at Docket Entry No. 98.

I read the plaintiffs' motion to compel production of documents, and so therefore, plaintiff, you have the floor.

MR. GRAVANTE: Good morning, Your Honor.

THE COURT: Good morning.

MR. GRAVANTE: So, yes, we are here today on plaintiffs' motion to compel certain financial discovery from the defendants. The requested financial information, Your Honor, is directly relevant to plaintiffs' claims and

specifically our damages theory. And the defendants have not met their burden to show why it should not -- why it should be withheld.

As you know, Your Honor, Rule 26 provides that a party may obtain discovery of any nonprivileged matter that is relevant to a claim or defense and proportional to the needs of the case. Here, the defendants object primarily on relevance grounds, but a court routinely compelling exactly this type of financial discovery in cases like ours involving the Lanham Act, trade secrets, unfair competition, and seeking disgorgement, which we [UNINTELLIGIBLE].

And so in our third amended complaint, we allege that the defendants improperly accessed our property management platform, that they harvested proprietary information, and they accelerated their own development of a competing software, thereby avoiding development costs and then -- this is what we call --

THE COURT: I'm sorry to interrupt, Counsel.

MR. GRAVANTE: Sure.

THE COURT: And that is why these discovery requests -- and just for the record, Request Nos. 3, 4, 6, 7 -- I believe it was 12 and 13 --

MR. GRAVANTE: That is correct.

THE COURT: -- and 28.

And that's why some of these discovery requests

request just -- how to say it broadly -- all financial documents disclosure and not those that are limited to -- although some are limited to, but not all are just limited to anything referencing or dealing with customers that were previously customers of the plaintiff; is that correct?

MR. GRAVANTE: Right. Well, it's not necessarily -- I think our requests were more specific than all financial documents. I mean, we --

THE COURT: It was. But I mean, they don't all have the qualifier that it is only referencing plaintiffs or referencing customers that previously were -- used Tenant Turner or ShowMojo --

MR. GRAVANTE: Right. That's correct, Your Honor. That's -- the reason for that is this head-start theory that I was talking about.

So we allege that they came onto our system, stole proprietary information, and then used that to develop their competing software. This is what -- in these sorts of trade secret cases is called the head-start theory. For instance, it is not a loss remedy case. Right? So that's why the customer -- the specific customer information is not enough because it's not just about what -- how much revenue we lost.

Our trade secret claims are expressly based on this head-start theory, that they used our confidential information to accelerate development and commercialization of their

competing platform. And we also seek disgorgement and unjust enrichment damages.

Now, courts in this district and elsewhere have held that they approve the types of financial discovery we're seeking here is highly relevant in cases like this involving a head-start theory.

Your Honor, I'm going to talk about a case in this district called Sensormatic. It was not in the brief. I've given defense a copy. Would you like a copy as well?

THE COURT: Yes, please. If you could hand it to my law clerk. And I know it says it on there, but if someone can also just give me the citation.

MR. GRAVANTE: Sure. I'll do it right now.

It is 632 F. Supp. 2d 1147, Southern District of Florida, 2008. It's Judge Hurley. So this is the Sensormatic case. This case is particularly instructive, Your Honor, because it involved the exact type of trade secret head-start theory that we're talking about here.

And the Court found that the defendant used the plaintiff's confidential specifications and then -- as a starting point for the development of its own competing product. And that's exactly what we allege here.

And it specifically recommended that disgorgement of the defendants' products is a proper measure of damages. That is, you know, disgorgement from the amount of time it would

have taken the defendant to independently develop the product without the benefit of our trade secrets -- the head-start period. That's what that's called.

Now, the Court went in -- in reaching its decision in this case, the Court specifically relied on actual and forecasted sales and profit data to calculate that head-start benefit. And that's exactly why we're seeking broad financial discovery here. The head-start damages necessarily require analysis of proof, financial performance, commercialization timing, and the economic benefits associated with the accelerated development.

And, Your Honor, we've submitted the declaration of our expert James Donohue, who is going to be conducting our damages analysis. And he explained why these materials are necessary. He says in there that the information he requests -- we request is necessary to evaluate any avoided development costs, acceleration benefits, unjust enrichment, customer migration value, profitability impacts, and disgorgement.

So this is not speculative discovery, Your Honor. Our expert specifically explains why the information was necessary. So it's not only highly relevant but absolutely necessary for him to conduct his damages analysis.

Now, defendants did in fact produce some financial data. It was limited to the customers that allegedly left our

place -- our software for theirs. And they did provide some minimal discovery related to revenues generated from those specific customers. But that's not enough-- because that's not the same thing as showing how the defendants financially benefitted from our trade secrets. It only shows how much money we've lost. This is not a revenue -- lost revenue case. It's a head-start case.

It doesn't tell us how much development costs they avoided, whether they accelerated their product, and all the other things we discussed before about the head-start theory. Those are the core damages issues in a head-start case.

I'll point Your Honor to a case that is cited in our brief. It's Crocs, Inc. v. Effervescent. And that's 2017 WL 5714720.

Now, this case is particularly important here because the defendant made almost the exact same arguments as the defendant makes here. They had already produced summary sales information and that the underlying financials were not necessary, and that financial statements were irrelevant.

And the Court rejected it all. The Court, and I'll quote, says, "The defendants do not cite any authority for the proposition that the production of summary sales information precludes discovery of the underlying financial statements." That's our situation.

And the court goes on to say, "When the discovery

sought appears relevant -- and it certainly appears relevant here -- the party resisting discovery has the burden to establish lack of relevancy and that it may be withheld."

One other case I'll point you to, in the Middle District of Florida, is also -- this is not in our brief, but I'm just going to talk about it very briefly. It's City Hunt, LLC, versus Let's Roam, LLC, 2019 WL 1306211. That's a Middle District of Florida case from 2019.

This was a Lanham Act case. We assert the Lanham Act claim here as well. And the defendant argued that only limited revenues tied to actual infringement should be produced. And the court rejected that argument.

Quote, "The plaintiff need only prove gross -- the plaintiff need only prove gross sales, and then it is up to the infringer to prove which, if any, of those sales were not attributable -- attributable to the wrongful act. Again, this is the -- it's their burden to show why this information is not discoverable."

So as to the requests -- you know, briefly, we are seeking development costs -- bank records related to development costs and time to market, revenue, and gross profit, and net income. And Sensormatic says, "You cannot evaluate avoided cost damages or acceleration benefits without examining development budgets, projections, commercialization planning, and financial analyses relating to product

development.

We've also requested financial performance and cost of sales information. And -- I have to go through all of them -- Your Honor, the bottom -- what -- defendants are trying to invert the burden. We've established that this information is relevant. They argue that it's not but haven't described why it's not relevant -- haven't met their burden to show why it's not relevant. And so we think that this information should be produced.

Now -- so I'm going to refer to Sensormatic one more time. Sensormatic is especially instructive because it recognizes that head-start damages are the measures of the defendants' profits -- commercialization, timing, accelerated development, gross revenues during that period of accelerated development -- the head-start period. That's why the customer-specific revenue is not -- is insufficient.

Your Honor, the defendants also argue -- excuse me -- defendants also argue that this information should not be produced because it's confidential and proprietary and sensitive.

Now, that's not really a relevance objection. It's a confidentiality objection. But confidentiality alone is not a valid reason to withhold discovery. That is especially the case here where we have a stipulated protective order that the Court entered -- that's Docket Entry 93 -- and it contains an

attorneys' eyes only provision.

So this robust protective order is going to -- will -- you know, will prevent any sort of issues related to confidentiality. So they can't credibly argue that the production should be denied altogether based on this confidentiality argument when the protective order exists to protect it.

And lastly, Your Honor, the defendants' first and primary argument, because they cannot argue that this information is not relevant, is a procedural detour. They claim that we are barred. We have waived our right to seek this discovery because a prior request for production -- the deadlines have passed for us to seek that -- a motion to compel under local Rule 26.1(g).

That is not the purpose of that rule, and that's not -- that's not how that works. That Rule 26 is a procedural bar. The purpose of that rule is to focus the parties' conferral efforts and ensure that the discovery motions are filed when ripe and not held until shortly before the close of trial. That's the purpose of Rule 26.1(g). And that purpose was satisfied here, Your Honor.

Plaintiffs served our third request for production. Defendants objected. We met and conferred. And then plaintiffs timely brought this dispute, and they participated in the joint hearing request.

So the purpose of Rule 26.1(g) has been satisfied here. It's a list of conferral efforts. It's got us here in front of you long before trial to resolve this issue.

So even if we had missed the deadline with respect to the second request for production, that doesn't -- that, at most, would affect a motion directed at those requests -- those specific responses. It doesn't adjudicate the whole merits of the dispute. Rule 26.1(g) is not a merits rule. It's a procedural rule. So that doesn't bar us from ever seeking any information on that topic because the deadline has passed on a prior request.

THE COURT: If I understand defendants' argument correctly, what they're saying is that the plaintiffs are trying to do an end-run around the purpose of that rule by saying, "Okay. Since we missed the timing under second request, we still have time within the discovery period. Let's just blow that, repropound basically the same request, and a third one shall reset the clock."

I may be misinterpreting their argument. They can clarify. But if I'm not, what is your response about how this isn't just gamesmanship to get in the back door what you can do from the front door?

MR. GRAVANTE: Well, Your Honor, the purpose of the rule, as I said, number one, is to [UNINTELLIGIBLE] discovery and prevent last-minute motions to compel. And it's to force

the parties to confer and go through the discovery process [UNINTELLIGIBLE] the purpose.

So even if we did propound identical requests, I think that would still be, you know -- the merits issue is still up in the air. It hasn't been decided yet. But more importantly, Your Honor, these are not the same requests. They're very different.

The third RFPs, they do several things. They -- they narrow the relevant time period. They shift from general accounting discovery to this head-start damages discovery. Right? We -- the third RFPs aren't broad, but the second RFPs were broad requests for accounting files and historical financial statements. Here, we're specifically targeting product development costs, time-to-market analysis, commercial timing, avoided development expenses, growth metrics, and competitive benefit.

None of this stuff was -- our -- our -- our requests are very focused on these specific issues. The second request for production were not. They were broad, in general.

And, Your Honor, that's -- the purpose -- you know, federal discovery is iterative; right? It's meant to -- parties are supposed to go back and forth and narrow their requests and work on it. And that's why it's -- you learn information. You refine theories. You narrow requests, and confer and brief these disputes to the Court, which is exactly

what happened here.

The third RFPs also focus on the specific financial content -- concepts relevant to disgorgement and unjust enrichment, which we do not. That includes contribution margin, profitability, growth, commercialization benefit -- many of the same things, but -- we've narrowed these requests. We've made them specific. And that's what the Rules of Civil Procedure Rule 26 is meant to encourage.

This is refinement through discovery, not circumvention of the local rule, again, which is just meant to focus the parties' efforts and prevent last-minute motions to compel.

And, you know, defendants responded to this third request for productions. They asserted substantive objections. We engaged in the meet-and-confers, and they participated in the joint motion process. That's exactly the order of the conferral process that 26.1(g) is meant to facilitate. This is not a stale surprise motion on the eve of trial. It is a timely dispute over narrower, refined financial requests.

Briefly, I just wanted to mention defendants' cases. They focus on they have some authority primarily from the district of New Mexico, including the case Hancock. Defendants rely on a statement in Hancock that says where a first motion to compel is untimely, a party is not allowed to

circumvent the time deadlines by serving a second set of similar discovery requests and a later timely motion to compel.

Again, first of all, the District of New Mexico does not have Southern District of Florida local Rule 26.1(g). But that's not what was -- that case was different. There, the court was dealing with [UNINTELLIGIBLE] trying to apply the exact same stale dispute through identical requests, and it denied the motion not on that basis but primarily because the discovery was not relevant to the claims.

Hancock says, "It is not certain that the second discovery requests are identical to the earlier set, and some requests saw broader and additional information. These requests are clearly not identical."

Our requests are different. They're refined. They're narrower. But the Court primarily denied the motion because the second discovery request, again, asked for extrinsic materials and information that are not relevant. This case was decided because the documents sought were not relevant.

And then the Gregory case, also from the District of New Mexico. It says that, "BATO" -- I'm not sure what that is -- "provides no authority for holding one party to the deadline of filing a motion to compel regarding another party's discovery request even if those requests are

identical." So Gregory actually says that you can submit the identical requests, and it will still hear it. The court overruled the [UNINTELLIGIBLE] objection in the case they cited.

So they cite this Teen Services case, which is an Eleventh Circuit case. They cite a restrictive enforcement of Rule 26.1(g), but in a joint motion quotes it as affirming denial, quote, "for being untimely under the district court's scheduling order in Rule 26.1(g)."

But that was an untimely motion to compel. It didn't involve -- on those specific requests, it didn't involve narrow or different requests. So the court just held that it was untimely under the rule because it was those requests that were at issue, not some later, narrower requests.

All right. I'll just close out by saying, you know, their waiver argument, it's a procedural distraction. It's not a merits issue. This subject matter has not been barred from discovery just because in a prior request we did not move to compel. We moved to compel here on these different requests. They're not duplicative. They're different. They're narrower. They're more refined. And that's the purpose of federal discovery Rule 26 and the local Rule 26.1(g).

If Your Honor doesn't have any questions, I will sit down.

THE COURT: I do not. Thank you, Attorney Gravante.

MR. GRAVANTE: Thanks.

MR. FLOCH: Good morning, Your Honor. Brandon Floch, again, on behalf of defendants.

I'd like to start with a little bit of background about the case just because we haven't been before Your Honor. So this case involves our client called RentEngine. They're an emerging startup in the property management platform arena. They're basically the only viable emerging competitor to the two plaintiffs that are called ShowMojo and Tenant Turner. Both ShowMojo and Tenant Turner, they were formerly competitors. They're now owned by the same private equity firm called Greater Sum Ventures.

And I mention that because it's relevant to an argument I'll make a little bit later. So there's Greater Sum Ventures, private equity. It owns plaintiff ShowMojo and Tenant Turner. Our client is RentEngine. It's pretty much the only competitor in the space right now. It's very new, about two years old. It's young. That informs the arguments we're going to make today.

And, Your Honor, I wanted to point you to the complaint here because obviously the discovery that's relevant is tied to the complaint. And despite months and months of discovery, almost a year of discovery, the core allegations of defendants' complaint here that my client copied their

platform is all based on information and belief, which I do think is important here.

Paragraph 8 and paragraph 77 of the operative complaint, which is Docket Entry 57, they just say, "On information and belief, defendants used this confidential and proprietary information to replicate numerous password-protected processes within RentEngine's own platform." That's it.

We only have information and belief allegations after nearly a year of discovery. And based on those information and belief allegations, plaintiffs have now asked for wide-ranging financial discovery. I think Your Honor hit the nail on the head. This isn't just about head-start costs. This is pretty much the full bulk of financial discovery they're asking from their competitor.

And so, Your Honor, I would like to proceed with two arguments today. The first is a procedural argument. Mr. Gravante has said it's just procedural. It's just technical. No. It has meaning, and we'll walk through the local rules and what we believe the purpose of the local rules are.

The second argument has to do with the competitive harm the defendant RentEngine would face if forced to disclose this material. And, Your Honor, there's a case called Duracell we'll talk about. The Duracell test basically says

that the court has to weigh the competitor harm from disclosure against plaintiffs' necessity of the documents to determine what to order and when, especially when you're looking at discovery from one competitor -- an emerging startup -- RentEngine -- to the big -- they're the big competitors in the space, the plaintiffs here.

So, Your Honor, on point one, waiver, the local rule here could not be clearer. I don't need to read it out, but it basically says if you don't bring me a discovery dispute within 28 days, you're pretty much barred from bringing the dispute. And your local -- your standing order says, "The parties must timely raise discovery disputes as required by local Rule 26.1(g)(2) and that the court strictly enforces the local rule."

THE COURT: That's true, but I think the local rule is more permissive, is it not? It says that I may not hear it, but it doesn't completely foreclose me from hearing it even if it were time barred; is that correct?

MR. FLOCH: That is true, Your Honor. It basically says, "Failure to submit" -- not basically. It says, "Failure to submit a discovery dispute to the court within the time period set forth" -- and it lists some letters above -- "absent a showing of good cause may, in the Court's discretion, constitute grounds for denial of the request for relief." The Court does have discretion.

But here, there's no good cause for why they missed the deadline. And I'll walk through the history here, Your Honor.

In December, they propounded financial discovery. I believe the request for you -- and I will -- they're pretty much duplicative of what they've listed in their third set of RFPs. That was the second set of RFPs propounded in December. There was a predecessor counsel -- not Mr. Gravante. We objected to all of the financial discovery.

THE COURT: What I would like to know -- and it's not completely clear from the docket -- is whether or not that predecessor set of discovery was also tied to a prior, now nonoperative version of the complaint.

MR. FLOCH: Your Honor, I believe it was tied to the operative version of the complaint --

THE COURT: Okay.

MR. FLOCH: -- which was the third amended complaint.

THE COURT: Okay.

MR. FLOCH: And as a sidenote -- and it's not clear from the docket, but this is part of a history of dilatory conduct by the plaintiffs. They have moved for leave to amend to add a fourth amended complaint. Very recently, Judge Altman denied that, finding that they unduly delayed in trying to -- so we're operating off of a third amended complaint. That is going to be the complaint in this case.

So, Your Honor, the history here is, again, December they propound RFPs. There are three very express financial RFPs. We object in full. We have some conversations with predecessor counsel. We never reached an agreement. They didn't move to compel timely.

Mr. Gravante came in after the deadline had already expired, and we said, "Too bad. The deadline's expired. We spent all this time negotiating. We didn't reach a deal."

And then we were hit with a third set of RFPs that to us are functionally identical. Mr. Gravante has basically tried to say they're only about head-start costs. Well, if we read them word for word, they're pretty much the same. And I'll just give one example without reading them.

So I'm reading right now what is from the second set, the RFPs propounded in December, answered in January. It says, "All financial statements and financial reports from RentEngine's launch to present, including audited and unaudited income statements, balance sheets, statements of cash flows, trial balances, and general ledger detail to identify revenue, costs of sales and expense categories relevant to plaintiffs' claims."

And then just as an example, Your Honor -- and again, we think they're all duplicative. If you look at the third set of RFPs -- I'm sorry, Your Honor. Just to direct you, 96-5 is where the second set is. And I was reading from

Request for Production 22. Again, those are the ones that were propounded in December.

The third set propounded in March and answered in April, they're very similar. What do they say? RFP 3. And, again, this is at 96-2 on the docket. "Documents sufficient to show RentEngine's annual and monthly revenue, gross profit, and net income from January 1, 2023, to the present."

And then RFP 4, again, subsumed by old RFP 22, says, "Documents sufficient to show RentEngine's annual and monthly financial performance from January 1, 2023, to the present, including revenue and cost of sales."

And I can go through the old RFPs and the new RFPs, Your Honor, and link them up. But, again, functionally identical. And there's a case from the Eleventh Circuit we did cite which basically says, "The court has discretion to deny a late motion to compel."

We spent a lot of time negotiating with old counsel. We never reached an agreement. And then, you know, we come in and now we've got to renegotiate this financial stuff that we thought had been put to bed. And this Gregory versus Harris case that we cited from the District of New Mexico, Your Honor, the reason we cite it is because New Mexico has a very similar local rule.

And I'd like to read the language we cited in our brief, which says, "Where a first motion to compel is

untimely, a party is not allowed to circumvent time deadlines by serving a second set of similar discovery requests and a later timely motion to compel as to the subsequent discovery request." That is what is occurring here. We've got a circumvention of RFPs that they didn't move to dismiss on.

And, Your Honor, the purpose -- we talked -- Mr. Gravante talked a lot about the purpose of the rule. I think the purpose of the rule is really to wrap up discovery disputes timely -- make efficient use of time. We negotiated with old counsel. Now we've had to negotiate with new counsel. We did end up giving a small batch. But if you look at our third set at 96-5, we always objected based on this waiver argument.

So, Your Honor, I do think the Court should find that it can give credence to the rule. The rule is out here. I mean, we are trying to follow the 28-day deadline. The plaintiffs did not follow it. It wasn't Mr. Gravante's fault. There was a change of counsel at the time.

But plaintiffs need to deal with the consequences of missing those deadlines and not redo all the work that was done in trying to negotiate a deal. And we gave Mr. Gravante what we told him we would give plaintiffs the first time, which is the targeted customer revenue.

So, Your Honor, that's point one on the waiver. Again, we don't think it's just technical. We do think it is

substantive. Rules do matter in this district, very much so. Judge Altman has already found they unduly delayed in bringing their other complaint. They've unduly delayed in bringing this to the Court too. And the Court should reach -- this Court, Judge Lett, should reach the same decision that Judge Altman reached on a very similar issue.

Your Honor, as to the second, Mr. Gravante talks a lot about relevance, but we submit, Your Honor, that Duracell governs the Court's analysis here. And that case -- I just want to read a snippet of it because I think it's important for Your Honor to see if we couldn't cite all of it in our brief. But it says in talking about whether to order financial discovery from one competitor to another -- it says, "Armed with this information, a competitor could determine the strength or vulnerability of a company's financial condition. This type of information is sensitive, especially for a company in a vulnerable competitive position.

"Defendants have adequately demonstrated that the release of financial information of this kind could be devastating to a small company's emergence into the market. Plaintiff again asserts that the information is important for discovery and the scope of defendants' scheme and for assessing damages. If the Court wants to balance the plaintiffs' need for this information at this stage of the litigation against the harm the defendant would suffer from

disclosure, the Court finds that the relevance of Power Plus's financial strategy is indirect and circumstantial at best."

And the reason we raised this, Your Honor -- and I'll get to the point about the protective order, which I do think solves some problems but not all of them -- is that this is a case where RentEngine is pretty much the only competitor to plaintiffs. And I'm not just speculating that they're looking for financial information from defendants -- from our client RentEngine.

Why? We submitted a docket, Docket 99. We tried to submit it earlier, and there was some confusion about whether it was in there or not. But that email shows that someone at the private equity firm, who is in charge and doing investments, keeps reaching out to the main principal at RentEngine, Alex Stringfellow -- said, "Hey, I want to chat. I really want to talk to you." I don't think this is -- obviously, that person is not aware of the litigation, but they're highly interested in our client's financials and what our client is doing in the market.

Our client is the emerging competitor. Emails like that cause defendant concern about producing lots of financial information in this case even with a protective order. And so, Your Honor, we would submit that this is not a speculative concern about the plaintiffs wanting to look at some financial data. Clearly they do. Docket 99 shows that.

And so, Your Honor, I just want to walk through some of the RFPs and show you --

THE COURT: Well, let's go back to the protective order. So let's tease this all the way out because I understand your argument and I understand Duracell. But what this comes down to for me is a balance between Rule 26 and what you say -- which I understand that Duracell wants me to do, this weight about the actual harm and practical sense. Because under Rule 26, if it's relevant to a claim or defense -- and here, I don't really think -- if we accept this head-start theory, which we have to because Judge Altman has ruled on your motion to dismiss or compel arbitration. And frankly, I can't do it on the merits. It's not within my jurisdiction.

So accepting that that is the claim -- the operative claim, it's relevant to that. You get it unless it's privileged, burdensome, harassing -- you know, I'm not going to go over that.

So you're here saying, "I understand that, and under normal circumstances, yes, I would have to produce that." But here, we have this very strong interest and not completely losing our financial way to a competitor that has at least taken some preferment of action that would hit that they are trying to understand as from a competitive standpoint. Now in walks a protective order that says "attorneys' eyes only."

Is it your suggestion that despite that if the attorneys would still share -- why is -- and you said you were going to get to it, but why is that protective order insufficient in my Duracell analysis?

MR. FLOCH: So, Your Honor, here's the concern. We know why they need this data or why they're saying they need it. Again, I don't think that they actually need it.

But experts will use this. An expert will come out with the report. In order for the plaintiffs and even the defendants to be litigating this case, I'm sure the parties themselves will have to be looking at the expert reports, will have to be looking at the expert depositions.

Experts are allowed to use attorneys' eyes only. And so what I'm battling with here, Your Honor, is it's difficult for me to hand over this information, know that the expert's going to use it even if those documents themselves or a financial spreadsheet does not end up in the hands of a principal at ShowMojo or Tenant Turner. It ends up with the expert who puts it in a report, and that report then may say certain things that obviously are very sensitive to our client. And I'm trying to find a way to stop that from happening.

I do think Duracell says, "Listen, let's talk about necessity." And here, I don't think there is necessity. I mean, plaintiffs can use their own development costs as a

proxy of what would it take to develop. They also told us, Your Honor, in March, when Mr. Gravante came in the case. He said he was ready to produce an expert report. He didn't have any of this financial data. So, again, I go back to necessity here.

I don't think they need it. And I do think that necessity under Duracell is a different task than just straight relevance given the competitive nature. So, Your Honor, they can use their own financial data. They told us in March 2026. And we've already produced all the customer-level revenue.

But back to the protective order. It's really about leakage through the expert report. I don't know how to stop that --

THE COURT: [UNINTELLIGIBLE]. And I like your framework, so I actually want to put it to use since we only have five or six of these.

So let's talk about necessity with that balancing act for each of these, because, to be perfectly frank, I kind of have a sense of where to go with each, and I wanted you all to tell me specifically why I was right or wrong, and to specify what you had already produced, because in only one of them, which I believe is in response to Request No. 7, did I see that defendants state that they basically already produced that.

So I'm looking at Docket Entry No. 96-2, pages 21 and 22, 51, and response to Request No. 7 that asks for the identity of all customers. It says that you produced basically the identity of the customers but that you have not produced the financial information because it asks about the revenue earned from each customer.

MR. FLOCH: Your Honor, wouldn't we have produced that information now? The revenue --

THE COURT: Oh, okay.

MR. FLOCH: -- for each customer that came from their company to our company. We have not produced revenue information for every single customer. So if we had 20 new customers and we don't know if they came from --

THE COURT: Okay. That's very helpful. So let's just walk through it so you can let me know, because now No. 7 sounds like it means that specific one would be moot.

MR. FLOCH: Yes, Your Honor.

THE COURT: Okay.

MR. FLOCH: I believe that's --

THE COURT: So No. 3, we have documents sufficient to show RentEngine's annual and monthly revenue, gross profit, and net income. And we can kind of group it with No. 4. That shows financial performance. This is one that I -- what I would call a broader one that is not just limited to anything touching and concerning plaintiffs. But from plaintiffs'

theory that this is necessary because this gives it this head-start theory, why are you refuting the necessity of 3 and 4?

MR. FLOCH: Your Honor, I think there's some -- there are really two reasons: One, understanding our competitive or cash state at a certain time can allow them to make certain decisions in litigation based on knowing, hey, listen, this emerging competitor, they're not doing well, or they're not doing well in these months, and take certain actions that, you know, might be based on the financials that aren't really connected to the case.

Now, again, will the protective order protect against that? I think so, but I'm assuming because the expert asks for it, they're going to have an understanding of how healthy financially the company is, and that will inform how they compete or whether they make certain acquisition offers like they're making in Docket 99. Those are the concerns with RFP 3 and RFP 4.

THE COURT: Okay. Moving to RFP No. 6 -- hold on a second. Am I understanding from your interpretation -- I'll certainly ask the plaintiffs again -- that essentially the difference between RFP No. 6 and No. 7, just the clause of asking for revenue earned, is that 6 is for every one of the defendants' customers, and 7 is limited to the revenue -- I'm going to say fees, gross profits -- but the financials of just

the customers that used to be with ShowMojo and Tenant Turner.

MR. FLOCH: That is my understanding, Your Honor, which is why 6 is probably the one that, I think, is --

THE COURT: You're saying it's problematic.

MR. FLOCH: -- problematic. I mean, just knowing that, okay, Property Manager A, who came to us with no prior relationship with them, they're making X revenue. They're charging him X. If that client is a -- is a very large client of RentEngine, that could give them a competitive advantage to want to target them.

And I don't really see how it's tethered to the allegations at all so that there is a very real concern with 6, probably the most concern.

THE COURT: Okay. And how would it not be tethered to the allegations on X on this head-start theory? Is that where you're saying, well, they can use -- they have a number of different projection models that they can use? Pick one.

MR. FLOCH: Well, the revenue from each customer that we gained independently, then, says nothing about the cost to develop the platform. It's just the amount of money they're making on each of those customers.

THE COURT: True. But that would say how fast that you were able to [UNINTELLIGIBLE] go back to the exact language that they were using -- accelerate. Wouldn't that get to, you know, how you were able to accelerate your

platform and able to manage, say, a large customer that is Property Manager A because you were able to use a lot of their information that you gleaned from their customers signing onto their website, and you were able to get your software up to speed. So despite the fact that that customer didn't come through them, their kind of proprietary information in the way this platform ran came from them for you to service another customer. How is that not tethered to --

MR. FLOCH: Perhaps indirectly. But, again, if we go back to 3 and 4, I think if we're showing our monthly revenue, they can get that on a less granular basis. The more granular, the more sensitive. And so if they saw monthly revenue, you know, in the third -- in response to RFP 3, that would cover it, but it would be more anonymized, for example, less granular about who the customer is, what they're being charged, how much they're paying per month.

THE COURT: Okay. And I understand at least from defendants' perspective, No. 7 is now moot because you've turned over both the financials and the identity of all customers.

MR. FLOCH: Yes, Your Honor.

THE COURT: Okay. Nos. 12 and 13.

MR. FLOCH: Your Honor, for 12 and 13, I don't -- I've talked to the client. I don't know what really exists beyond what's responsive to 3 and 4. There may be some things

here and there.

The one thing that does concern us and I do think is a -- is the churn -- information about churn. If they're losing certain types of customers, that can provide a competitive disadvantage to plaintiffs. For example, let's say they're losing all of their large property managers in South Florida during X number of months. That could provide insight into certain decisions that plaintiffs could make. And, again, if the protective order stops that information from getting to them, maybe it protects it.

But that churn information in 12 and 13 is something that we're concerned about -- defendant is concerned about, but I do want to let the Court know I've asked the client about these. And I'm not sure what exists beyond the financial statements with 3 and 4. There may be one or two things, but it's not going to be bulky.

THE COURT: Okay. And where No. 13 is, at least -- although I wanted to see if I was interpreting right this No. 13 correctly, that it's not just financial performance associated with customers who previously used Tenant Turner or ShowMojo but all of these things -- the analysis, projections, financial models, et cetera, associated with customers who previously used Tenant Turner or ShowMojo. If that is the correct interpretation -- and I will ask plaintiffs' counsel -- how is No. 13 not more tethered to the claims here

and more akin to, say, request No. 7?

MR. FLOCH: It is more akin to 7. And, Your Honor, I think the point is that the revenue data we gave -- previous customers who were at ShowMojo and Tenant Turner and are now with RentEngine, it may be the full universe of what exists there. If there are other projections that might exist, they're going to be minimal, but the bulk of it has already been turned over under RFP 7.

THE COURT: Okay. And then lastly, No. 28.

MR. FLOCH: For 28, Your Honor, I've had the client search, and there are no -- there's nothing responsive that shows how much revenue or conversions that they're making from blog posts. We've already turned over the only document that shows how many people visited one of the comparative or the comparative blog posts that exists.

THE COURT: Are there marketing materials referencing plaintiffs that defendants utilize?

MR. FLOCH: There are, but I believe all of them have been turned over.

THE COURT: Are there analytics, traffic metrics based on just the top marketing materials that reference plaintiffs?

MR. FLOCH: Yes. And it's a document that I previously identified for plaintiffs. And I can identify it again.

THE COURT: Okay.

MR. FLOCH: And it's been turned over.

THE COURT: Okay. Thank you for walking through those with me.

If you have any further argument, you may proceed. I know I interrupted you --

MR. FLOCH: No, Your Honor.

THE COURT: -- to do that exercise.

MR. FLOCH: I'll just end by making two points which is I do think the waiver argument here is real. I do think the rules matter here. If not, people could continue to issue similar RFPs while missing the 28-day deadline as long as they don't do it at the end of -- or before discovery expires. And I don't think that is the purpose of the rule.

And second, Your Honor, this is a unique situation. Docket 99 does show that plaintiffs are looking at our clients' information, financial information. I don't know what for. But there are some serious concerns with turning over basically every financial, which when you read the RFPs together, it is quite a large universe of documents being requested. So I appreciate your time, Your Honor.

THE COURT: Thank you so much, Attorney Floch.

Attorney Gravante.

MR. GRAVANTE: Yes, Your Honor. I'll be brief.

Counsel got up here and argued why these documents

are not relevant, and his argument was always that they're sensitive, and we're afraid that the plaintiffs are going to see them. We have a protective order. We have an attorneys' eyes only provision in there. That's the purpose of that. I mean, if we don't trust those protective orders, then why do we enter them? They would be -- we're not going to violate it, you know.

The expert, of course, is going to look at it. And if there is sensitive or confidential information that would go in his report, we could make that -- you know, we could make that confidential as well.

THE COURT: Okay. So let's really talk through this practically.

MR. GRAVANTE: Yeah.

THE COURT: I mean, I know no party goes into trying to violate a protective order. But what Attorney Floch argued would happen without violating the protective order -- and I can go back and look. Most protective orders, even for attorneys' eyes only, do allow the attorneys' agents or those that are hired to further the litigation, which would be an expert. And although the underlying data may not go to the client -- I mean to whoever is the actual client contact that you have, surely the expert report does.

So how is that, honestly, from a practical matter -- and I did look at this Duracell case -- how does that not

invoke those interests in saying even from a practical matter without violating the protective order -- if there is financial information that can be gleaned about the company that in this context of litigation would extend beyond that and be harmful in a real competitive way, and why would the Court not consider that?

MR. GRAVANTE: Well, Your Honor, the cases say that if you have a protective order with an attorneys' eyes provision in place, that is sufficient. The assumption is that that protective order is going to prevent the disclosure of that information.

And yes, experts are going to look at it, and then there's going to be some information in the expert report. But as I mentioned, we could make the report confidential or attorneys' eyes only, if necessary. We could -- and in any event, I mean, this is -- this is information that is directly relevant to our claims, highly relevant to prove our head-start theory, and there's a protective order that says attorneys' eyes only.

We shouldn't be barred from receiving highly relevant discovery when there's sufficient protections in place. And, of course, practically, you know -- yes, the expert's going to look at it, but there are ways to protect that information even if it's in the expert's report, I believe.

THE COURT: And -- oh, I'm sorry.

MR. GRAVANTE: Go ahead. Go ahead. I'm sorry.

THE COURT: No problem. I thought you were sitting down. [UNINTELLIGIBLE] just a couple questions.

Were you about to say something before I interrupted --

MR. GRAVANTE: No. I was going to talk about Duracell, but you can --

THE COURT: No, go ahead. Talk about Duracell, because I was going to ask you specifically about some of the individual --

MR. GRAVANTE: Okay. Well, I'll start with Duracell, and then -- I'll be very brief.

First, you know, the court there emphasized that, you know, there's nothing -- there's no allegations related to anything -- the defendants to this misconduct or this misappropriation and that that was the reason why it wasn't permitting discovery of this financial information.

Here, we pleaded detailed head-start and unjust enrichment theories. And they're tailored to the specific request for production for those precise damages categories. We narrowed the time periods. We seek commercialization measures, avoid development costs, contribution margin, profitability analysis. All this is related to our -- is highly relevant to our head-start theory.

But, you know, in Duracell, the court allowed

discovery of this information when it was specifically tied to the misappropriation claims. It compels entire discovery because it was narrowed to materials specifically relevant to the misappropriation claims. Why? That is the case here.

Our allegations and our requests are tailored to our misappropriation allegations. The Duracell court ordered production of those materials in such circumstances.

So like the narrow discovery permitted in Duracell, our third RFPs were specifically targeted to the alleged head-start theory and the unjust enrichment theories and the disgorgement theories in our third amended complaint.

And so you wanted to ask about --

THE COURT: I wanted to specifically ask if you would agree that No. 7 is now moot.

MR. GRAVANTE: Yes --

THE COURT: Okay.

MR. GRAVANTE: -- I would, Your Honor.

THE COURT: And if you would explain, if you can, just -- would 13 -- Request No. 13 kind of be encompassed in Request No. 7, or would you say that 13 is a little bit more broad? So even if they produce everything under Request No. 7, No. 13 is still alive?

MR. GRAVANTE: No. 13 is broad because in 7 we're seeking just information related to the customer and the revenue earned from each customer.

In 13, we're asking for analyses, projections, financial models, or communications concerning overall profitability [UNINTELLIGIBLE] .

So to the extent there is other information beyond just the revenues, we would -- we would like that as well. If there is no such information, then -- then 7 probably covers it.

THE COURT: Those are all of the questions that I have.

Attorney Gravante, you will have the last word, but I do have a couple of questions for Attorney Floch. And so I will make sure you get the last word. It's your motion. But I just wanted to let you know that I'm going to go back to him on some additional information.

MR. GRAVANTE: All right. Your Honor, may I make just one --

THE COURT: Yes, go ahead. I thought you were done. You go ahead.

MR. GRAVANTE: [UNINTELLIGIBLE] about the local rule. You know, counsel got up here and told you what he thinks the purpose of the local rule is, but that's not what the cases say. There are two cases, Munro v. Fairchild Tropical Botanic Garden. That's 2021 WL 11960970. And that's a Southern District of Florida case from 2021.

And it specifically explains the purpose of

Rule 26.1(g). It is to focus the parties' conferral efforts and ensure that discovery motions are filed when ripe and not held until shortly before the close of discovery on the eve of trial. That's the purpose. And that's what happened here.

We issued narrower, [UNINTELLIGIBLE] more specific requests. We -- within the 28 days, we met, we conferred, we argued, and then we filed our [UNINTELLIGIBLE] motion within the time limit about this dispute. That's the -- it's to focus disputes. It has done that here. The local rule served its purpose by allowing us to come here.

And then I'll give way to my colleague.

THE COURT: Thank you. Hold on one moment. I'm sorry. Just two moments, please. My apologies. A grand jury matter.

Attorney Floch, I think you were already prepared to say something, so I'll hold my question until after your remarks. Go ahead.

MR. FLOCH: Oh, no. Your Honor, I just wanted to thank you for moving the schedule. I forgot to thank you in the beginning. We were supposed to do it on Friday, and I had a conflict, so I appreciate that.

THE COURT: No problem at all.

Okay. Practically speaking, how would you respond to Attorney Gravante's suggestion that -- it doesn't sound like -- and I would agree. It doesn't sound -- well, that's

not true. You are saying, I believe, in certain cases that this information simply isn't necessary, that there are other ways to get it. But it doesn't sound like even if there are other ways to get at this that it's not relevant. But the greatest concern is this loss of a competitive advantage from an emerging competitor in a market that is not at a similar bargaining position.

So there are other ways to fashion -- to give this protective order more teeth. In your perspective, is that accurate? Or do you still have remaining concerns [UNINTELLIGIBLE] --

MR. FLOCH: Your Honor, I don't want to give up the waiver argument. Obviously, we've got the waiver argument to one side.

THE COURT: I understand that. And I get that. But my questions are just now to --

MR. FLOCH: On relevance, I really don't think, even for this head-start theory, the amount of information they're asking for is relevant to the head-start theory.

But assuming the real concern here is sensitivity or that's what Your Honor is asking about, if there were some type of order that said they've got to redact the expert report, they also have to share the expert report with us before their client to see if there's anything further that should be redacted from the attorneys' eyes only material.

That perhaps would be a way to satisfy some of the sensitivity concerns.

There may be other creative ways that Your Honor can think of. That's the one that's at the top of my mind. Because I take Mr. Gravante at his word. He's not going to share the AVO materials, and that was never really the concern.

THE COURT: Just so that your larger argument doesn't get lost, you're still of the mind that broad and sweeping financials that essentially shows the current -- the past and current financial state of your company simply is not necessary in order to come up with a damages projection on any theory that is asserted by plaintiffs.

MR. FLOCH: That is correct, Your Honor.

And one point I make that we haven't really talked about is, like, the discovery that they're asking about is really discovery that you see in a punitive damages phase of a case, asking about net worth.

As Your Honor knows, you have to do a full proffer for that. The discovery here is very similar to that. I don't think they need every monthly financial statement, which is what they're asking for. I don't think they need revenue from every single customer we have to prove up their head-start theory.

And all of that -- Mr. Gravante told me in March he

was ready to produce an expert report without it. So clearly he's got enough to come up with the proxy. Do they want every financial? Of course. An expert always asks for everything. But I look at his list in paragraph 10 of the declaration --

THE COURT: I was going to ask you about the declaration --

MR. FLOCH: Everything. And he asks going back to 2021. Well, guess what? Our company didn't exist in 2021. So on its face, it's overly broad. Experts always want more data.

I do a lot of the plaintiff [UNINTELLIGIBLE] for experts who ask for all the data in the world, and I always say, "You can't get everything you want." And that seems to be like -- sorry. That list is a wish list. It's not a necessity list.

THE COURT: Thank you.

MR. FLOCH: Thank you, Your Honor.

MR. GRAVANTE: Your Honor, very briefly. I would first say that RentEngine is not a nascent, emerging competitor. RentEngine is doing very, very well. We believe it's probably doing better than our company, specifically as a result of its misappropriation of our trade secrets. So let's not be fooled that [UNINTELLIGIBLE] some struggling, growing company. That's not the case.

As to the [UNINTELLIGIBLE], specific requests, and

why they're relevant, I'll just refer back to Sensormatic again. Judge Hurley went through this in detail.

Under this head-start theory, as a starting point from the development, the court found that the defendant used the plaintiffs' confidential specifications as a starting point for the development efforts in order to bypass the period of research and development. That's our head-start theory.

Disgorgement of profits is an appropriate remedy when disgorgement is limited -- you know, I already talked about that. But the court specifically relied on actual and forecasted sales and profit data to calculate the head-start benefit because that's how you do it. You have to look at how successful they were during this head-start period and extrapolate from that, you know, how much benefit they gain from stealing our trade secrets.

That's exactly why we're seeking this broad discovery. It is broad. So it's not just a punitive damages analysis. This comes up in these cases all the time, and the cases make clear that a party asserting this sort of damages theory, seeking disgorgement, unjust enrichment, Lanham Act claims, this kind of financial information is highly relevant and necessary for an expert to conduct his analysis and do the damages analysis. So that's all I have.

THE COURT: Thank you so much.

MR. GRAVANTE: Thank you.

THE COURT: Are we good, Attorney Floch?

MR. FLOCH: Yes, Your Honor. Thank you for your time.

THE COURT: You all have given me really, really great argument in a different prism to go back and look at these cases.

So I'm going to take this matter under advisement and issue a ruling in short order. I will say with regard to the waiver argument, I am prepared to rule on that, so just not to keep you waiting.

Attorney Floch, I understand your argument and, you know, normally it won't carry the day. I do know that some of my colleagues believe that the sole purpose of 26.1(g) is just to bring argument to the court timely before trial, before gotcha, and that is also it. But a larger spirit of all the rules is not to go through the back door which you can't do through the front door.

Here, I do believe, having understood that this was going to be your argument, looked at the request and see just enough dissimilarity, which I did not put together, Attorney Floch -- and I appreciate for knowing it -- is that Attorney Gravante is actually newer to the case.

So where the Court generally has a preference to rule on the merits, then a procedural bar -- although procedural

bars are taken seriously and go to the merits, it's not the merits itself. The Court has a preference to rule on the merits. And even here I think there is enough dissimilarity. And by the time it sounds like Attorney Gravante got into the case and you all have been working this out, it has not been a delay, and he has brought this, and you all have met and conferred. And there has been some exchange based on those meet-and-confers, it sounds like, with Request No. 7. And so I'm not going to bar the plaintiffs from being heard on the merits on that alone.

However, I do want to look at the merits. And the ruling will go through each request one by one. I would appreciate both of your proposed orders, but it likely is going to give you an individualized analysis of how I'm looking at each request.

Thank you so much, gentlemen. Have a great morning.

MR. FLOCH: Thank you, Your Honor.

THE COURTROOM DEPUTY: Court's adjourned. All rise.

(Proceedings were adjourned.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter. The transcript was prepared to the best of my ability from a digital audio recording of the proceedings provided by the Court.

DATE: 26th of June, 2026

*/s/Lance W. Steinbeisser*
Transcriber
United States District Court
Southern District of Florida
Miami, Florida

## /

**/s/Lance** [1] - 48:5

## 1

**1** [3] - 1:6, 22:7, 22:10
**10** [1] - 44:4
**100** [1] - 2:10
**1147** [1] - 6:14
**11960970** [1] - 40:23
**12** [4] - 4:22, 32:22, 32:23, 33:11
**13** [13] - 4:22, 32:22, 32:23, 33:11, 33:17, 33:19, 33:25, 39:19, 39:20, 39:22, 39:23, 40:1
**1306211** [1] - 9:7
**1st** [1] - 2:4

## 2

**20** [1] - 29:12
**2008** [1] - 6:15
**2017** [1] - 8:13
**2019** [2] - 9:7, 9:8
**2021** [4] - 40:23, 40:24, 44:8
**2023** [2] - 22:7, 22:10
**2026** [3] - 1:5, 28:10, 48:5
**21** [1] - 29:1
**22** [3] - 22:1, 22:8, 29:2
**25-cv-22939-Judge** [1] - 3:3
**25-cv-22939-RKA** [1] - 1:3
**26** [7] - 1:5, 4:4, 11:16, 14:8, 16:22, 26:6, 26:9
**26.1(g** [5] - 12:1, 12:8, 14:17, 16:7, 46:14
**26.1(g)** [6] - 11:14, 11:20, 15:5, 16:9, 16:23, 41:1
**26.1(g)(2** [1] - 19:13
**26th** [1] - 48:5
**28** [5] - 4:24, 19:10, 34:9, 34:10, 41:6
**28-day** [2] - 23:16, 35:12
**2d** [1] - 6:14

## 3

**3** [9] - 4:21, 22:4, 29:20, 30:2, 30:18, 32:10, 32:13, 32:25, 33:15
**305-434-4943** [1] - 2:11
**305.523.5633** [1] - 1:22
**33128** [1] - 1:22
**33137** [1] - 2:5
**33394** [1] - 2:10
**3800** [1] - 2:4

## 4

**4** [8] - 4:21, 22:8, 29:22, 30:3, 30:18, 32:10, 32:25, 33:15
**400** [1] - 1:21
**48** [1] - 1:6

## 5

**500** [1] - 2:4
**51** [1] - 29:2
**516-441-0961** [1] - 2:6
**57** [1] - 18:4
**5714720** [1] - 8:14

## 6

**6** [6] - 4:21, 30:19, 30:22, 30:23, 31:3, 31:13
**632** [1] - 6:14

## 7

**7** [16] - 4:22, 28:23, 29:2, 29:15, 30:22, 30:24, 32:18, 34:1, 34:2, 34:8, 39:14, 39:20, 39:22, 39:23, 40:6, 47:8
**77** [1] - 18:3

## 8

**8** [1] - 18:3
**805** [1] - 2:10

## 9

**93** [1] - 10:25
**96** [1] - 3:15
**96-2** [2] - 22:5, 29:1
**96-5** [2] - 21:25, 23:12
**98** [1] - 3:17
**99** [4] - 25:10, 25:25, 30:17, 35:16

## A

**ability** [1] - 48:3
**able** [5] - 31:23, 31:25, 32:1, 32:2, 32:4
**above-entitled** [1] - 48:3
**absent** [1] - 19:23
**absolutely** [1] - 7:22
**accelerate** [3] - 5:25, 31:24, 31:25
**accelerated** [5] - 4:15, 7:11, 8:9, 10:13, 10:14
**acceleration** [2] - 7:17, 9:23
**accept** [1] - 26:10
**accepting** [1] - 26:15
**accessed** [1] - 4:13
**accounting** [2] - 13:10, 13:12
**accurate** [1] - 42:10
**acquisition** [1] - 30:16
**act** [2] - 9:16, 28:18
**Act** [4] - 4:10, 9:9, 45:21
**action** [1] - 26:23
**actions** [1] - 30:9
**actual** [5] - 7:5, 9:11, 26:8, 36:22, 45:11
**add** [1] - 20:22
**additional** [2] - 15:13, 40:14
**adequately** [1] - 24:18
**adjourned** [2] - 47:18, 47:19
**adjudicate** [1] - 12:7
**advantage** [2] - 31:9, 42:5
**advisement** [1] - 46:8
**affect** [1] - 12:6
**affirming** [1] - 16:7
**afraid** [1] - 36:2
**agents** [1] - 36:19
**agree** [2] - 39:14, 41:25
**agreement** [2] - 21:4, 22:18
**ahead** [6] - 38:1, 38:8, 40:17, 40:18, 41:17
**aided** [1] - 1:25
**air** [1] - 13:5
**akin** [2] - 34:1, 34:2
**al** [1] - 3:4
**Alex** [1] - 25:15
**ALEXANDER** [1] - 1:9
**alive** [1] - 39:22
**allegations** [8] - 17:24, 18:9, 18:11, 31:12, 31:15, 38:14, 39:5, 39:6
**allege** [3] - 4:12, 5:16, 6:22
**alleged** [1] - 39:9
**allegedly** [1] - 7:25
**allow** [2] - 30:6, 36:19
**allowed** [4] - 14:25, 23:1, 27:13, 38:25
**allowing** [1] - 41:10
**Almeida** [1] - 2:9
**almost** [2] - 8:16, 17:24
**alone** [2] - 10:22, 47:10
**Altman** [5] - 3:3, 20:23, 24:2, 24:6, 26:11
**altogether** [1] - 11:5
**amend** [1] - 20:21
**amended** [5] - 4:12, 20:17, 20:22, 20:24, 39:11
**amount** [3] - 6:25, 31:20, 42:18
**analyses** [2] - 9:25, 40:1
**analysis** [12] - 7:9, 7:14, 7:23, 13:14, 24:9, 27:4, 33:21, 38:23, 45:19, 45:23, 45:24, 47:14
**analytics** [1] - 34:20
**announce** [1] - 3:5
**annual** [3] - 22:6, 22:9, 29:21
**anonymized** [1] - 32:14
**answered** [2] - 21:15, 22:3
**apologies** [1] - 41:13
**APPEARANCES** [1] - 2:1
**apply** [1] - 15:7
**appreciate** [4] - 35:21, 41:21, 46:22, 47:13
**appropriate** [1] - 45:9
**approve** [1] - 6:4
**April** [1] - 22:4
**arbitration** [1] - 26:12
**arena** [1] - 17:8
**argue** [5] - 10:6, 10:17, 10:18, 11:4, 11:9
**argued** [4] - 9:10, 35:25, 36:16, 41:7
**argument** [22] - 9:12, 11:6, 11:9, 12:12, 12:19, 16:16, 17:15, 18:17, 18:22, 23:13, 26:5, 35:5, 35:10, 36:1, 42:13, 43:8, 46:6, 46:10, 46:12, 46:15, 46:20
**arguments** [3] - 8:16, 17:19, 18:17
**Armed** [1] - 24:14
**assert** [1] - 9:9
**asserted** [2] - 14:14, 43:13
**asserting** [1] - 45:20
**asserts** [1] - 24:21
**assessing** [1] - 24:23
**associated** [3] - 7:10, 33:20, 33:22
**assuming** [2] - 30:13, 42:20
**assumption** [1] - 37:9
**Attorney** [14] - 3:9, 17:1, 35:22, 35:23, 36:16, 40:10, 40:11, 41:15, 41:24, 46:2, 46:12, 46:21, 46:22, 47:4
**attorneys** [1] - 27:2
**attorneys'** [10] - 11:1, 26:25, 27:13, 36:3, 36:19, 37:8, 37:15, 37:19, 42:25
**attributable** [2] - 9:16
**audio** [2] - 1:25, 48:4
**audited** [1] - 21:17
**authority** [3] - 8:21, 14:22, 15:23
**Avenue** [3] - 1:21, 2:4, 2:10
**AVO** [1] - 43:6
**avoid** [1] - 38:22
**avoided** [4] - 7:16,

8:9, 9:23, 13:15
**avoiding** [1] - 4:16
**aware** [1] - 25:17

## B

**background** [1] - 17:5
**bad** [1] - 21:7
**balance** [3] - 21:18, 24:23, 26:6
**balances** [1] - 21:19
**balancing** [1] - 28:18
**bank** [1] - 9:20
**bar** [4] - 11:17, 12:9, 46:25, 47:9
**bargaining** [1] - 42:7
**barred** [5] - 11:11, 16:17, 19:10, 19:18, 37:20
**bars** [1] - 47:1
**based** [9] - 5:23, 11:5, 18:1, 18:10, 23:12, 30:7, 30:10, 34:21, 47:7
**basis** [2] - 15:9, 32:11
**batch** [1] - 23:11
**BATO** [1] - 15:22
**battling** [1] - 27:14
**bed** [1] - 22:20
**BEFORE** [1] - 1:14
**beginning** [2] - 3:5, 41:20
**behalf** [3] - 3:8, 3:11, 17:4
**BEHALF** [2] - 2:2, 2:7
**belief** [4] - 18:1, 18:5, 18:9, 18:11
**benefit** [6] - 7:2, 7:7, 13:16, 14:5, 45:13, 45:15
**benefits** [3] - 7:10, 7:17, 9:23
**benefitted** [1] - 8:5
**best** [2] - 25:2, 48:3
**better** [1] - 44:21
**between** [2] - 26:6, 30:22
**beyond** [4] - 32:25, 33:14, 37:4, 40:4
**bfloch@nmfalawfirm.com** [1] - 2:11
**big** [2] - 19:5
**bit** [3] - 17:5, 17:15, 39:20
**blog** [2] - 34:13, 34:15
**blow** [1] - 12:17
**Botanic** [1] - 40:22
**bottom** [1] - 10:4
**BRANDON** [1] - 2:8
**Brandon** [2] - 3:10, 17:3
**brief** [8] - 6:8, 8:13, 9:5, 13:25, 22:25, 24:12, 35:24, 38:12
**briefly** [4] - 9:6, 9:19, 14:21, 44:18
**bring** [2] - 19:9, 46:15
**bringing** [3] - 19:10, 24:2, 24:3
**broad** [10] - 7:7, 13:11, 13:12, 13:19, 39:21, 39:23, 43:9, 44:9, 45:17, 45:18
**broader** [2] - 15:13, 29:24
**broadly** [1] - 5:1
**brought** [2] - 11:24, 47:6
**budgets** [1] - 9:24
**bulk** [2] - 18:14, 34:7
**bulky** [1] - 33:16
**burden** [5] - 4:2, 9:2, 9:17, 10:5, 10:7
**burdensome** [1] - 26:17
**business** [1] - 1:8
**bypass** [1] - 45:6

## C

**calculate** [2] - 7:6, 45:12
**cannot** [2] - 9:22, 11:9
**carry** [1] - 46:13
**case** [41] - 4:7, 5:20, 6:7, 6:16, 7:5, 8:6, 8:7, 8:11, 8:12, 8:15, 9:4, 9:8, 9:9, 10:24, 14:23, 15:6, 15:19, 15:21, 16:3, 16:5, 16:6, 17:6, 17:7, 18:24, 20:25, 22:14, 22:21, 24:9, 25:6, 25:22, 27:10, 28:2, 30:11, 36:25, 39:4, 40:24, 43:18, 44:24, 46:23, 47:5
**Case** [1] - 3:2
**CASE** [1] - 1:3
**cases** [11] - 4:9, 5:19, 6:5, 14:21, 37:7, 40:21, 40:22, 42:1, 45:19, 45:20, 46:7
**cash** [2] - 21:19, 30:6
**categories** [2] - 21:20, 38:20
**certain** [10] - 3:23, 15:11, 27:20, 30:6, 30:9, 30:16, 33:4, 33:8, 42:1
**certainly** [2] - 9:1, 30:21
**CERTIFICATE** [1] - 48:1
**certify** [1] - 48:2
**cetera** [1] - 33:22
**change** [1] - 23:18
**charge** [1] - 25:13
**charged** [1] - 32:16
**charging** [1] - 31:8
**chat** [1] - 25:15
**CHRISTOPHER** [1] - 2:9
**Christopher** [1] - 3:12
**churn** [3] - 33:3, 33:11
**Circuit** [2] - 16:6, 22:14
**circumstances** [2] - 26:20, 39:7
**circumstantial** [1] - 25:2
**circumvent** [2] - 15:1, 23:1
**circumvention** [2] - 14:10, 23:5
**citation** [1] - 6:12
**cite** [6] - 8:21, 16:5, 16:6, 22:15, 22:22, 24:11
**cited** [4] - 8:12, 16:4, 22:21, 22:24
**City** [1] - 9:6
**Civil** [1] - 14:7
**claim** [6] - 4:6, 9:10, 11:11, 26:9, 26:15, 26:16
**claims** [9] - 3:25, 5:23, 15:10, 21:21, 33:25, 37:17, 39:2, 39:4, 45:22
**clarify** [1] - 12:20
**clause** [1] - 30:22
**clear** [3] - 20:11, 20:19, 45:20
**clearer** [1] - 19:8
**clearly** [3] - 15:14, 25:25, 44:1
**clerk** [1] - 6:11
**client** [15] - 17:7, 17:17, 17:25, 25:8, 25:19, 25:20, 27:21, 31:8, 32:24, 33:13, 34:10, 36:22, 42:24
**client's** [1] - 25:18
**clients'** [1] - 35:17
**clock** [1] - 12:18
**close** [3] - 11:20, 16:15, 41:3
**colleague** [1] - 41:11
**colleagues** [1] - 46:14
**commercial** [1] - 13:14
**commercialization** [6] - 5:25, 7:9, 9:24, 10:13, 14:5, 38:21
**communications** [1] - 40:2
**company** [9] - 24:17, 29:11, 30:15, 37:3, 43:11, 44:8, 44:21, 44:24
**company's** [2] - 24:15, 24:20
**comparative** [2] - 34:14, 34:15
**compel** [16] - 3:18, 3:23, 11:14, 12:25, 14:12, 14:25, 15:3, 15:24, 16:10, 16:19, 21:5, 22:16, 22:25, 23:3, 26:12
**compelling** [1] - 4:8
**compels** [1] - 39:2
**compete** [1] - 30:16
**competing** [4] - 4:15, 5:18, 6:1, 6:21
**competition** [1] - 4:10
**competitive** [10] - 13:16, 18:22, 24:17, 26:24, 28:8, 30:5, 31:9, 33:5, 37:5, 42:5
**competitor** [13] - 17:9, 17:18, 18:15, 19:1, 19:4, 24:13, 24:14, 25:6, 25:20, 26:22, 30:8, 42:6, 44:20
**competitors** [2] - 17:12, 19:6
**complaint** [13] - 4:12, 17:22, 17:23, 17:25, 18:4, 20:13, 20:15, 20:17, 20:22, 20:25, 24:3, 39:11
**completely** [3] - 19:17, 20:11, 26:21
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concepts** [1] - 14:3
**concern** [9] - 25:21, 25:24, 27:5, 31:12, 31:13, 33:2, 42:5, 42:20, 43:7
**concerned** [2] - 33:12
**concerning** [2] - 29:25, 40:2
**concerns** [4] - 30:17, 35:18, 42:10, 43:2
**condition** [1] - 24:15
**conduct** [3] - 7:23, 20:21, 45:23
**conducting** [1] - 7:13
**confer** [2] - 13:1, 13:25
**conferral** [4] - 11:18, 12:2, 14:17, 41:1
**conferred** [3] - 11:23, 41:6, 47:7
**confers** [2] - 14:15, 47:8
**confidential** [8] - 5:24, 6:20, 10:19, 18:5, 36:9, 36:11, 37:14, 45:5
**confidentiality** [4] - 10:22, 11:4, 11:6
**conflict** [1] - 41:21
**confusion** [1] - 25:11
**connected** [1] - 30:11
**consequences** [1] - 23:19
**consider** [1] - 37:6
**constitute** [1] - 19:24
**contact** [1] - 36:22
**contains** [1] - 10:25
**content** [1] - 14:3
**context** [1] - 37:4
**continue** [1] - 35:11
**contribution** [2] - 14:4, 38:22
**conversations** [1] - 21:3
**conversions** [1] - 34:12
**copied** [1] - 17:25
**copy** [2] - 6:9
**core** [2] - 8:11, 17:24
**correct** [7] - 4:23, 5:5, 5:13, 19:18, 33:24, 43:14, 48:2
**correctly** [2] - 12:13,

33:19
**cost** [4] - 9:23, 10:2, 22:11, 31:19
**costs** [11] - 4:16, 7:17, 8:8, 9:20, 9:21, 13:14, 18:13, 21:11, 21:20, 27:25, 38:22
**counsel** [9] - 20:8, 21:4, 22:17, 23:10, 23:11, 23:18, 33:25, 35:25, 40:20
**Counsel** [2] - 3:13, 4:18
**couple** [2] - 38:3, 40:11
**course** [3] - 36:8, 37:22, 44:3
**COURT** [54] - 1:1, 3:9, 3:13, 3:21, 4:18, 4:20, 4:24, 5:9, 6:10, 12:12, 17:1, 19:15, 20:10, 20:16, 20:18, 26:3, 28:15, 29:9, 29:14, 29:18, 29:20, 30:19, 31:4, 31:14, 31:22, 32:17, 32:22, 33:17, 34:9, 34:16, 34:20, 35:1, 35:3, 35:8, 35:22, 36:12, 36:15, 37:25, 38:2, 38:8, 39:13, 39:16, 39:18, 40:8, 40:17, 41:12, 41:22, 42:15, 43:8, 44:5, 44:16, 45:25, 46:2, 46:5
**court** [16] - 4:8, 8:25, 9:12, 15:7, 16:2, 16:12, 19:1, 19:13, 19:21, 22:15, 38:13, 38:25, 39:6, 45:4, 45:11, 46:15
**Court** [23] - 1:21, 3:1, 6:19, 7:4, 7:5, 8:20, 10:25, 13:25, 15:16, 19:25, 23:14, 24:4, 24:5, 24:23, 25:1, 33:13, 37:6, 46:24, 47:2, 48:4, 48:6
**court's** [2] - 16:8, 47:18
**Court's** [2] - 19:23, 24:9
**COURTROOM** [2] - 3:2, 47:18
**courts** [1] - 6:3
**cover** [1] - 32:14
**covers** [1] - 40:6
**creative** [1] - 43:3
**credence** [1] - 23:15
**credibly** [1] - 11:4
**Crocs** [1] - 8:13
**current** [2] - 43:10, 43:11
**customer** [17] - 5:21, 7:18, 10:16, 23:23, 28:10, 29:6, 29:10, 29:12, 31:18, 32:1, 32:5, 32:8, 32:15, 39:24, 39:25, 43:23
**customer-level** [1] - 28:10
**customer-specific** [1] - 10:16
**customers** [17] - 5:4, 5:5, 5:11, 7:25, 8:3, 29:3, 29:4, 29:13, 30:24, 31:1, 31:21, 32:3, 32:20, 33:4, 33:20, 33:22, 34:4

**D**

**damages** [17] - 4:1, 6:2, 6:24, 7:8, 7:14, 7:23, 8:11, 9:23, 10:12, 13:10, 24:23, 38:20, 43:12, 43:17, 45:18, 45:20, 45:24
**data** [11] - 7:6, 7:25, 25:25, 27:6, 28:4, 28:9, 34:3, 36:21, 44:10, 44:12, 45:12
**DATE** [1] - 48:5
**days** [2] - 19:10, 41:6
**deadline** [7] - 12:4, 12:10, 15:24, 20:2, 21:6, 23:16, 35:12
**deadline's** [1] - 21:7
**deadlines** [4] - 11:13, 15:1, 23:1, 23:20
**deal** [3] - 21:8, 23:19, 23:21
**dealing** [2] - 5:4, 15:7
**December** [5] - 20:4, 20:7, 21:1, 21:15, 22:2
**decided** [2] - 13:5, 15:19
**decision** [2] - 7:4, 24:5
**decisions** [2] - 30:7, 33:8
**declaration** [3] - 7:12, 44:4, 44:6
**defendant** [10] - 6:19, 7:1, 8:16, 8:17, 9:10, 18:23, 24:25, 25:21, 33:12, 45:4
**Defendants** [1] - 1:10
**DEFENDANTS** [1] - 2:7
**defendants** [22] - 3:11, 3:24, 4:1, 4:7, 4:13, 7:24, 8:4, 8:21, 10:4, 10:17, 10:18, 11:23, 14:13, 14:24, 17:4, 18:5, 24:18, 25:8, 27:10, 28:24, 34:17, 38:15
**defendants'** [9] - 6:24, 10:13, 11:8, 12:12, 14:21, 17:25, 24:22, 30:24, 32:18
**defense** [3] - 4:6, 6:9, 26:10
**delay** [1] - 47:6
**delayed** [3] - 20:23, 24:2, 24:3
**demonstrated** [1] - 24:18
**denial** [2] - 16:8, 19:24
**denied** [4] - 11:5, 15:9, 15:16, 20:23
**deny** [1] - 22:16
**depositions** [1] - 27:12
**DEPUTY** [2] - 3:2, 47:18
**described** [1] - 10:7
**despite** [3] - 17:23, 27:1, 32:5
**detail** [2] - 21:19, 45:2
**detailed** [1] - 38:18
**determine** [2] - 19:3, 24:14
**detour** [1] - 11:10
**devastating** [1] - 24:20
**develop** [4] - 5:17, 7:1, 28:1, 31:20
**development** [20] - 4:15, 4:16, 5:25, 6:21, 7:11, 7:17, 8:8, 9:20, 9:21, 9:24, 10:1, 10:14, 10:15, 13:14, 13:15, 27:25, 38:22, 45:4, 45:6, 45:7
**difference** [1] - 30:22
**different** [9] - 13:7, 15:6, 15:15, 16:12, 16:19, 16:20, 28:7, 31:17, 46:6
**difficult** [1] - 27:14
**digital** [2] - 1:24, 48:4
**dilatory** [1] - 20:20
**direct** [1] - 21:24
**directed** [1] - 12:6
**directly** [2] - 3:25, 37:16
**disadvantage** [1] - 33:5
**disclose** [1] - 18:23
**disclosure** [4] - 5:2, 19:2, 25:1, 37:10
**discoverable** [1] - 9:18
**DISCOVERY** [1] - 1:13
**discovery** [61] - 3:15, 3:16, 3:23, 4:5, 4:9, 4:20, 4:25, 6:4, 7:8, 7:20, 8:2, 8:23, 8:25, 9:2, 10:23, 11:12, 11:18, 12:16, 12:24, 13:1, 13:10, 13:21, 14:9, 15:2, 15:10, 15:12, 15:17, 15:25, 16:18, 16:22, 17:22, 17:24, 18:10, 18:12, 18:14, 19:4, 19:9, 19:12, 19:21, 20:4, 20:9, 20:12, 23:2, 23:3, 23:8, 24:13, 24:22, 35:13, 37:21, 38:17, 39:1, 39:2, 39:8, 41:2, 41:3, 43:16, 43:17, 43:20, 45:18
**discretion** [3] - 19:24, 19:25, 22:15
**discussed** [1] - 8:10
**disgorgement** [10] - 4:11, 6:1, 6:23, 6:25, 7:19, 14:3, 39:11, 45:9, 45:10, 45:21
**dismiss** [2] - 23:5, 26:12
**dispute** [8] - 11:24, 12:8, 14:19, 15:8, 19:9, 19:11, 19:21, 41:8
**disputes** [4] - 13:25, 19:12, 23:9, 41:9
**dissimilarity** [2] - 46:21, 47:3
**distraction** [1] - 16:16
**district** [5] - 6:3, 6:8, 14:23, 16:8, 24:1
**DISTRICT** [2] - 1:1, 1:1
**District** [11] - 1:21, 6:14, 9:5, 9:8, 15:4, 15:5, 15:21, 22:21, 40:24, 48:6, 48:7
**DIVISION** [1] - 1:2
**Docket** [9] - 3:15, 3:16, 10:25, 18:4, 25:10, 25:25, 29:1, 30:17, 35:16
**docket** [4] - 20:11, 20:20, 22:5, 25:10
**document** [2] - 34:13, 34:23
**documents** [10] - 3:19, 5:2, 5:8, 15:19, 19:2, 22:5, 27:16, 29:20, 35:20, 35:25
**Documents** [1] - 22:9
**done** [3] - 23:21, 40:17, 41:9
**Donohue** [1] - 7:13
**door** [4] - 12:21, 12:22, 46:17, 46:18
**down** [3] - 16:25, 26:6, 38:3
**duplicative** [3] - 16:20, 20:6, 21:23
**Duracell** [15] - 18:25, 24:8, 26:5, 26:7, 27:4, 27:23, 28:7, 36:25, 38:7, 38:8, 38:11, 38:25, 39:6, 39:8
**during** [3] - 10:14, 33:7, 45:14

**E**

**earned** [3] - 29:6, 30:23, 39:25
**economic** [1] - 7:10
**Effervescent** [1] - 8:13
**efficient** [1] - 23:9
**efforts** [5] - 11:18, 12:2, 14:11, 41:1, 45:6
**Eleventh** [2] - 16:6, 22:14
**elsewhere** [1] - 6:3
**email** [1] - 25:12

**emails** [1] - 25:20
**emergence** [1] - 24:20
**emerging** [7] - 17:8, 17:9, 19:4, 25:20, 30:8, 42:6, 44:19
**emphasized** [1] - 38:13
**encompassed** [1] - 39:19
**encourage** [1] - 14:8
**end** [5] - 12:14, 23:11, 27:17, 35:9, 35:13
**end-run** [1] - 12:14
**ends** [1] - 27:18
**enforcement** [1] - 16:6
**enforces** [1] - 19:13
**engaged** [1] - 14:15
**ENJOLIQUÉ** [1] - 1:14
**enrichment** [6] - 6:2, 7:17, 14:4, 38:19, 39:10, 45:21
**ensure** [2] - 11:18, 41:2
**enter** [1] - 36:6
**entered** [1] - 10:25
**entire** [1] - 39:2
**entitled** [1] - 48:3
**Entry** [5] - 3:15, 3:16, 10:25, 18:4, 29:1
**equity** [3] - 17:12, 17:16, 25:13
**especially** [4] - 10:11, 10:23, 19:3, 24:16
**ESQ** [3] - 2:3, 2:8, 2:9
**essentially** [2] - 30:21, 43:10
**establish** [1] - 9:3
**established** [1] - 10:5
**et** [2] - 3:4, 33:22
**evaluate** [2] - 7:16, 9:23
**eve** [2] - 14:18, 41:3
**event** [1] - 37:16
**exact** [4] - 6:17, 8:16, 15:8, 31:23
**exactly** [6] - 4:8, 6:22, 7:7, 13:25, 14:16, 45:17
**examining** [1] - 9:24
**example** [4] - 21:13, 21:22, 32:14, 33:5
**exchange** [1] - 47:7
**excuse** [1] - 10:17
**exercise** [1] - 35:8
**exist** [2] - 34:6, 44:8
**exists** [5] - 11:6, 32:24, 33:14, 34:5, 34:15
**expense** [1] - 21:20
**expenses** [1] - 13:15
**expert** [18] - 7:13, 7:21, 27:8, 27:11, 27:12, 27:19, 28:3, 28:13, 30:13, 36:8, 36:21, 36:23, 37:13, 42:22, 42:23, 44:1, 44:3, 45:23
**expert's** [3] - 27:15, 37:22, 37:24
**experts** [5] - 27:8, 27:13, 37:12, 44:9, 44:12
**expired** [2] - 21:7
**expires** [1] - 35:13
**explain** [1] - 39:18
**explained** [1] - 7:14
**explains** [2] - 7:21, 40:25
**express** [1] - 21:2
**expressly** [1] - 5:23
**extend** [1] - 37:4
**extent** [1] - 40:4
**extrapolate** [1] - 45:15
**extrinsic** [1] - 15:18
**eyes** [9] - 11:1, 26:25, 27:13, 36:4, 36:19, 37:8, 37:15, 37:19, 42:25

## F

**face** [2] - 18:23, 44:9
**facilitate** [1] - 14:18
**fact** [2] - 7:24, 32:5
**Failure** [2] - 19:20
**fairchild** [1] - 40:22
**fashion** [1] - 42:8
**fast** [1] - 31:22
**fault** [1] - 23:17
**FCRR** [1] - 1:20
**federal** [2] - 13:21, 16:22
**fees** [1] - 30:25
**filed** [3] - 11:19, 41:2, 41:7
**files** [1] - 13:12
**filing** [1] - 15:24
**financial** [50] - 3:23, 3:24, 4:9, 5:1, 5:7, 6:4, 7:7, 7:9, 7:24, 8:19, 8:23, 9:25, 10:2, 13:13, 14:2, 14:20, 18:12, 18:14, 20:4, 20:9, 21:2, 21:16, 22:10, 22:19, 24:13, 24:15, 24:19, 25:2, 25:8, 25:21, 25:24, 26:22, 27:17, 28:4, 28:9, 29:5, 29:23, 33:15, 33:19, 33:22, 35:17, 35:19, 37:3, 38:17, 40:2, 43:11, 43:21, 44:3, 45:22
**financially** [2] - 8:4, 30:15
**financials** [6] - 8:18, 25:18, 30:10, 30:25, 32:19, 43:10
**firm** [2] - 17:13, 25:13
**first** [8] - 11:8, 14:25, 15:4, 18:17, 22:25, 23:22, 38:13, 44:19
**five** [1] - 28:17
**FLOCH** [34] - 2:8, 3:10, 17:3, 19:19, 20:14, 20:17, 20:19, 27:5, 29:7, 29:10, 29:17, 29:19, 30:4, 31:2, 31:5, 31:18, 32:9, 32:21, 32:23, 34:2, 34:10, 34:18, 34:23, 35:2, 35:7, 35:9, 41:18, 42:12, 42:17, 43:14, 44:7, 44:17, 46:3, 47:17
**Floch** [10] - 2:9, 3:10, 17:3, 35:22, 36:16, 40:11, 41:15, 46:2, 46:12, 46:22
**floor** [1] - 3:19
**FLORIDA** [1] - 1:1
**Florida** [12] - 1:4, 1:22, 2:5, 2:10, 6:15, 9:5, 9:8, 15:5, 33:7, 40:24, 48:7, 48:7
**flows** [1] - 21:19
**focus** [6] - 11:17, 14:2, 14:11, 14:22, 41:1, 41:9
**focused** [1] - 13:18
**follow** [2] - 23:16, 23:17
**fooled** [1] - 44:23
**force** [1] - 12:25
**forced** [1] - 18:23
**forecasted** [2] - 7:6, 45:12
**foreclose** [1] - 19:17
**foregoing** [1] - 48:2
**forgot** [1] - 41:19
**formerly** [1] - 17:11
**forth** [2] - 13:22, 19:22
**fourth** [1] - 20:22
**FPR** [1] - 1:20
**FPR-C** [1] - 1:20
**framework** [1] - 28:16
**frank** [1] - 28:19
**frankly** [1] - 26:13
**Friday** [1] - 41:20
**front** [3] - 12:3, 12:22, 46:18
**full** [4] - 18:14, 21:3, 34:5, 43:19
**functionally** [2] - 21:10, 22:13

## G

**gain** [1] - 45:15
**gained** [1] - 31:19
**gamesmanship** [1] - 12:21
**Garden** [1] - 40:23
**general** [3] - 13:9, 13:19, 21:19
**generally** [1] - 46:24
**generated** [1] - 8:2
**gentlemen** [1] - 47:16
**given** [3] - 6:9, 28:8, 46:5
**gleaned** [2] - 32:3, 37:3
**gotcha** [1] - 46:16
**governs** [1] - 24:9
**grand** [1] - 41:13
**granting** [1] - 3:16
**granular** [3] - 32:11, 32:12, 32:15
**Gravante** [17] - 3:8, 3:9, 17:1, 18:18, 20:8, 21:6, 21:10, 23:7, 23:21, 24:7, 28:2, 35:23, 40:10, 43:5, 43:25, 46:23, 47:4
**GRAVANTE** [24] - 2:3, 3:7, 3:20, 3:22, 4:19, 4:23, 5:6, 5:13, 6:13, 12:23, 17:2, 35:24, 36:14, 37:7, 38:1, 38:6, 38:11, 39:15, 39:17, 39:23, 40:15, 40:19, 44:18, 46:1
**Gravante's** [2] - 23:17, 41:24
**great** [2] - 46:6, 47:16
**Greater** [2] - 17:13, 17:15
**greatest** [1] - 42:5
**Gregory** [3] - 15:21, 16:1, 22:20
**gross** [7] - 9:13, 9:14, 9:21, 10:14, 22:6, 29:21, 30:25
**grounds** [2] - 4:8, 19:24
**group** [1] - 29:22
**growing** [1] - 44:23
**growth** [2] - 13:15, 14:5
**guess** [1] - 44:8

## H

**Hancock** [3] - 14:23, 14:24, 15:11
**hand** [2] - 6:10, 27:15
**hands** [1] - 27:17
**harassing** [1] - 26:17
**harm** [4] - 18:23, 19:1, 24:25, 26:8
**harmful** [1] - 37:5
**Harris** [1] - 22:20
**harvested** [1] - 4:14
**head** [31] - 5:14, 5:19, 5:24, 6:6, 6:17, 7:2, 7:6, 7:8, 8:7, 8:10, 8:11, 10:12, 10:15, 13:10, 18:13, 21:11, 26:11, 30:2, 31:15, 37:18, 38:18, 38:24, 39:10, 42:18, 42:19, 43:24, 45:3, 45:7, 45:12, 45:14
**head-start** [30] - 5:14, 5:19, 5:24, 6:6, 6:17, 7:2, 7:6, 7:8, 8:7, 8:10, 8:11, 10:12, 10:15, 13:10, 18:13, 21:11, 26:11, 30:2, 31:15, 37:18, 38:18, 38:24, 39:10, 42:18, 42:19, 43:24, 45:3, 45:7, 45:12, 45:14
**healthy** [1] - 30:14
**hear** [2] - 16:2, 19:16
**heard** [1] - 47:9
**HEARING** [1] - 1:13

**hearing** [4] - 3:15, 3:16, 11:25, 19:17
**held** [4] - 6:3, 11:19, 16:12, 41:3
**HELD** [1] - 1:14
**helpful** [1] - 29:14
**highly** [7] - 6:5, 7:22, 25:18, 37:17, 37:20, 38:24, 45:22
**hired** [1] - 36:20
**historical** [1] - 13:12
**history** [3] - 20:2, 20:20, 21:1
**hit** [3] - 18:12, 21:9, 26:23
**hold** [3] - 30:19, 41:12, 41:16
**holding** [1] - 15:23
**honestly** [1] - 36:24
**Honor** [72] - 3:7, 3:10, 3:20, 3:25, 4:4, 5:13, 6:7, 6:16, 7:12, 7:20, 8:12, 10:4, 10:17, 11:8, 11:21, 12:23, 13:6, 13:20, 16:24, 17:3, 17:6, 17:21, 18:12, 18:16, 18:24, 19:7, 19:19, 20:3, 20:14, 21:1, 21:22, 21:24, 22:13, 22:22, 23:6, 23:14, 23:24, 24:7, 24:8, 24:11, 25:3, 25:23, 26:1, 27:5, 27:14, 28:2, 28:9, 29:7, 29:17, 30:4, 31:2, 32:21, 32:23, 34:2, 34:10, 35:7, 35:15, 35:21, 35:24, 37:7, 39:17, 40:15, 41:18, 42:12, 42:21, 43:3, 43:14, 43:19, 44:17, 44:18, 46:3, 47:17
**HONORABLE** [1] - 1:14
**Hunt** [1] - 9:6
**Hurley** [2] - 6:15, 45:2

## I

**identical** [8] - 13:3, 15:8, 15:12, 15:14, 16:1, 16:2, 21:10, 22:14
**identified** [1] - 34:24
**identify** [2] - 21:20, 34:24
**identity** [3] - 29:3, 29:4, 32:19
**III** [1] - 2:3
**impacts** [1] - 7:18
**important** [4] - 8:15, 18:2, 24:10, 24:21
**importantly** [1] - 13:6
**improperly** [1] - 4:13
**INC** [1] - 1:4
**Inc** [2] - 3:3, 8:13
**includes** [1] - 14:4
**including** [3] - 14:23, 21:17, 22:11
**income** [4] - 9:22, 21:18, 22:7, 29:22
**independently** [2] - 7:1, 31:19
**indirect** [1] - 25:2
**indirectly** [1] - 32:9
**individual** [1] - 38:10
**individualized** [1] - 47:14
**inform** [1] - 30:15
**information** [57] - 3:24, 4:14, 5:17, 5:21, 5:24, 7:15, 7:21, 8:18, 8:22, 9:17, 10:3, 10:6, 10:9, 10:18, 11:10, 12:10, 13:24, 15:13, 15:18, 18:1, 18:5, 18:6, 18:9, 18:10, 24:14, 24:16, 24:19, 24:21, 24:24, 25:8, 25:22, 27:15, 29:5, 29:8, 29:12, 32:3, 32:6, 33:3, 33:9, 33:11, 35:17, 36:9, 37:3, 37:11, 37:13, 37:16, 37:23, 38:17, 39:1, 39:24, 40:4, 40:6, 40:14, 42:2, 42:18, 45:22
**informs** [1] - 17:19
**infringement** [1] - 9:11
**infringer** [1] - 9:15
**insight** [1] - 33:8
**instance** [1] - 5:19
**instructive** [2] - 6:16, 10:11
**insufficient** [2] - 10:16, 27:4
**interest** [1] - 26:21
**interested** [1] - 25:18
**interests** [1] - 37:1
**interpretation** [2] - 30:20, 33:24
**interpreting** [1] - 33:18
**interrupt** [1] - 4:18
**interrupted** [2] - 35:6, 38:5
**invert** [1] - 10:5
**investments** [1] - 25:14
**invoke** [1] - 37:1
**involve** [2] - 16:11
**involved** [1] - 6:17
**involves** [1] - 17:7
**involving** [2] - 4:9, 6:5
**irrelevant** [1] - 8:19
**issue** [7] - 12:3, 13:4, 16:14, 16:17, 24:6, 35:11, 46:9
**issued** [1] - 41:5
**issues** [3] - 8:11, 11:3, 13:18
**iterative** [1] - 13:21
**itself** [1] - 47:2

## J

**James** [1] - 7:13
**January** [3] - 21:15, 22:7, 22:10
**Jayaram** [1] - 2:4
**John** [1] - 3:7
**JOHN** [1] - 2:3
**john@jayaramlaw.com** [1] - 2:5
**joint** [4] - 3:14, 11:25, 14:16, 16:7
**JOYCE** [1] - 2:9
**Joyce** [1] - 3:12
**Judge** [7] - 6:15, 20:23, 24:2, 24:5, 26:11, 45:2
**JUDGE** [1] - 1:15
**June** [1] - 48:5
**jurisdiction** [1] - 26:14
**jury** [1] - 41:13

## K

**keep** [1] - 46:11
**keeps** [1] - 25:14
**kind** [6] - 24:19, 28:19, 29:22, 32:6, 39:19, 45:22
**knowing** [3] - 30:7, 31:5, 46:22
**knows** [1] - 43:19

## L

**lack** [1] - 9:3
**LANCE** [1] - 1:20
**language** [2] - 22:24, 31:24
**Lanham** [4] - 4:10, 9:9, 45:21
**large** [4] - 31:8, 32:1, 33:6, 35:20
**larger** [2] - 43:8, 46:16
**last** [4] - 12:25, 14:11, 40:10, 40:12
**last-minute** [2] - 12:25, 14:11
**lastly** [2] - 11:8, 34:9
**late** [1] - 22:16
**launch** [1] - 21:17
**Law** [1] - 2:4
**law** [1] - 6:11
**leakage** [1] - 28:13
**learn** [1] - 13:23
**least** [3] - 26:22, 32:17, 33:17
**leave** [1] - 20:21
**ledger** [1] - 21:19
**left** [2] - 3:11, 7:25
**less** [2] - 32:11, 32:15
**Lett** [1] - 24:5
**LETT** [1] - 1:14
**letters** [1] - 19:22
**level** [1] - 28:10
**likely** [1] - 47:13
**limit** [1] - 41:8
**limited** [8] - 5:2, 5:3, 7:25, 9:11, 29:24, 30:24, 45:10
**link** [1] - 22:13
**list** [5] - 12:2, 44:4, 44:14, 44:15
**listed** [1] - 20:6
**Listen** [1] - 27:23
**listen** [1] - 30:7
**lists** [1] - 19:22
**litigating** [1] - 27:10
**litigation** [5] - 24:25, 25:17, 30:7, 36:20, 37:4
**LLC** [5] - 1:5, 1:8, 3:4, 9:7
**local** [15] - 11:14, 14:10, 15:5, 16:22, 18:20, 19:7, 19:11, 19:13, 19:14, 19:15, 22:23, 40:19, 40:21, 41:9
**look** [12] - 21:23, 23:11, 25:24, 36:8, 36:18, 36:25, 37:12, 37:23, 44:4, 45:13, 46:6, 47:11
**looked** [1] - 46:20
**looking** [7] - 19:4, 25:7, 27:11, 27:12, 29:1, 35:16, 47:15
**losing** [3] - 26:22, 33:4, 33:6
**loss** [2] - 5:20, 42:5
**lost** [4] - 5:22, 8:6, 43:9

## M

**MAGISTRATE** [1] - 1:15
**main** [1] - 25:14
**manage** [1] - 32:1
**management** [2] - 4:13, 17:8
**Manager** [2] - 31:6, 32:2
**managers** [1] - 33:6
**March** [4] - 22:3, 28:2, 28:10, 43:25
**margin** [2] - 14:5, 38:22
**market** [5] - 9:21, 13:14, 24:20, 25:19, 42:6
**marketing** [2] - 34:16, 34:21
**material** [2] - 18:24, 42:25
**materials** [7] - 7:14, 15:18, 34:16, 34:21, 39:3, 39:7, 43:6
**matter** [9] - 4:5, 16:17, 24:1, 35:11, 36:24, 37:1, 41:14, 46:8, 48:3
**Mays** [1] - 2:9
**mean** [9] - 5:8, 5:9, 23:16, 27:25, 31:5, 36:5, 36:15, 36:22, 37:16
**meaning** [1] - 18:19
**means** [1] - 29:16
**meant** [4] - 13:21, 14:8, 14:10, 14:17
**measure** [1] - 6:24
**measures** [2] - 10:12, 38:22
**mechanical** [1] - 1:24
**meet** [2] - 14:15, 47:8
**meet-and-confers** [2]

- 14:15, 47:8
**mention** [2] - 14:21, 17:14
**mentioned** [1] - 37:14
**merits** [11] - 12:8, 13:4, 16:17, 26:13, 46:25, 47:1, 47:2, 47:3, 47:10, 47:11
**met** [5] - 4:2, 10:7, 11:23, 41:6, 47:6
**metrics** [2] - 13:15, 34:20
**Mexico** [5] - 14:23, 15:4, 15:22, 22:21, 22:22
**MIAMI** [1] - 1:2
**Miami** [6] - 1:4, 1:21, 1:22, 2:5, 2:10, 48:7
**Middle** [2] - 9:4, 9:7
**might** [2] - 30:10, 34:6
**migration** [1] - 7:18
**mind** [2] - 43:4, 43:9
**minimal** [2] - 8:2, 34:7
**minute** [2] - 12:25, 14:11
**misappropriation** [5] - 38:16, 39:2, 39:4, 39:6, 44:22
**misconduct** [1] - 38:15
**misinterpreting** [1] - 12:19
**missed** [3] - 12:4, 12:15, 20:1
**missing** [2] - 23:20, 35:12
**models** [3] - 31:17, 33:22, 40:2
**moment** [1] - 41:12
**moments** [1] - 41:13
**money** [2] - 8:6, 31:20
**month** [1] - 32:16
**monthly** [6] - 22:6, 22:9, 29:21, 32:10, 32:12, 43:21
**months** [4] - 17:23, 30:9, 33:7
**moot** [3] - 29:16, 32:18, 39:14
**morning** [9] - 3:7, 3:9, 3:10, 3:13, 3:14, 3:20, 3:21, 17:3, 47:16
**most** [3] - 12:6, 31:13, 36:18
**motion** [20] - 3:15, 3:18, 3:23, 11:13, 12:6, 14:16, 14:18, 14:25, 15:2, 15:9, 15:16, 15:24, 16:7, 16:10, 22:16, 22:25, 23:3, 26:12, 40:12, 41:7
**motions** [4] - 11:19, 12:25, 14:11, 41:2
**move** [3] - 16:18, 21:5, 23:5
**moved** [2] - 16:19, 20:21
**moving** [2] - 30:19, 41:19
**MR** [56] - 3:7, 3:10, 3:20, 3:22, 4:19, 4:23, 5:6, 5:13, 6:13, 12:23, 17:2, 17:3, 19:19, 20:14, 20:17, 20:19, 27:5, 29:7, 29:10, 29:17, 29:19, 30:4, 31:2, 31:5, 31:18, 32:9, 32:21, 32:23, 34:2, 34:10, 34:18, 34:23, 35:2, 35:7, 35:9, 35:24, 36:14, 37:7, 38:1, 38:6, 38:11, 39:15, 39:17, 39:23, 40:15, 40:19, 41:18, 42:12, 42:17, 43:14, 44:7, 44:17, 44:18, 46:1, 46:3, 47:17
**Munro** [1] - 40:22
**must** [1] - 19:12

## N

**nail** [1] - 18:13
**narrow** [5] - 13:9, 13:22, 13:24, 16:12, 39:8
**narrowed** [3] - 14:6, 38:21, 39:3
**narrower** [5] - 14:19, 15:16, 16:14, 16:21, 41:5
**nascent** [1] - 44:19
**nature** [1] - 28:8
**nearly** [1] - 18:10
**necessarily** [2] - 5:6, 7:8
**necessary** [10] - 7:15, 7:16, 7:22, 7:23, 8:19, 30:1, 37:15, 42:2, 43:12, 45:23
**necessity** [8] - 19:2, 27:24, 28:4, 28:7, 28:18, 30:2, 44:15
**need** [11] - 9:13, 9:14, 19:8, 23:19, 24:24, 27:6, 27:7, 28:6, 43:21, 43:22
**needs** [1] - 4:6
**negotiate** [2] - 23:10, 23:21
**negotiated** [1] - 23:9
**negotiating** [2] - 21:8, 22:17
**Neiman** [1] - 2:9
**net** [4] - 9:22, 22:7, 29:22, 43:18
**never** [3] - 21:4, 22:18, 43:6
**New** [5] - 14:23, 15:4, 15:22, 22:21, 22:22
**new** [4] - 17:18, 22:12, 23:10, 29:12
**newer** [1] - 46:23
**NO** [1] - 1:3
**none** [1] - 13:17
**nonoperative** [1] - 20:13
**nonprivileged** [1] - 4:5
**normal** [1] - 26:20
**normally** [1] - 46:13
**North** [1] - 1:21
**Northeast** [1] - 2:4
**Nos** [2] - 4:21, 32:22
**nothing** [3] - 31:19, 34:11, 38:14
**number** [3] - 12:24, 31:16, 33:7
**numerous** [1] - 18:6

## O

**object** [2] - 4:7, 21:3
**objected** [3] - 11:23, 20:9, 23:12
**objection** [3] - 10:21, 10:22, 16:3
**objections** [1] - 14:15
**obtain** [1] - 4:5
**obviously** [4] - 17:22, 25:17, 27:20, 42:13
**occurring** [1] - 23:4
**OF** [5] - 1:1, 1:13, 2:2, 2:7, 48:1
**offers** [1] - 30:16
**old** [5] - 17:19, 22:8, 22:12, 22:17, 23:10
**ON** [2] - 2:2, 2:7
**one** [28] - 9:4, 10:10, 12:18, 12:24, 15:23, 19:4, 19:7, 21:13, 23:24, 24:13, 28:22, 29:16, 29:23, 29:24, 30:5, 30:23, 31:3, 31:17, 33:2, 33:15, 34:14, 40:16, 41:12, 42:14, 43:4, 43:15, 47:12
**ones** [1] - 22:1
**operating** [1] - 20:24
**operative** [3] - 18:3, 20:15, 26:15
**order** [30] - 3:16, 10:24, 11:2, 11:6, 14:17, 16:9, 19:3, 19:11, 24:12, 25:4, 25:22, 26:4, 26:25, 27:3, 27:9, 28:12, 30:12, 33:9, 36:3, 36:16, 36:17, 37:2, 37:8, 37:10, 37:18, 42:9, 42:22, 43:12, 45:6, 46:9
**Order** [1] - 3:1
**ordered** [1] - 39:6
**orders** [3] - 36:5, 36:18, 47:13
**overall** [1] - 40:2
**overly** [1] - 44:9
**overruled** [1] - 16:3
**own** [5] - 4:15, 6:21, 18:7, 27:25, 28:9
**owned** [1] - 17:12
**owns** [1] - 17:16

## P

**pages** [2] - 1:6, 29:1
**paragraph** [3] - 18:3, 44:4
**part** [1] - 20:20
**participated** [2] - 11:24, 14:16
**particularly** [2] - 6:16, 8:15
**parties** [5] - 3:5, 13:1, 13:22, 19:12, 27:10
**parties'** [4] - 3:14, 11:18, 14:11, 41:1
**party** [7] - 4:5, 9:2, 14:25, 15:23, 23:1, 36:15, 45:20
**party's** [1] - 15:25
**passed** [2] - 11:13, 12:11
**password** [1] - 18:7
**password-protected** [1] - 18:7
**past** [1] - 43:10
**paying** [1] - 32:16
**people** [2] - 34:14, 35:11
**per** [1] - 32:16
**perfectly** [1] - 28:19
**performance** [5] - 7:9, 10:2, 22:10, 29:23, 33:19
**perhaps** [2] - 32:9, 43:1
**period** [8] - 7:3, 10:14, 10:15, 12:16, 13:9, 19:22, 45:7, 45:14
**periods** [1] - 38:21
**permissive** [1] - 19:16
**permitted** [1] - 39:8
**permitting** [1] - 38:17
**person** [1] - 25:17
**perspective** [2] - 32:18, 42:9
**phase** [1] - 43:17
**pick** [1] - 31:17
**place** [3] - 8:1, 37:9, 37:21
**plaintiff** [8] - 3:6, 3:19, 5:5, 9:13, 9:14, 17:16, 24:21, 44:11
**plaintiff's** [1] - 6:20
**plaintiffs** [27] - 3:8, 5:10, 11:22, 11:24, 12:13, 17:10, 18:11, 19:6, 20:21, 23:17, 23:19, 23:22, 25:7, 25:24, 27:9, 27:25, 29:25, 30:21, 33:5, 33:8, 34:17, 34:22, 34:24, 35:16, 36:2, 43:13, 47:9
**Plaintiffs** [1] - 1:6
**PLAINTIFFS** [1] - 2:2
**plaintiffs'** [9] - 3:18, 3:23, 3:25, 19:2, 21:21, 24:24, 29:25, 33:24, 45:5
**planning** [1] - 9:25
**platform** [8] - 4:14, 6:1, 17:8, 18:1, 18:8, 31:20, 32:1, 32:7
**pleaded** [1] - 38:18

**PLLC** [1] - 2:9
**Plus's** [1] - 25:1
**point** [11] - 6:21, 8:12, 9:4, 17:21, 19:7, 23:24, 25:4, 34:3, 43:15, 45:3, 45:6
**points** [1] - 35:9
**position** [2] - 24:17, 42:7
**posts** [2] - 34:13, 34:15
**Power** [1] - 25:1
**practical** [3] - 26:8, 36:24, 37:1
**practically** [3] - 36:13, 37:22, 41:23
**precise** [1] - 38:20
**precludes** [1] - 8:23
**predecessor** [3] - 20:8, 20:12, 21:4
**preference** [2] - 46:24, 47:2
**preferment** [1] - 26:23
**prepared** [3] - 41:15, 46:10, 48:3
**present** [3] - 21:17, 22:7, 22:10
**pretty** [6] - 17:17, 18:14, 19:10, 20:5, 21:12, 25:6
**prevent** [4] - 11:3, 12:25, 14:11, 37:10
**previous** [1] - 34:3
**previously** [5] - 5:5, 5:11, 33:20, 33:23, 34:24
**primarily** [4] - 4:7, 14:22, 15:9, 15:16
**primary** [1] - 11:9
**principal** [2] - 25:14, 27:18
**prism** [1] - 46:6
**private** [3] - 17:12, 17:16, 25:13
**privileged** [1] - 26:17
**problem** [2] - 38:2, 41:22
**problematic** [2] - 31:4, 31:5
**problems** [1] - 25:5
**procedural** [8] - 11:10, 11:17, 12:9, 16:16, 18:17, 18:18, 46:25
**Procedure** [1] - 14:8
**proceed** [2] - 18:16, 35:5
**Proceedings** [2] - 1:24, 47:19
**proceedings** [2] - 48:3, 48:4
**process** [3] - 13:1, 14:16, 14:17
**processes** [1] - 18:7
**produce** [5] - 7:24, 26:20, 28:3, 39:21, 44:1
**produced** [12] - 1:25, 8:17, 9:12, 10:9, 10:19, 28:10, 28:22, 28:24, 29:3, 29:5, 29:7, 29:11
**producing** [1] - 25:21
**product** [5] - 6:22, 7:1, 8:9, 9:25, 13:14
**production** [9] - 3:18, 8:22, 11:5, 11:12, 11:22, 12:5, 13:19, 38:20, 39:7
**Production** [1] - 22:1
**productions** [1] - 14:14
**products** [1] - 6:24
**proffer** [1] - 43:19
**profit** [5] - 7:6, 9:22, 22:6, 29:21, 45:12
**profitability** [4] - 7:18, 14:5, 38:23, 40:3
**profits** [3] - 10:13, 30:25, 45:9
**projection** [2] - 31:17, 43:12
**projections** [4] - 9:24, 33:21, 34:6, 40:1
**proof** [1] - 7:9
**proper** [1] - 6:24
**Property** [2] - 31:6, 32:2
**property** [3] - 4:13, 17:8, 33:6
**proportional** [1] - 4:6
**proposed** [1] - 47:13
**proposition** [1] - 8:22
**propound** [2] - 13:3, 21:2
**propounded** [5] - 20:4, 20:7, 21:15, 22:2, 22:3
**proprietary** [5] - 4:14, 5:17, 10:19, 18:6, 32:6
**protect** [3] - 11:7, 30:12, 37:23
**protected** [1] - 18:7
**protections** [1] - 37:21
**protective** [21] - 10:24, 11:2, 11:6, 25:4, 25:22, 26:3, 26:25, 27:3, 28:12, 30:12, 33:9, 36:3, 36:5, 36:16, 36:17, 36:18, 37:2, 37:8, 37:10, 37:18, 42:9
**protects** [1] - 33:10
**prove** [5] - 9:13, 9:14, 9:15, 37:17, 43:23
**provide** [3] - 8:1, 33:4, 33:7
**provided** [1] - 48:4
**provides** [2] - 4:4, 15:23
**provision** [3] - 11:1, 36:4, 37:9
**proxy** [2] - 28:1, 44:2
**punitive** [2] - 43:17, 45:18
**purpose** [21] - 11:15, 11:17, 11:20, 11:21, 12:1, 12:14, 12:23, 13:2, 13:20, 16:22, 18:20, 23:6, 23:7, 23:8, 35:14, 36:4, 40:21, 40:25, 41:4, 41:10, 46:14
**put** [3] - 22:20, 28:16, 46:21
**puts** [1] - 27:19

## Q

**qualifier** [1] - 5:10
**questions** [5] - 16:24, 38:3, 40:8, 40:11, 42:16
**quite** [1] - 35:20
**quote** [3] - 8:21, 9:13, 16:8
**quotes** [1] - 16:7

## R

**raise** [1] - 19:12
**raised** [1] - 25:3
**ran** [1] - 32:7
**ranging** [1] - 18:12
**reach** [3] - 21:8, 24:4, 24:5
**reached** [3] - 21:4, 22:18, 24:6
**reaching** [2] - 7:4, 25:14
**read** [6] - 3:18, 19:8, 21:12, 22:24, 24:10, 35:19
**reading** [3] - 21:13, 21:14, 21:25
**ready** [2] - 28:3, 44:1
**real** [4] - 31:12, 35:10, 37:5, 42:20
**really** [16] - 10:21, 23:8, 25:16, 26:10, 28:12, 30:5, 30:10, 31:11, 32:24, 36:12, 42:17, 43:6, 43:15, 43:17, 46:5
**reason** [5] - 5:14, 10:23, 22:22, 25:3, 38:16
**reasons** [1] - 30:5
**receiving** [1] - 37:20
**recently** [1] - 20:22
**recognizes** [1] - 10:12
**recommended** [1] - 6:23
**record** [3] - 3:5, 4:21, 48:3
**recorded** [1] - 1:24
**recording** [2] - 1:25, 48:4
**records** [1] - 9:20
**redact** [1] - 42:22
**redacted** [1] - 42:25
**redo** [1] - 23:20
**refer** [2] - 10:10, 45:1
**reference** [1] - 34:21
**referencing** [4] - 5:4, 5:10, 5:11, 34:16
**refine** [1] - 13:24
**refined** [3] - 14:19, 15:15, 16:21
**refinement** [1] - 14:9
**refuting** [1] - 30:2
**regard** [1] - 46:9
**regarding** [1] - 15:24
**rejected** [2] - 8:20, 9:12
**related** [6] - 8:2, 9:20, 11:3, 38:14, 38:23, 39:24
**relating** [1] - 9:25
**relationship** [1] - 31:7
**release** [1] - 24:19
**relevance** [6] - 4:8, 10:21, 24:8, 25:1, 28:8, 42:17
**relevancy** [1] - 9:3
**relevant** [30] - 3:25, 4:6, 6:5, 7:22, 9:1, 10:6, 10:7, 10:8, 11:10, 13:9, 14:3, 15:10, 15:18, 15:20, 17:14, 17:22, 21:21, 26:9, 26:16, 36:1, 37:17, 37:20, 38:24, 39:3, 42:4, 42:19, 45:1, 45:22
**relied** [2] - 7:5, 45:11
**relief** [1] - 19:25
**rely** [1] - 14:24
**remaining** [1] - 42:10
**remarks** [1] - 41:17
**remedy** [2] - 5:20, 45:9
**renegotiate** [1] - 22:19
**RentEngine** [11] - 17:7, 17:17, 18:23, 19:5, 25:6, 25:9, 25:15, 31:9, 34:5, 44:19, 44:20
**RENTENGINE** [1] - 1:8
**RentEngine's** [5] - 18:7, 21:17, 22:6, 22:9, 29:21
**replicate** [1] - 18:6
**report** [13] - 27:9, 27:19, 28:3, 28:13, 36:10, 36:23, 37:13, 37:14, 37:24, 42:23, 44:1
**reports** [2] - 21:16, 27:11
**repropound** [1] - 12:17
**Request** [8] - 4:21, 22:1, 28:23, 29:2, 39:19, 39:20, 39:21, 47:8
**request** [22] - 5:1, 7:16, 11:12, 11:22, 11:25, 12:5, 12:11, 12:16, 12:17, 13:18, 14:14, 15:17, 15:25, 16:18, 19:24, 20:5, 23:4, 34:1, 38:20, 46:20, 47:12, 47:15
**requested** [3] - 3:24, 10:2, 35:21
**requests** [31] - 4:21, 4:25, 5:7, 7:16, 9:19, 12:6, 13:3, 13:6, 13:12, 13:17, 13:23, 13:24, 14:6, 14:20, 15:2, 15:8, 15:12, 15:13, 15:14, 15:15, 15:25, 16:2, 16:11, 16:12, 16:13,

16:14, 16:20, 23:2, 39:5, 41:6, 44:25
**require** [1] - 7:8
**required** [1] - 19:12
**research** [1] - 45:7
**reset** [1] - 12:18
**resisting** [1] - 9:2
**resolve** [1] - 12:3
**respect** [1] - 12:4
**respond** [1] - 41:23
**responded** [1] - 14:13
**response** [4] - 12:20, 28:23, 29:2, 32:13
**responses** [1] - 12:7
**responsive** [2] - 32:25, 34:11
**restrictive** [1] - 16:6
**result** [1] - 44:22
**revenue** [24] - 5:22, 8:6, 9:21, 10:16, 21:20, 22:6, 22:11, 23:23, 28:11, 29:6, 29:8, 29:11, 29:21, 30:23, 30:24, 31:7, 31:18, 32:10, 32:13, 34:3, 34:12, 39:25, 43:22
**revenues** [4] - 8:2, 9:11, 10:14, 40:5
**RFP** [9] - 22:4, 22:8, 30:18, 30:19, 30:22, 32:13, 34:8
**RFPs** [18] - 13:8, 13:11, 14:2, 20:7, 21:2, 21:3, 21:9, 21:15, 21:24, 22:12, 23:5, 26:2, 35:12, 35:19, 39:9
**ripe** [2] - 11:19, 41:2
**rise** [1] - 47:18
**Roam** [1] - 9:7
**robust** [1] - 11:2
**routinely** [1] - 4:8
**RPR** [1] - 1:20
**Rule** [16] - 4:4, 11:14, 11:16, 11:20, 12:1, 12:8, 14:8, 15:5, 16:7, 16:9, 16:22, 16:23, 19:13, 26:6, 26:9, 41:1
**rule** [23] - 11:15, 11:17, 12:8, 12:9, 12:14, 12:24, 14:10, 16:13, 19:7, 19:14, 19:15, 22:23, 23:7, 23:8, 23:15, 35:14, 40:19, 40:21, 41:9, 46:10, 46:24, 47:2
**ruled** [1] - 26:12
**rules** [5] - 18:20, 24:1, 35:11, 46:17
**Rules** [1] - 14:7
**ruling** [2] - 46:9, 47:12
**run** [1] - 12:14

## S

**sales** [9] - 7:6, 8:17, 8:22, 9:14, 9:15, 10:3, 21:20, 22:11, 45:12
**satisfied** [2] - 11:21, 12:1
**satisfy** [1] - 43:1
**saw** [2] - 15:13, 32:12
**schedule** [1] - 41:19
**scheduling** [1] - 16:9
**scheme** [1] - 24:22
**scope** [1] - 24:22
**search** [1] - 34:11
**second** [15] - 12:5, 12:15, 13:11, 13:18, 15:1, 15:11, 15:17, 18:22, 20:7, 21:14, 21:25, 23:2, 24:7, 30:20, 35:15
**secret** [3] - 5:19, 5:23, 6:17
**secrets** [5] - 4:10, 7:2, 8:5, 44:22, 45:16
**see** [8] - 24:11, 28:23, 31:11, 33:18, 36:3, 42:24, 43:17, 46:20
**seek** [4] - 6:1, 11:11, 11:13, 38:21
**seeking** [8] - 4:10, 6:5, 7:7, 9:20, 12:10, 39:24, 45:17, 45:21
**sense** [2] - 26:8, 28:20
**sensitive** [6] - 10:20, 24:16, 27:20, 32:12, 36:2, 36:9
**sensitivity** [2] - 42:20, 43:1
**Sensormatic** [6] - 6:8, 6:15, 9:22, 10:10, 10:11, 45:1
**serious** [1] - 35:18
**seriously** [1] - 47:1
**served** [2] - 11:22, 41:9
**service** [1] - 32:7
**Services** [1] - 16:5
**serving** [2] - 15:1, 23:2
**set** [13] - 15:1, 15:12, 19:22, 20:6, 20:7, 20:12, 21:9, 21:14, 21:24, 21:25, 22:3, 23:2, 23:12
**several** [1] - 13:8
**shall** [1] - 12:18
**share** [3] - 27:2, 42:23, 43:6
**sheets** [1] - 21:18
**shift** [1] - 13:9
**short** [1] - 46:9
**shortly** [2] - 11:19, 41:3
**show** [8] - 4:2, 9:17, 10:8, 22:6, 22:9, 26:2, 29:21, 35:16
**showing** [3] - 8:4, 19:23, 32:10
**SHOWMOJO** [1] - 1:5
**ShowMojo** [10] - 3:4, 5:12, 17:10, 17:11, 17:16, 27:18, 31:1, 33:21, 33:23, 34:4
**shows** [7] - 8:5, 25:12, 25:25, 29:23, 34:12, 34:14, 43:10
**side** [1] - 42:14
**sidenote** [1] - 20:19
**signing** [1] - 32:3
**similar** [8] - 15:2, 22:4, 22:23, 23:2, 24:6, 35:12, 42:6, 43:20
**simply** [2] - 42:2, 43:11
**single** [2] - 29:12, 43:23
**sit** [1] - 16:24
**sitting** [1] - 38:2
**situation** [2] - 8:24, 35:15
**six** [1] - 28:17
**small** [2] - 23:11, 24:20
**snippet** [1] - 24:10
**software** [4] - 4:16, 5:18, 8:1, 32:4
**sole** [1] - 46:14
**solves** [1] - 25:5
**someone** [2] - 6:11, 25:12
**sorry** [6] - 4:18, 21:24, 37:25, 38:1, 41:13, 44:14
**sort** [2] - 11:3, 45:20
**sorts** [1] - 5:18
**sought** [2] - 9:1, 15:19
**sound** [3] - 41:24, 41:25, 42:3
**sounds** [3] - 29:16, 47:4, 47:8
**South** [1] - 33:7
**Southeast** [1] - 2:10
**Southern** [4] - 6:14, 15:5, 40:23, 48:7
**SOUTHERN** [1] - 1:1
**space** [2] - 17:18, 19:6
**speaking** [1] - 41:23
**specific** [13] - 5:7, 5:21, 8:3, 10:16, 12:7, 13:18, 14:2, 14:7, 16:11, 29:16, 38:19, 41:5, 44:25
**specifically** [14] - 4:1, 6:23, 7:5, 7:21, 13:13, 28:21, 38:9, 39:1, 39:3, 39:9, 39:13, 40:25, 44:21, 45:11
**specifications** [2] - 6:20, 45:5
**specify** [1] - 28:21
**speculating** [1] - 25:7
**speculative** [2] - 7:20, 25:23
**speed** [1] - 32:5
**spent** [2] - 21:8, 22:17
**spirit** [1] - 46:16
**spreadsheet** [1] - 27:17
**stage** [1] - 24:24
**stale** [2] - 14:18, 15:8
**standing** [1] - 19:11
**standpoint** [1] - 26:24
**start** [32] - 5:14, 5:19, 5:24, 6:6, 6:17, 7:2, 7:6, 7:8, 8:7, 8:10, 8:11, 10:12, 10:15, 13:10, 17:5, 18:13, 21:11, 26:11, 30:2, 31:15, 37:18, 38:11, 38:18, 38:24, 39:10, 42:18, 42:19, 43:24, 45:3, 45:7, 45:12, 45:14
**starting** [3] - 6:21, 45:3, 45:5
**startup** [2] - 17:8, 19:5
**state** [3] - 28:24, 30:6, 43:11
**statement** [2] - 14:24, 43:21
**statements** [7] - 8:19, 8:23, 13:13, 21:16, 21:18, 33:15
**STATES** [2] - 1:1, 1:15
**States** [2] - 1:21, 48:6
**stealing** [1] - 45:16
**Steinbeisser** [1] - 48:5
**STEINBEISSER** [1] - 1:20
**stenography** [1] - 1:24
**still** [8] - 12:16, 13:4, 13:5, 16:2, 27:2, 39:22, 42:10, 43:9
**stipulated** [1] - 10:24
**stole** [1] - 5:16
**stop** [2] - 27:21, 28:13
**stops** [1] - 33:9
**straight** [1] - 28:8
**strategy** [1] - 25:2
**strength** [1] - 24:15
**strictly** [1] - 19:13
**STRINGFELLOW** [1] - 1:9
**Stringfellow** [1] - 25:15
**strong** [1] - 26:21
**struggling** [1] - 44:23
**stuff** [2] - 13:17, 22:19
**subject** [1] - 16:17
**submit** [6] - 16:1, 19:20, 19:21, 24:8, 25:11, 25:23
**submitted** [2] - 7:12, 25:10
**subsequent** [1] - 23:3
**substantive** [2] - 14:14, 24:1
**subsumed** [1] - 22:8
**successful** [1] - 45:14
**suffer** [1] - 24:25
**sufficient** [5] - 22:5, 22:9, 29:20, 37:9, 37:21
**suggestion** [2] - 27:1, 41:24
**Suite** [2] - 2:4, 2:10
**Sum** [2] - 17:13, 17:15
**summary** [2] - 8:17,

8:22
**Supp** [1] - 6:14
**supposed** [2] - 13:22, 41:20
**surely** [1] - 36:23
**surprise** [1] - 14:18
**sweeping** [1] - 43:9
**system** [1] - 5:16

## T

**tailored** [2] - 38:19, 39:5
**talks** [1] - 24:7
**target** [1] - 31:10
**targeted** [2] - 23:23, 39:9
**targeting** [1] - 13:13
**task** [1] - 28:7
**tease** [1] - 26:4
**technical** [2] - 18:19, 23:25
**TECHNOLOGY** [1] - 1:8
**Teen** [1] - 16:5
**teeth** [1] - 42:9
**Tenant** [10] - 3:3, 5:11, 17:10, 17:11, 17:17, 27:18, 31:1, 33:20, 33:23, 34:4
**TENANT** [1] - 1:4
**test** [1] - 18:25
**tethered** [4] - 31:11, 31:14, 32:8, 33:25
**THE** [58] - 1:14, 2:2, 2:7, 3:2, 3:9, 3:13, 3:21, 4:18, 4:20, 4:24, 5:9, 6:10, 12:12, 17:1, 19:15, 20:10, 20:16, 20:18, 26:3, 28:15, 29:9, 29:14, 29:18, 29:20, 30:19, 31:4, 31:14, 31:22, 32:17, 32:22, 33:17, 34:9, 34:16, 34:20, 35:1, 35:3, 35:8, 35:22, 36:12, 36:15, 37:25, 38:2, 38:8, 39:13, 39:16, 39:18, 40:8, 40:17, 41:12, 41:22, 42:15, 43:8, 44:5, 44:16, 45:25, 46:2, 46:5, 47:18
**theirs** [1] - 8:1
**themselves** [2] - 27:11, 27:16
**theories** [4] - 13:24, 38:19, 39:10, 39:11
**theory** [21] - 4:1, 5:14, 5:19, 5:24, 6:6, 6:18, 8:10, 26:11, 30:1, 30:2, 31:15, 37:18, 38:24, 39:10, 42:18, 42:19, 43:13, 43:24, 45:3, 45:8, 45:21
**thereby** [1] - 4:16
**therefore** [1] - 3:19
**they've** [3] - 20:6, 24:3, 42:22
**thinks** [1] - 40:20
**third** [17] - 4:12, 11:22, 12:18, 13:8, 13:11, 14:2, 14:13, 20:6, 20:17, 20:24, 21:9, 21:23, 22:3, 23:12, 32:13, 39:9, 39:11
**Third** [1] - 2:10
**three** [1] - 21:2
**THRESHOLD** [1] - 1:8
**tied** [5] - 9:11, 17:23, 20:12, 20:14, 39:1
**time-to-market** [1] - 13:14
**timely** [8] - 11:24, 14:19, 15:2, 19:12, 21:5, 23:3, 23:9, 46:15
**timing** [4] - 7:10, 10:13, 12:15, 13:15
**today** [3] - 3:22, 17:20, 18:17
**together** [2] - 35:20, 46:21
**top** [2] - 34:21, 43:4
**topic** [1] - 12:10
**touching** [1] - 29:25
**trade** [8] - 4:10, 5:18, 5:23, 6:17, 7:2, 8:5, 44:22, 45:16
**traffic** [1] - 34:20
**TRANSCRIBER** [1] - 48:1
**Transcriber** [2] - 1:20, 48:6
**transcript** [3] - 1:25, 48:2, 48:3
**TRANSCRIPT** [1] - 1:13
**transcription** [1] - 1:25
**trial** [6] - 11:20, 12:3, 14:19, 21:19, 41:4, 46:15
**tried** [2] - 21:11, 25:10
**Tropical** [1] - 40:22
**true** [4] - 19:15, 19:19, 31:22, 42:1
**trust** [1] - 36:5
**trying** [9] - 10:5, 12:14, 15:7, 20:24, 23:16, 23:21, 26:24, 27:21, 36:15
**turned** [5] - 32:19, 34:8, 34:13, 34:19, 35:2
**TURNER** [1] - 1:4
**Turner** [10] - 3:3, 5:12, 17:10, 17:11, 17:17, 27:18, 31:1, 33:20, 33:23, 34:4
**turning** [1] - 35:18
**two** [8] - 17:10, 17:19, 18:16, 30:5, 33:15, 35:9, 40:22, 41:13
**type** [4] - 4:9, 6:17, 24:16, 42:22
**types** [2] - 6:4, 33:4

## U

**unaudited** [1] - 21:18
**under** [11] - 11:14, 12:15, 16:8, 16:13, 26:9, 26:19, 28:7, 34:8, 39:21, 45:3, 46:8
**underlying** [3] - 8:18, 8:23, 36:21
**understood** [1] - 46:19
**unduly** [3] - 20:23, 24:2, 24:3
**unfair** [1] - 4:10
**UNINTELLIGIBLE** [14] - 12:24, 13:2, 15:7, 16:3, 31:23, 38:3, 40:3, 40:19, 41:5, 41:7, 42:11, 44:11, 44:23, 44:25
**UNINTELLIGIBLE]** [2] - 4:11, 28:15
**unique** [1] - 35:15
**UNITED** [2] - 1:1, 1:15
**United** [2] - 1:21, 48:6
**universe** [2] - 34:5, 35:20
**unjust** [6] - 6:1, 7:17, 14:3, 38:18, 39:10, 45:21
**unless** [1] - 26:16
**untimely** [5] - 14:25, 16:8, 16:10, 16:13, 23:1
**up** [15] - 9:14, 13:5, 22:13, 23:8, 23:11, 27:17, 27:18, 32:4, 35:25, 40:20, 42:12, 43:12, 43:23, 44:2, 45:19
**utilize** [1] - 34:17

## V

**valid** [1] - 10:23
**value** [1] - 7:18
**Ventures** [2] - 17:13, 17:16
**version** [2] - 20:13, 20:15
**versus** [3] - 3:3, 9:7, 22:20
**viable** [1] - 17:9
**violate** [2] - 36:6, 36:16
**violating** [2] - 36:17, 37:2
**visited** [1] - 34:14
**vs** [1] - 1:7
**vulnerability** [1] - 24:15
**vulnerable** [1] - 24:17

## W

**waiting** [1] - 46:11
**waived** [1] - 11:11
**waiver** [8] - 16:16, 19:7, 23:13, 23:24, 35:10, 42:13, 46:10
**walk** [4] - 18:19, 20:2, 26:1, 29:15
**walking** [1] - 35:3
**walks** [1] - 26:25
**wants** [2] - 24:23, 26:7
**ways** [5] - 37:23, 42:3, 42:4, 42:8, 43:3
**website** [1] - 32:4
**weigh** [1] - 19:1
**weight** [1] - 26:8
**whole** [1] - 12:7
**wide** [1] - 18:12
**wide-ranging** [1] - 18:12
**wish** [1] - 44:14
**withheld** [2] - 4:3, 9:3
**withhold** [1] - 10:23
**WL** [3] - 8:13, 9:7, 40:23
**word** [5] - 21:12, 40:10, 40:12, 43:5
**works** [1] - 11:16
**world** [1] - 44:12
**worth** [1] - 43:18
**wrap** [1] - 23:8
**wrongful** [1] - 9:16

## Y

**year** [2] - 17:24, 18:10
**years** [1] - 17:19
**young** [1] - 17:19