**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-cv-22939-ALTMAN**

**SHOWMOJO, LLC**, and **TENANT TURNER, INC.**,

*Plaintiffs*,

*v.*

**THRESHOLD TECHNOLOGY, LLC**, *d/b/a* **RENTENGINE**, and **ALEXANDER STRINGFELLOW**,

*Defendants*.

_______________________________________/

**ORDER**

Software providers sued a rival for allegedly gaining unauthorized access to—and misappropriating—their products. The Defendants now move to compel arbitration of the claims under the doctrine of equitable estoppel. After careful review, we **GRANT in part** and **DENY in part** the motion.

## THE FACTS

Our Plaintiffs—ShowMojo, LLC ("ShowMojo") and Tenant Turner, Inc. ("Tenant Turner")—"provide[ ] . . . property management software" to "real estate professionals throughout the United States." Third Amended Complaint (the "TAC") [ECF No. 57] ¶ 1. Those Platforms—"proprietary, cloud-based," and "specifically designed for the property management industry"—"allow property managers to efficiently coordinate leasing activities, manage leads, schedule showings, facilitate communication with prospective tenants[,] and integrate with third-party services and hardware." *Id.* ¶¶ 1, 21. To prevent "competitor access" and "reverse engineering," the Plaintiffs

"safeguard their Platforms and associated confidential information through . . . technical, contractual[,] and operational controls." *Id.* ¶¶ 25, 28.

"As part of these protections," our Plaintiffs say, "prospective user[s]" of the platforms "must accept the applicable Terms of Use before any account is provisioned or access is permitted." *Id.* ¶ 28.[1] And those Terms of Use, we're further told, "expressly forbid[ ] the use of the[ ] Platforms by competitors," giving "access to the Platforms or any of their features available to third parties," and "[r]everse engineering, decompiling, disassembling, copying, creating derivative works from, or otherwise analyzing the Platforms—or any underlying source code, algorithms, or functionalities—for the purpose of developing, enhancing, or providing a competing product or service[.]" *Id.* ¶¶ 38–39.

Despite such protections, our Plaintiffs allege that a "direct competitor"—RentEngine, "a leasing platform for property managers"—"engaged in a systematic and deliberate scheme to improperly access and exploit [the] Plaintiffs' Platforms and confidential information." *Id.* ¶¶ 4, 44. According to our Plaintiffs, RentEngine "has been directly soliciting [the] Plaintiffs' customers to provide access to their profiles on [the] Plaintiffs' Platforms, claiming that such access is necessary for purposes such as data migration or demonstrations of RentEngine's services," even though its "true objective [i]s to gain unauthorized entry into [the] Plaintiffs' secure, proprietary systems to further its own competitive interests." *Id.* ¶ 45. And "[o]nce provided with [a] customer's login credentials," our Plaintiffs continue, RentEngine "make[s] additional accounts under that customer profile to access and manipulate [the] Plaintiffs' Platforms." *Id.* ¶ 46.

[1] Our Plaintiffs—two different companies—each have their own Terms of Use. *See* Tenant Turner Terms of Use [ECF No. 147-1]; ShowMojo Terms of Use [ECF No. 147-2]. But they refer to those terms as a monolithic "Terms of Use." *See, e.g.*, TAC ¶ 28 ("[A]ny prospective user must accept the applicable Terms of Use before any account is provisioned or access is permitted[.]"). We do the same, unless otherwise noted.

The Plaintiffs claim to have uncovered at least forty instances of RentEngine "us[ing] customer credentials to establish unauthorized accounts on the Platforms." *Id.* ¶ 51. And those instances, the Plaintiffs add, have allowed RentEngine to "receive[ ] a vast amount of private, properly-protected information about Plaintiffs . . . to which [it] w[a]s not entitled," including the "confidential features, data flows, user interfaces[,] and functional tools . . . that comprise [the] Plaintiffs' proprietary trade secrets." *Id.* ¶¶ 51, 58. Armed with that information, the Plaintiffs tell us, RentEngine "accelerate[d] [its] product development"; "divert[ed] leads and communications to [its own] systems"; "replicate[d] numerous password-protected processes"; and "misappropriated images and depictions of Plaintiffs' interfaces and features" in "marketing brochures" to "disparage and misrepresent the . . . Plaintiffs' offerings in the marketplace." *Id.* ¶¶ 60, 64, 77, 80.

"As a direct result of [that] misappropriation," the Plaintiffs allege, RentEngine "avoided substantial development costs and achieved a material head-start in product design, feature breadth, onboarding/migration capabilities[,] and marketing." *Id.* ¶ 99. In so doing, they further claim, "RentEngine intentionally caused confusion and harm in the marketplace, materially damaging [the] Plaintiffs' business reputation, goodwill[,] and competitive standing." *Id.* ¶ 90; *see also id.* ¶ 102 ("Plaintiffs have suffered and continue to suffer significant business and reputational injuries, including loss of customer relationships and goodwill, harm to their industry standing, and a reduction in market share.").

In May 2025, our Plaintiffs sued RentEngine and its "Chief Executive Officer," Alexander Stringfellow. *Id.* ¶ 17. *See* Complaint [ECF No. 1]. In July 2025, the Plaintiffs filed a Motion for Preliminary Injunction (the "PI Motion") [ECF No. 7] along with a Motion to Expedite Discovery [ECF No. 8]. That same month, we granted the Motion to Expedite Discovery, *see* Order Granting Motion to Expedite [ECF No. 11], and the parties filed a Joint Motion for an Extension of Time to Comply with the Order to Expedite Discovery [ECF No. 16]. In August 2025, the Plaintiffs filed the

First Amended Complaint [ECF No. 28]. That same day, the parties jointly moved for a stipulated order, noting that they "reached an agreement to resolve the issues related to the request for a preliminary injunction[.]" Joint Motion for Entry of Stipulated Order [ECF No. 29] at 1.

In October 2025, the Plaintiffs filed the Second Amended Complaint [ECF No. 43]. And, in November 2025, the Plaintiffs filed the operative TAC, bringing eleven counts. Of those eleven counts, only Count IX names both RentEngine and Stringfellow (together, the "Defendants"). The remaining ten counts concern only RentEngine.

Count I alleges a violation of the Computer Fraud and Abuse Act (the "CFAA"), 18 U.S.C. § 1030(a). *See* TAC ¶¶ 107–124. Count II alleges tortious interference with contract. *See id.* ¶¶ 125–135. Count III alleges unjust enrichment. *See id.* ¶¶ 136–144. Count IV asserts a claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). *See* TAC ¶¶ 145–159. Count V alleges a violation of the Florida Deceptive and Unfair Trade Practices Act (the "FDUPTA"), Fla. Stat. §§ 501.201 *et seq*. *See* TAC ¶¶ 160–171. Count VI advances an unfair-competition claim. *See id.* ¶¶ 172–190. Count VII brings a conversion claim. *See id.* ¶¶ 191–201. Count VIII alleges trespass to chattels. *See id.* ¶¶ 202–211. Count IX alleges common-law fraud. *See id.* ¶¶ 212–229. Count X alleges a violation of the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1836. *See* TAC ¶¶ 230–243. Finally, Count XI alleges a violation of the Florida Uniform Trade Secrets Act (the "FUTSA"), Fla. Stat. § 688.001. *See* TAC ¶¶ 244–257.

In December 2025, the Defendants filed the Motion to Compel Arbitration or, Alternatively, to Dismiss (the "Motion") [ECF No. 63]. Later that month, the Plaintiffs filed the Response in Opposition to the Motion (the "Response") [ECF No. 69]. And, in January 2026, the Defendants filed a Reply in Support of the Motion (the "Reply") [ECF No. 72]. The Motion is now ripe for adjudication.[2]

[2] In March 2026, the Plaintiffs moved for leave to file a *fourth* amended complaint. *See* Motion for Leave [ECF No. 82]. We denied that request, noting (among other things) that the Plaintiffs failed

## THE LAW

Section 2 of the Federal Arbitration Act (the "FAA") provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. That provision reflects "both a liberal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (cleaned up). Accordingly, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

The FAA "also establishes procedures by which federal courts implement § 2's substantive rule." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010). "A party to an arbitration agreement may move 'for an order directing that such arbitration proceed in the manner provided for in such agreement' under § 4 of the FAA, and for a stay of proceedings in federal court pending the outcome of arbitration under § 3." *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1294 (11th Cir. 2022) (quoting 9 U.S.C. §§ 3–4). But "[b]efore enforcing an arbitration agreement, the court should ensure that the agreement was formed and that it applies to the dispute at hand." *Ibid.* "If the parties' arbitration agreement applies to their dispute and no grounds render it invalid or unenforceable, the court 'shall' compel arbitration and stay proceedings in federal court." *Ibid.* (quoting §§ 3–4).

## ANALYSIS

The Motion advances two arguments. It asks in the main that we compel arbitration. And it maintains in the alternative that the TAC fails to state a claim for relief. We begin—and end—with the motion to compel arbitration.

---

to respond to the Defendants' argument that leave could've been sought back in September 2025. *See* Order Denying Leave [ECF No. 92].

According to the Defendants, "the Terms of Use . . . contain broad arbitration provisions requiring arbitration of disputes between the Plaintiffs and their customers." Motion at 5. The Defendants therefore invoke the doctrine of equitable estoppel, which they say allows them "to enforce [the] arbitration agreement between . . . the Plaintiffs and the customers." *Id.* at 9. That doctrine applies here, they argue, for two reasons: *first*, because "the Terms of Use . . . are the genesis of each of the Plaintiffs' claims," *id.* at 12; and *second*, because the TAC alleges "concerted, interdependent misconduct" on the part of the Defendants and the Plaintiffs' customers. *Id.* at 14. But "[e]ven if equitable estoppel were unavailable," the Defendants add, "the Court should still compel arbitration because [the] Plaintiffs . . . affirmatively allege that [the] Defendants accepted the Terms of Use." *Ibid.*

Our Plaintiffs accuse the Defendants of "gloss[ing] over a basic fact of this case"—namely, that they "are, in fact, *signatories* to [the] Plaintiffs' Terms of Use." Response at 19; *see also ibid.* ("The Complaint details the countless times Defendants agreed to Plaintiffs' Terms of Use to furtively gain access to Plaintiffs' Platforms, thus, rendering Defendants signatories to Plaintiffs' Terms of Use."). And, as signatories, the Plaintiffs continue, the Defendants "may not invoke the doctrine of equitable estoppel," which applies only to "a *non-signatory* to an agreement." *Id.* at 20 (quotation marks omitted). Still, our Plaintiffs maintain that "arbitration is inappropriate" because the Plaintiffs "never intended to contract with [the] Defendants," which means "the contract between [the] Plaintiffs and [the] Defendants was never formed on account of fraud in the factum." *Id.* at 21. In any event, the Plaintiffs conclude, the Defendants "waived" any arbitration right through "conduct . . . inconsistent with any intent to arbitrate." *Id.* at 24.

After careful review, we compel arbitration of ShowMojo's claims—and stay Tenant Turner's claims pending that arbitration. And we reach that holding in three steps. *First*, as a threshold matter, we confirm that the Terms of Use contain valid—and applicable—arbitration provisions. *Second*, we

conclude that the Defendants, as signatories to a void contract, can invoke equitable estoppel to compel arbitration of ShowMojo's (but not Tenant Turner's) claims. *Third*, and finally, we reject the Plaintiffs' waiver argument.

## I. The Prerequisites for Arbitrability

Before determining whether the Defendants are signatories, we must first confirm that "a written agreement exists," that the agreement "contain[s] an arbitration clause," and that "an arbitrable issue exists[.]" *Pro. Consulting Servs. S.A.S. v. Inmigracion Pro, LLC*, 2024 WL 4103919, at *4 (S.D. Fla. Sept. 6, 2024) (Altman, J.) (cleaned up). We do so in short order.

"The FAA reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Ctr.*, 561 U.S. at 67. So, "the first question in any arbitration dispute must be: What have these parties agreed to?" *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024). To that end, "we look to the wording of the . . . provision itself" to "determine whether the parties have manifested a clear and unmistakable intent to arbitrate[.]" *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1267 (11th Cir. 2017). Here, two such provisions exist—§ 16.1 of the Tenant Turner Terms of Use and § 11.1 of the ShowMojo Terms of Use.[3] Section 16.1 of the former requires arbitration of "any controversies, claims, counterclaims, or other disputes between you and us or you and a third-party agent of ours." Tenant Turner Terms of Use [ECF No. 147-1] at 7. And § 11.1 of the latter requires arbitration of "any dispute or controversy arising out of, in relation to, or in connection with these Terms of Use including, without limitation, any and all disputes, claims (whether in tort, contract, statutory, or otherwise), or disagreements

[3] The TAC hyperlinks to both Tenant Turner's and ShowMojo's Terms of Use. *See* TAC ¶ 29 n.2, n.3; *see also* Defendants' Notice of Filing Terms of Use Referenced in Operative Complaint and Motion to Compel Arbitration [ECF No. 147]. And the Defendants agree that we "may consider the entirety of the Terms of Use . . . because the Terms of Use are 'central' to the Plaintiffs' Complaint." Motion at 4 n.1; *see also ibid.* ("[N]either party will dispute the authenticity of the Terms of Use for the purposes of this [M]otion."). We therefore rely on the versions of the Terms of Use incorporated by the TAC. *See* FED. R. CIV. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

concerning the existence, breach, interpretation, application, or termination of these Terms[.]" ShowMojo Terms of Use [ECF No. 147-2] at 7.

Our parties dispute whether the Defendants accepted the Terms of Use. But neither side contests that the Terms of Use bind signatories, that the Terms of Use contain valid arbitration provisions, and that—to the extent that the Defendants are signatories—those provisions encompass the claims at issue here. *See, e.g.*, Motion at 2 (arguing that, if it's "true" that the Defendants agreed to the Terms of Use, then "arbitration is straightforward" because "both sets of Terms contain broad, mandatory arbitration provisions that require this dispute to be arbitrated"); *id.* at 4 ("[T]he Terms of Use also contain broad arbitration provisions requiring arbitration of disputes between the Plaintiffs and their customers."); Reply at 1 (noting that the "gateway factors for arbitration are satisfied"); Response at 24 ("Plaintiffs intended to, and did, enter an agreement with the Targeted Customers and at all times believed their agreements to be with Targeted Customers.").

We see no reason to find otherwise. Tenant Turner's arbitration provision reaches all issues that occur "between you and us or you and a third-party agent of ours." Tenant Turner Terms of Use at 7. That language (it's true) limits the *parties* to whom the provision applies. But § 16.1 otherwise embraces "*any* controversies, claims, counterclaims, or other disputes"—not just those bearing a certain nexus to the Terms of Use—between applicable parties. *Ibid.* (emphasis added). And while ShowMojo's arbitration provision requires *some* nexus to the Terms of Use (*i.e.*, the "dispute or controversy" must be "arising out of, in relation to, or in connection with these Terms of Use"), it doesn't limit the parties to whom the provision applies.

Whether Tenant Turner's arbitration provision applies to the Defendants thus turns on whether the Defendants are signatories to the Terms of Use. But both Tenant Turner's and ShowMojo's arbitration provisions prove broad enough in scope to encompass *the claims* set forth in the TAC. At a minimum, all eleven counts explicitly reference the Terms of Use, *see* TAC ¶¶ 1–144,

160–257, or at least concern information gleaned from the Defendants' (undisputed) access of the Platforms, *see id.* ¶¶ 145–159; *see also* Reply at 9 ("It is undisputed that Defendants accessed the Platforms[.]"). All eleven counts thus arise out of, relate to, or connect with the Terms of Use. *See Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1114 (11th Cir. 2001) (deeming "broad" a clause requiring arbitration of "'any dispute between them or claim by either party to the contract against the other.'" (cleaned up)); *Armada Coal Exp., Inc. v. Interbulk, Ltd.*, 726 F.2d 1566, 1568 (11th Cir. 1984) ("The pertinent clause . . . is admitted by both parties to be broad; it states that 'any dispute arising during the execution of the Charter Party shall be settled by arbitration.'" (cleaned up)); *see also Cheruvoth v. SeaDream Yacht Club Inc.*, 2021 WL 4595177, at *1 (11th Cir. Oct. 6, 2021) ("We have stated that federal courts interpret arbitration clauses broadly where possible." (cleaned up)).

In sum: The Plaintiffs' *claims*—if nothing else—implicate valid arbitration clauses and present arbitrable issues. So, with the prerequisites for arbitrability met, we can proceed to the merits.

## II. The Defendants Can Compel Arbitration of ShowMojo's Claims

That brings us to the parties' central dispute: Can the Defendants compel arbitration of the Plaintiffs' claims? Our answer is yes—but only as to ShowMojo's claims. And we arrive at that answer in four parts. *First*, we agree with the Plaintiffs that the Defendants are signatories to the Terms of Use. *Second*, we agree with the Plaintiffs that any contract between the Defendants and the Plaintiffs is void, but we *disagree* with the Plaintiffs' contention that signatories to a void contract cannot attempt an equitable-estoppel defense. *Third*, we determine that the Defendants *successfully* invoke equitable estoppel to compel arbitration of ShowMojo's claims. *Fourth*, and finally, we stay Tenant Turner's claims.

### a. The Defendants are Signatories to the Terms of Use

Our Plaintiffs believe that the Defendants "agreed to [the] Plaintiffs' Terms of Use to furtively gain access to [the] Plaintiffs' Platforms." Response at 19; *see also id.* at 20 (insisting that the

"Defendants do not dispute" their signatory status). But the Defendants believe it "undisputed" that they "were *not* contractual counterparties to the Terms of Use." Reply at 2 (emphasis added). On the record before us, we agree with the Plaintiffs.

To be sure, the Plaintiffs "never intended for their Terms of Use to be accepted by or govern their relationships with an industry competitor." TAC ¶ 38. But the thrust of the TAC remains the same: The Defendants *accessed* the Platforms—and, in so doing, *acceded* to the Terms of Use. *See, e.g.*, TAC ¶ 29 ("To create user accounts on Plaintiffs' Platforms, Defendants were required to accept Tenant Turner's Customer Terms and ShowMojo's Terms of Use[.]"); *id.* ¶ 31 ("[T]o access the Tenant Turner Platform—whether authorized or not—the user must affirmatively accept the 'Tenant Turner Customer Terms[.]'"); *id.* ¶ 37 ("Defendants, through creating and operating unauthorized user accounts on ShowMojo's Platform, agreed to be bound by ShowMojo's Terms of Use by guising themselves as *bona fide* ShowMojo customers."); *id.* ¶ 46 ("At least one such account was created by Stringfellow[.]"); *id.* ¶ 51 ("Defendants used customer credentials to establish unauthorized accounts on the Platforms.").

The Defendants concede as much. They admit that they "accessed the Platforms . . . through customer-provided credentials." Reply at 9; *see also id.* at 6 ("It is undisputed . . . that Plaintiffs' customers provided Defendants with access to Plaintiffs' systems[.]"); Motion at 16 ("[I]t is undisputed that the Plaintiffs' customers provided RentEngine with their login credentials, whether for data-migration purposes or any other reason, such as to generate lock-box codes. Either way, RentEngine's use of consensually provided access credentials to access the Plaintiffs' Platforms makes the alleged access "authorized."). And they never dispute that this access required accepting the Terms of Use. All the Defendants argue is that the signatory theory is "illogical" because the Plaintiffs "repeatedly allege that they never intended for their Terms of Use to be accepted by or govern their relationships with an industry competitor." Reply at 2 (cleaned up). But that response has little bearing on whether,

as a factual matter, the Defendants accepted the Terms of Use by accessing and/or creating accounts on the Platforms.

"When deciding motions to compel, we draw all reasonable inferences in favor of the non-moving party." *Sudakow v. CleanChoice Energy, Inc.*, 153 F.4th 280, 285 (2d Cir. 2025) (Park, J.) (cleaned up); *see also Ragab v. Howard*, 841 F.3d 1134, 1139 (10th Cir. 2016) ("When parties do not dispute the material facts surrounding an arbitration provision, then a district court, while viewing the facts most favorable to the non-moving party, can decide as a matter of law whether the parties actually agreed to arbitrate.").[4] Doing so here requires giving weight to at least three datapoints. *One*, the Defendants concede that they accessed the Platforms. *Two*, the Defendants never contest that this activity required accepting the Terms of Use. And *three*, neither the Defendants nor the Plaintiffs has requested an evidentiary hearing, disputed the authenticity of any documents, or identified a genuine issue of material fact that prevents us from adjudicating the Motion on the record before us. So, drawing all

[4] "The FAA does not expressly identify the evidentiary standard a party seeking to avoid compelled arbitration must meet." *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). Still, the Eleventh Circuit—among others—has held that "[w]e treat motions to compel arbitration similarly to motions for summary judgment." *Hearn v. Comcast Cable Commc'ns, LLC*, 992 F.3d 1209, 1215 n.3 (11th Cir. 2021). But that doesn't mean such motions always require evidentiary hearings. At least the Third, Fourth, and Eighth Circuits have analyzed motions to compel arbitration under Rule 12(b)(6)'s standard. *See Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (explaining that "the Rule 12(b)(6) standard is no longer appropriate" when "the complaint and incorporated documents facially establish arbitrability but the non-movant has come forward with enough evidence in response to the motion to compel arbitration to place the question in issue"); *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 233–34 (4th Cir. 2019) ("[W]e accept as true the allegations of the Operative Complaint that relate to the underlying dispute between the parties." (quotation marks omitted)); *City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 881 (8th Cir. 2017) ("[The] motion is properly analyzed under either Rule 12(b)(6) or Rule 56."). And, in holding that "a summary judgment-like standard is appropriate," the Eleventh Circuit allows for "a district court [to] conclude as a matter of law that parties did or did not enter into an arbitration agreement . . . if there is no genuine dispute as to any material fact concerning the formation of such an agreement." *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016); *see also Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 175 (1st Cir. 2021) ("Like the other courts of appeals to consider the question, we decline to mandate specific procedures and leave the conduct of the § 4 trial to the discretion of the district court." (citations omitted)).

reasonable inferences from those datapoints, we find that the Defendants *are* signatories to the Terms of Use.[5]

**b. Fraud in the Factum Renders the Defendants Non-Signatories**

"Under the FAA, a party to an arbitration agreement may petition a United States district court for an order directing that 'arbitration proceed in the manner provided for in such agreement.'" *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (quoting § 4). So, having found that the Defendants *are* signatories to the Terms of Use, we must compel arbitration under those Terms of Use—*unless* some exception applies. *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) ("[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." (cleaned up)). Our Plaintiffs identify such an exception, arguing that "the contract between [the] Plaintiffs and Defendants was never formed on account of fraud in the factum." Response at 21. We take up that theory below.

"Fraud in the factum has been described as the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents, as fraud which occurs within the instrument itself, and as fraud arising when a party signs a document without full knowledge of the character or essential terms of the instrument." *Fed. Sav. & Loan Ins. Corp. v. Gordy*, 928 F.2d 1558, 1565 (11th Cir. 1991) (cleaned up). Whereas a "fraud in the inducement claim will lie" if a party "understands the nature of the contract they are executing but contends that there has been some

[5] That outcome comports with common parlance. A signatory is simply "[a] person or entity that signs a document, personally or through an agent, and thereby becomes a party to an agreement." Black's Law Dictionary 1666 (12th ed. 2024); *see also* Webster's Third New International Dictionary 2116 (2002) ("a signer with another"); American Heritage Dictionary 1630 (5th ed. 2016) ("Bound by signed agreement."; "One who has signed a contract or other legal document as a party.").

material misrepresentation as to the obligations rising thereunder," a fraud-in-the-factum claim "relate[s] to the execution of the contract." *Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 995 (11th Cir. 2012); *see also Browning v. Fla. Hometown Democracy, Inc., PAC*, 29 So. 3d 1053, 1062 (Fla. 2010) (defining fraud in the factum as "[f]raud occurring when a legal instrument as actually executed differs from the one intended for execution by the person who executes it, or when the instrument may have had no legal existence"). As a result, "[f]raud in the factum renders an instrument entirely void." *Baumann v. Savers Fed. Sav. & Loan Ass'n*, 934 F.2d 1506, 1516 (11th Cir. 1991).[6]

Our Plaintiffs argue that the Defendants—"wolves in sheep's clothing"—"covertly substituted themselves in as a party without [the] Plaintiffs' consent[.]" Response at 24. Specifically, they claim that they "believed they had an agreement that was something different from what it was," since the Plaintiffs "at all times believed their agreements to be with Targeted Customers." *Ibid.*; *see also* TAC ¶ 5 ("Defendants gained unfettered and entirely unauthorized access to Plaintiffs' Platforms by disguising themselves as legitimate, paying customers."); *id.* ¶ 6 ("At Defendants' behest, a subset of users with existing 'profiles' on Plaintiffs' Platforms created unauthorized 'user accounts'—which were controlled by Defendants and for Defendants' benefit—on the existing users' Tenant Turner

[6] "Federal courts must . . . apply background principles of state contract law when evaluating arbitration agreements." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 190 (2019) (Thomas, J., concurring) (cleaned up)). In pressing their fraud-in-the-factum theory, our Plaintiffs rely on Florida law, noting that "the same mutual-assessment requirement exists under Florida," "Delaware," and "Virgina" law. Response at 21 n.3. The Defendants offer no objection to that approach—and indeed fail to engage with the merits of the theory. We therefore accept the parties' choice-of-law decision. For our purposes, in any event, we see no material difference in how these states conceptualize fraud in the factum. *See, e.g.*, *Lincoln Nat. Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*, 28 A.3d 436, 441 (Del. 2011) ("Fraud in the factum occurs when a party makes a misrepresentation that is regarded as going to the very character of the proposed contract itself, as when one party induces the other to sign a document by falsely stating that it has no legal effect. If the misrepresentation is of this type, then there is no contract at all, or what is sometimes anomalously described as a void, as opposed to voidable, contract." (cleaned up)); *Lucas v. Thompson*, 61 Va. Cir. 44 (2003) ("Fraud in the factum is synonymous with fraud in the execution. In order to state a cause of action for fraud in the execution of an instrument, a plaintiff must allege that the instrument was misread to him, or his signature was obtained to a different instrument from the one he intended to sign." (cleaned up)).

and ShowMojo profiles. This deceptive Trojan Horse approach concealed Defendants' entrance and enabled their exploitation of Plaintiffs' Platforms."); *id.* ¶ 48 ("[T]o bypass the technical safeguards implemented by Plaintiffs that monitored and restricted RentEngine's access, RentEngine and Stringfellow utilized false or misleading contact information, including fictitious domains and alias email accounts, . . . to conceal their identity[.]")

The Defendants deny neither that this conduct occurred nor that it constitutes fraud in the factum. They argue instead—and *exclusively*—that the fraud-in-the-factum theory is "internally inconsistent," since "the voiding of the Terms [of Use] would necessarily vitiate the Plaintiffs' substantive claims." Reply at 4. But given the Defendants' concession that they accessed the Platforms through the customers (and their failure to address the merits of the argument), we find—on the record before us—that the Plaintiffs are right to posit that any "agreement between [the] Plaintiffs and Defendants [is] void." Response at 22; *see also Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it.").

But our agreement with the Plaintiffs ends there. Having advanced their fraud-in-the-factum theory, our Plaintiffs conclude that "the dispute must be resolved by the Court rather than sent to arbitration" because "there is no contract at all" between the parties. *Ibid.* (quotation marks omitted); *see also id.* at 23 ("[W]hen a defendant's conduct amounts to fraud in the factum, the issue is decided by the courts rather than an arbitrator notwithstanding an arbitration clause in the relevant agreement."). That view relies on an unstated premise—that a party to a void contract cannot resort to equitable estoppel. But we see no support for that assumption.

"A successful fraud in the factum claim makes the underlying contract *void ab initio*." *Solymar*, 672 F.3d at 994. "Something that is 'void *ab initio*' is null from the beginning, as from the first moment when a contract is entered into." *Griffin v. Coca-Cola Refreshments USA, Inc.*, 989 F.3d 923, 934 n.6 (11th

Cir. 2021) (cleaned up). "A void contract," in other words, "has no legal effect whatsoever." *Landcastle Acquisition Corp. v. Renasant Bank*, 57 F.4th 1203, 1223 (11th Cir. 2023) (cleaned up). So, "[a] contract that is void *ab initio* is a contract that never existed." *Pruco Life Ins. Co. v. Wells Fargo Bank, N.A.*, 780 F.3d 1327, 1332 (11th Cir. 2015).

Our Plaintiffs neglect those principles. If (as the Plaintiffs urge) the agreement between the Plaintiffs and the Defendants is *void*, then the Defendants are no longer bound by it. *See* Restatement (Second) of Contracts § 7 (1981) (" [A] void contract . . . is not a contract at all[.]"); 1 Williston on Contracts § 1:20 (4th ed. 2025) ("Void promises are not legally binding, have no legal effect, and, therefore, are not contracts . . . . In particular, 'void ab initio' means a bargain is null from the beginning, as from the first moment when the purported contract was entered into."); *see also Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 432 (1998) (Breyer, J., concurring) ("[A]n absolutely void contract . . . is void as to everybody whose rights would be affected by it if valid."); *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1452 (11th Cir. 1991) (Birch, J., dissenting) ("[W]here one is party to a void contract, he is not 'bound' by it; it represents no 'existing restraint' upon his conduct."). And if the Defendants are no longer bound, then the equitable-estoppel doctrine—inapplicable to signatories—should become available.

Misapprehending the logic of their own theory, our Plaintiffs fail to direct us to *any* cases suggesting that a party's signatory status—but not legal obligations—can survive the voiding of a contract. They contend instead that, "[i]n the Eleventh Circuit, a true claim of fraud in the execution . . . does not bind the parties to arbitration." Response at 23 (cleaned up). But the cases on which they rely—*Cancanon v. Smith Barney, Harris, Upham & Co.*, 805 F.2d 998, 1001 (11th Cir. 1986), and *Solymar*—are inapposite here. Those cases support a more modest proposition: Courts—not

arbitrators—resolve contract-formation challenges. Neither passes on whether a signatory to a void contract can invoke equitable estoppel. Indeed, neither even mentions equitable estoppel.[7]

Our Plaintiffs fail to recognize—and so fail to counteract—this problem. That failure leaves us with basic contract-law principles as our only guidance. And those principles point in one direction. If a void contract never exists and imposes no legal obligations, then its signatory can attempt to compel arbitration through equitable estoppel. We must therefore determine whether the Defendants satisfy the criteria for applying the doctrine.

**c. The Defendants Successfully Invoke Equitable Estoppel as to ShowMojo's Claims**

"Without an agreement to arbitrate, a court cannot compel the parties to settle their dispute in an arbitral forum." *Lubin v. Starbucks Corp.*, 122 F.4th 1314, 1319 (11th Cir. 2024) (cleaned up). And yet, "[i]n some cases, a non-signatory plaintiff can be bound to an arbitration agreement based on equitable estoppel." *Id.* at 1321. "[G]rounded in fairness," *Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012), that doctrine prevents parties from "playing fast and loose with the courts" and "protects the judicial system," *In re Coastal Plains Inc.*, 179 F.3d 197, 205 (5th Cir. 1999); *see also Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000) ("The linchpin for equitable estoppel is equity—fairness."). Equitable estoppel thus "gives a non-signatory a right to enforce an arbitration agreement by precluding the signatory from taking inconsistent positions." *Chemaly v. Lampert*, 174 F.4th 843, 856 (11th Cir. 2026).

[7] *Cancanon* held that, "where the allegation is one of fraud in the factum, i.e., ineffective assent to the contract, the issue is not subject to resolution pursuant to an arbitration clause contained in the contract documents." 805 F.2d 998, 1000. And *Solymar* explained the "two-step process required in considering the arbitrability of any contract containing an arbitration clause." 672 F.3d at 990; *see also ibid.* (noting that courts must first resolve "any formation challenge to the contract containing the arbitration clause" and then determine "whether any subsequent challenges are to the entire agreement, or to the arbitration clause specifically"). We fail to see how those cases preclude equitable estoppel here.

"State law controls whether a signatory to an agreement containing an arbitration clause can equitably compel a nonsignatory to arbitrate a dispute." *In re Martin*, 2026 WL 2469945, at *1 (11th Cir. Aug. 19, 2026); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) ("[T]raditional principles of state law allow a contract to be enforced by or against nonparties to the contract through . . . estoppel[.]" (cleaned up)). And, under Florida law, "an equitable estoppel theory allows a non-signatory to enforce the provisions of a contract against a signatory in two circumstances." *Chemaly*, 174 F.4th at 856. *One*, "when the signatory to the contract relies on the terms of the contract to assert his or her claims against the non-party." *Ibid.* (cleaned up). *Two*, "when the signatory raises allegations of interdependent and concerted misconduct by both the non-party and one or more of the signatories to the contract." *Ibid.* (cleaned up).[8]

---

[8] Another choice-of-law note. Section 18.2 of the Tenant Turner Terms of Use provides that the agreement "will be governed by and interpreted in accordance with the law of the Commonwealth of Virginia," "[e]xcept as otherwise described." Tenant Turner Terms of Use at 8. And Section 11.1 of the ShowMojo Terms of Use provides that "any dispute arising out or related to this Agreement or your use of the Services will be governed by the laws of the State of Delaware, without regard to its conflict of laws rules." ShowMojo Terms of Use at 7. Still, the Defendants bring their equitable-estoppel arguments under *Florida* law, relying principally on our decision in *Pro. Consulting Servs. S.A.S. See, e.g.*, Motion at 12–13 (applying Florida's equitable-estoppel law). Our Plaintiffs never address that discrepancy. Indeed, as emphasized above, our Plaintiffs never engage with the *substance* of the equitable-estoppel theory.

Given the parties' briefing, we'll analyze the issue under Florida law. *See Sizemore v. Zhao*, 2026 WL 962097, at *4 (S.D. Fla. Apr. 9, 2026) (Altman, J.) ("Where 'the parties litigate the case under the assumption that a certain law applies, we will assume that that law applies.'" (quoting *Byers*, 701 F.3d at 1342); *see also Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 317 F.3d 16, 20 (1st Cir. 2003) ("Where parties have agreed to the choice of law, this court is free to forego an independent analysis and accept the parties' agreement." (cleaned up)); *Masco Corp. v. Wojcik*, 795 F. App'x 424, 427 (6th Cir. 2019) ("[C]ourts . . . regularly rely on the litigants' agreement about the governing law (or, more often, on one litigant's failure to dispute the issue) to avoid deciding what could be knotty choice-of-law questions." (cleaned up)).

In any event, we see no conflict among the laws of Florida, Delaware, and Virginia, since all three states recognize the two theories at issue here. *See, e.g.*, *Eventus Holdings LLC v. Cliq, Inc.*, 2026 WL 1363765, at *7 (Del. Super. Ct. May 14, 2026) ("Under Delaware law, a non-signatory may invoke equitable estoppel to enforce an arbitration provision against a signatory in two limited circumstances[.] First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory . . . . Second, application of equitable estoppel is warranted when the signatory to the

In pressing its equitable-estoppel theory, the Defendant relies on both circumstances. It claims that "the Terms of Use (and, specifically, their confidentiality, access, and security provisions) are the genesis of each of the Plaintiffs' claims," given that "each count of the Complaint invokes, relies upon, or otherwise references the Terms of Use to support the Plaintiffs' claims." Motion at 13. And it contends that the doctrine likewise applies "based on allegations of concerted, interdependent misconduct because the Plaintiffs allege that their customers facilitated the misappropriation of confidential information to the Defendants—either knowingly or, as the Complaint alleges, under false pretenses." *Id.* at 14. For their part, the Plaintiffs insist that the Defendants cannot invoke "principles of fairness and justice" when it has "acted in such an egregiously dishonest and anti-competitive manner." Response at 19. But as to the merits of those equitable-estoppel arguments, the Plaintiffs remain silent.

We can decide the issue under the first prong. "A party relies on the terms of a contract when the party's claims are intimately founded in and intertwined with the underlying contract obligations." *Byers*, 701 F.3d at 1343 (cleaned up). But "the party must actually depend on the underlying contract to make out his or her claim against the nonsignatory"—*i.e.*, "[t]he signatory must attempt to hold the nonsignatory to the terms of the contract." *Ibid.* "A simple but-for relationship does not constitute

---

contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."); *Tattoo Art, Inc. v. Tat Int', LLC*, 711 F. Supp. 2d 645, 653–54 (E.D. Va. 2010) ("The equitable estoppel doctrine is applicable in two circumstances. First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must 'rely on the terms of the written agreement in asserting its claims against the nonsignatory. Second, equitable estoppel also applies when the signatory to a contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." (cleaned up)). So, "[b]ecause the outcome in this case is the same under . . . Florida law and [the other state] law[s], we need not decide which law applies." *Leidel v. Coinbase, Inc.*, 729 F. App'x 883, 886 (11th Cir. 2018).

the actual dependence on the underlying contract that equitable estoppel requires." *Bailey v. ERG Enters., LP*, 705 F.3d 1311, 1321–22 (11th Cir. 2013).

The Defendants clear that test. As they observe, the TAC relies on the Terms of Use in asserting all eleven counts. The CFAA claim, for instance, alleges that the "access [to the] Plaintiffs' Platforms was procured by fraud—i.e., by fundamentally changing the nature of the Terms of Use through Defendants substituting itself into the agreement in place of the Targeted Customers—which was contrary to [the] Plaintiffs' intent for and understanding of the Terms of Use, and as required by the Terms of Use." TAC ¶ 109. Similarly, the tortious-interference claim alleges that "RentEngine expressly requires that . . . customer[s] . . . add RentEngine to its existing Tenant Turner or ShowMojo account"—in "violation of both Tenant Turner's and ShowMojo's Terms of Use." *Id.* ¶ 129.

The remaining counts are similar. *See*, *e.g.*, *id.* ¶ 138 (unjust-enrichment claim alleging that RentEngine "obtained valuable data" through "its unauthorized access and use of Plaintiffs' Platforms"); *id.* ¶¶ 145–47 (Lanham Act claim alleging that RentEngine made "false or misleading statements" about the "capabilities, performance, security[,] and reliability of [the] Plaintiffs' Platforms");[9] *id.* ¶ 166 (FDUPTA claim alleging that the "misrepresentations deceived the Targeted Customers into . . . violating the Targeted Customers' existing agreements with Plaintiffs and subjecting those Targeted Customers to potential legal liability under the Platforms' Terms of Use"); *id.* ¶ 175 (unfair-competition claim alleging that "RentEngine accepted [the] Plaintiff's Terms of Use" about "the prohibitions on third-party access and sharing of credentials"); *id.* ¶ 194 (conversion claim

[9] Count IV doesn't explicitly mention the Terms of Use. But it describes its Lanham Act claim in the context of the preceding paragraphs, all of which it "incorporate[s]." TAC ¶ 145. And that context informs its allegations. In claiming that RentEngine misrepresented the "characteristics and qualities of [the] Plaintiffs' Platforms and/or software," as well as the "authenticity and origin of content or features 'sourced' from Plaintiffs," *id.* ¶ 147, the TAC draws on its earlier claims that the Defendants "gained unfettered and entirely unauthorized access to [the] Plaintiffs' Platforms" and "leveraged this unrestricted access to improperly exploit [the] Plaintiffs' Platforms for anti-competitive purposes," *id.* ¶ 5.

alleging that "RentEngine intentionally solicited Plaintiffs' customers to provide login credentials . . . in direct violation of Plaintiffs' Terms of Use"); *id.* ¶ 205 (trespass-to-chattel claim alleging that "RentEngine has been intentionally accessing Plaintiffs' Platforms . . . in violation of the Plaintiffs' Terms of Use"); *id.* ¶ 213 (common-law-fraud claim alleging that "RentEngine and Stringfellow have created fictitious domains and alias email accounts to . . . maintain . . . *unauthorized* access to the Platforms" (emphasis added)); *id.* ¶ 236 (DTSA claim alleging that "Defendants misappropriated Plaintiffs' trade secrets" through "*unauthorized* user accounts" (emphasis added)); *id.* ¶ 248 (FUTSA claim alleging that the Plaintiffs "condition[ ] access on express acceptance of Plaintiffs' Terms of Use").

Those claims thus "rely upon or presume the existence of an underlying contract." *In re Humana Inc. Managed Care Litig.*, 285 F.3d 971, 976 (11th Cir. 2002). The TAC is "replete with references to [the] duties" held by the Plaintiffs' "customers"—and uses the violation of those duties as the backdrop for all eleven counts. *McBro Plan. & Dev. Co. v. Triangle Elec. Const. Co.*, 741 F.2d 342, 344 (11th Cir. 1984). To establish that the Defendants gained and misused "unauthorized" information, the Plaintiffs point to the fact that the Terms of Use impose "confidentiality" restrictions, prohibit "sharing credentials or using the Platforms for the benefit of third parties," and "express[ly] . . . limit[ ] access" to the Platforms. TAC ¶ 174. And so, because the Terms of Use "form the legal basis of th[e] claims" set forth in the TAC, the Defendants *can* use an equitable-estoppel theory to compel arbitration under the Terms of Use. *Bailey*, 705 F.3d at 1322; *see also Hughes Masonry Co. v. Greater Clark Cnty. Sch. Bldg. Corp.*, 659 F.2d 836, 841 n.9 (7th Cir. 1981) (explaining that a party "is estopped from denying . . . the benefit of the arbitration clause with regard to claims that are . . . intimately founded in and intertwined with the underlying contract obligations").

But that's not the end of our inquiry. "[A] court may order arbitration of a particular dispute only when satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock Co. v. Int'l Bhd. of*

*Teamsters*, 561 U.S. 287, 297 (2010). So, even if the doctrine applies, "equitable estoppel is limited to compelling arbitration only if the plaintiff's claims are covered by the arbitration clause." *Kroma*, 845 F.3d at 1355–56. But whereas the ShowMojo Terms of Use require arbitration irrespective of the type of litigant, *see* ShowMojo Terms of Use at 7, the Tenant Turner Terms of Use narrow the scope of litigants to whom the provision applies, requiring arbitration only of issues "*between you and us or you and a third-party agent of ours*," Tenant Turner Terms of Use at 7 (emphasis added).

That difference matters. "Arbitration under the FAA is a matter of consent, not coercion." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (cleaned up). So, the FAA may "require[ ] expansive interpretation of arbitration agreements," but "not at the expense of limiting language in contracts." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1217 (11th Cir. 2011) (cleaned up). We thus cannot overlook the fact that, while ShowMojo's arbitration provision encompasses qualifying claims no matter who the party is, Tenant Turner's arbitration provision applies only if the Defendants are signatories *or* if the Plaintiffs' customers count as the Plaintiffs' "third-party agent."

The parties miss this issue too. And so, on the record before us and in the absence of any argument that the "third-party agent" hook applies, we find that the Defendants *can* use the equitable-estoppel theory to compel arbitration of only ShowMojo's—*not* Tenant Turner's—claims. As the Eleventh Circuit has made clear, "equitable estoppel permits a nonsignatory to an agreement to avail herself of an arbitration clause *only* when the claims asserted against her fall within the scope of the clause that the signatories had agreed upon." *Kroma*, 845 F.3d at 1356–57 (emphasis added). Holding otherwise "provide[s] a non-signatory with a scalpel to re-sculpt what appears on the face of a contract." *Id.* at 1357. We will do no such rewriting.

**d. Discretionary Stay**

The FAA provides that courts "shall . . . stay the trial of *the action*"—not merely *part* of the action—"[i]f any suit . . . be brought . . . upon any issue referable to arbitration[.]" 9 U.S.C. § 3

(emphasis added); *see also Volkswagen Of Am., Inc. v. Sud's Of Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir. 2007) (defending that reading of § 3). So, "[w]hen a court is presented with both arbitrable and non-arbitrable claims, . . . the decision to stay the non-arbitrable claims is within the court's discretion." *Variable Annuity Life Ins. Co. v. Laferrera*, 680 F. App'x 880, 884 (11th Cir. 2017). Indeed, it can "be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration." *Moses H. Cone*, 460 U.S. at 21 n.23.

"That decision is one left to the district court . . . as a matter of its discretion to control its docket." *Ibid.* "Crucial to this determination is whether arbitrable claims predominate or whether the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." *Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004). "[A] district court should stay an entire suit pending arbitration if there is a serious danger (should it fail to do so) of inconsistent rulings or needless duplication of effort." *GEA Grp. AG v. Flex-N-Gate Corp.*, 740 F.3d 411, 418 (7th Cir. 2014) (Posner, J.); *see also AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 242 F.3d 777, 783 (8th Cir. 2001) ("[I]ssues such as the risk of inconsistent rulings, the extent to which parties will be bound by the arbitrators' decision, and the prejudice that may result from delays must be weighed in determining whether to grant a discretionary stay, and in fashioning the precise contours of any stay.").

In considering whether to stay Tenant Turner's claims, we find instructive the Eleventh Circuit's decision in *Variable Annuity Life Ins. Co. v. Laferrera*, 680 F. App'x 880 (11th Cir. 2017). That case involved three Defendants: two financial advisors previously employed by the Plaintiffs, and one insurance company "owned and operated" by those advisors. *Id.* at 882. Suspecting that the advisors misused trade secrets to poach clients, the Plaintiffs fired the advisors and sued. After the district court compelled arbitration of the claims against the advisors but declined to issue a discretionary stay of the claims against the advisors' company, the Eleventh Circuit reversed.

Finding that the district court abused its discretion by failing to stay the claims against the company, the *Variable Annuity* panel noted that the claims against all three Defendants were "based on the exact same factual allegations," that the company "took no action except through" the advisors, and that the company "could not be held liable unless the [advisors were] also liable." *Id.* at 884. So, as the panel saw it, "[p]ermitting the claims against [the company] to go forward in federal court while the same claims against the [advisors] proceed in arbitration would require the [advisors] to defend identical claims in two separate forums" and could "give rise to the possibility of inconsistent results." *Id.* at 885. It thus vacated the district court's ruling, explaining that "a discretionary stay should have been granted because arbitrable claims predominate and the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." *Ibid.* (cleaned up).

That calculus cuts in favor of a discretionary stay here. To be sure, the TAC doesn't allege an ownership relationship between the Plaintiffs. But our Plaintiffs—sharing counsel—bring the same claims. All eleven counts of the TAC involve *identical* facts. Nothing in the TAC delineates any difference in the harm suffered by the two Plaintiffs, in the Defendants' abuse of the Platforms, or in the way the Platforms operated. To the contrary, the TAC treats the Platforms as *one* product, discusses the Terms of Use as *one* concept, and describes *one* "systematic and deliberate scheme to improperly access and exploit [the] Plaintiffs' Platforms." TAC ¶ 44.

"[P]iecemeal litigation" has its place. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985) (cleaned up). But this case resembles *Variable Annuity*. Arbitrable claims predominate because the Plaintiffs together bring all eleven counts. Arbitrating ShowMojo's claims *will* "help resolve, or at least shed some light on, the issues remaining in federal court" because the Plaintiffs allege the same facts and identify the same harm. *Volkswagen*, 474 F.3d at 972. And simultaneous proceedings would both risk "inconsistent results" *and* force the Defendants to "defend identical claims in two separate forums." *Variable Annuity*, 680 F. App'x at 885. We'll therefore stay the Tenant Turner claims while

the parties arbitrate the ShowMojo claims. *See Abousamak v. Buckhead Life Rest. Grp. Inc.*, 2022 WL 22983391, at *2 (S.D. Fla. Oct. 25, 2022) (Cannon, J.) ("Woodside's claims, brought in the same Complaint as Abousamak, are based on the same factual allegations as the claims subject to the arbitration agreements . . . . [P]roceeding on Woodside's claims would leave open the possibility of inconsistent results on factually similar claims."); *Quash Seltzer, LLC v. PepsiCo, Inc.*, 2021 WL 1963639, at *7 (S.D. Fla. May 17, 2021) (Ruiz, J.) ("[W]hen . . . claims are based on the same facts and are inherently inseparable as those delegated to arbitration, the better course is to stay the claims involving the nonsignatory."); *cf. Branch v. Ottinger*, 477 F. App'x 718, 721 (11th Cir. 2012) (finding no abuse of discretion in declining to stay non-arbitrable claims when the district court found that "there would not be any overlap of defendants between different fora," "that refusing to grant a stay would not result in duplicative proceedings," and "that all the claims against Mr. Ottinger . . . were . . . independent of the claims against the other defendants").

**III. The Defendants Haven't Waived Their Arbitration Rights**

"Like any other contractual right, the right to arbitrate can be waived." *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1235–36 (11th Cir. 2018) (cleaned up). "A party has waived its right to arbitrate if, under the totality of the circumstances, the party has acted inconsistently with the arbitration right." *S&H Contractors, Inc. v. A.J. Taft Coal Co.*, 906 F.2d 1507, 1514 (11th Cir. 1990). "There's no set rule as to what constitutes waiver of an arbitration agreement, so we review whether a waiver has occurred based on the facts of each case." *Warrington v. Rocky Patel Premium Cigars, Inc.*, 2023 WL 1818920, at *2 (11th Cir. Feb. 8, 2023). Still, a "key factor in deciding this is whether a party has substantially invoked the litigation machinery," such as by proceeding "with extensive discovery and court proceedings." *Gutierrez*, 889 F.3d at 1236 (cleaned up).

Our Plaintiffs believe that the Defendants "waived" any "right to enforce the arbitration clauses in [the] Plaintiffs' Terms of Use" through "conduct . . . inconsistent with any intent to

arbitrate." Response at 24. To support that theory, they advance four arguments. *First*, the Plaintiffs say that the Defendants "made no reservation of their right to seek arbitration" when making their "first appearance in this action" and in the "Stipulated Order resolving both the preliminary injunction motion and expedited discovery." *Id.* at 24–25. *Second*, they point out that the parties "negotiated a protective order and ESI stipulation, with [the] Defendants again failing to reserve any right to arbitrate[.]" *Id.* at 25. *Third*, the Plaintiffs contend that, "while Tenant Turner's Terms of Use have a carve out for injunctive relief being resolved by the courts rather than through arbitration, ShowMojo's Terms of Use do not, so [the] Defendants' conduct was inconsistent with an intent to invoke ShowMojo's Terms of Use." *Ibid.* And *fourth*, the Plaintiffs claim that they suffered "prejudice." *Ibid.*

The Defendants tell a different story. They maintain that the "litigation of the Plaintiffs' PI Motion" complied with the "very text of the arbitration provisions" because *both* Terms of Use "contain a . . . carve-out for injunctive-relief proceedings." Reply at 5. They insist that "they moved for arbitration at the earliest possible opportunity—their deadline to respond to the Plaintiffs' original Complaint." *Ibid.* And they claim that they "repeatedly and explicitly reserved their right to arbitrate, both in court filings and in virtually every communication to the Plaintiffs' counsel about this case," making any prejudice "the product of the Plaintiffs' own decisions." *Ibid.*

Reviewing the timeline of events, we cannot say that the Defendants exhibited "the classic 'heads I win, tails you lose' approach to dispute resolution." *Metro. Edison Co. v. Pennsylvania Pub. Util. Comm'n*, 767 F.3d 335, 367 (3d Cir. 2014). The two-month gap between the Defendants' appearance and their first attempt to compel arbitration, *see* First Motion to Compel Arbitration or, Alternatively, to Dismiss (the "First MTC") [ECF No. 34], "pales in comparison to the lag times the Eleventh Circuit has found suspect in other cases," *Lopez v. JW Lee Inc.*, 2026 WL 709744, at *4 (S.D. Fla. Mar. 13, 2026) (Altman, J.); *see, e.g.*, *E.C. Ernst, Inc. v. Manhattan Constr. Co.*, 551 F.2d 1026, 1040–41 (5th Cir. 1977) (finding waiver after two-and-a-half years of litigation); *Davis v. White*, 795 F. App'x 764, 770

(11th Cir. 2020) (eighteen months); *Krinsk v. SunTrust Banks, Inc.*, 654 F.3d 1194, 1201 (11th Cir. 2011) (nine months); *S&H Contractors, Inc.*, 906 F.2d at 1514 (eight months). Indeed, the Eleventh Circuit has rejected theories of waiver in timelines *twice* as long as ours. *See Sherrard v. Macy's Sys. & Tech. Inc.*, 724 F. App'x 736, 740 (11th Cir. 2018) ("[N]either filing an answer nor waiting four months to seek arbitration was sufficient to constitute a waiver[.]" (quoting *Coca–Cola Bottling Co. of N.Y., Inc. v. Soft Drink and Brewery Workers Union Local 812*, 242 F.3d 52, 57–58 (2nd Cir. 2001))).

Nor can we say that the Defendants spent those two months trying to "resolve the parties' entire dispute *on the merits*." *Davis*, 795 F. App'x at 769 (emphasis added). During that timeframe, the Defendants made four filings—none substantive. On July 17, 2026, after we granted the Plaintiffs' request to expedite discovery, the parties filed a joint motion seeking an extension of time to comply with discovery obligations. *See* Joint Motion for an Extension of Time to Comply with the Order to Expedite Discovery. In that joint motion, the Defendants noted that they would "abide by their discovery obligations" instead of "engag[ing] in motion practice"—but also that they carried doubts about the feasibility of completing "all expedited discovery by the current deadlines." *Id.* at 3.

On August 20, 2025, the parties jointly resolved the Plaintiffs' PI Motion. *See* Joint Motion for Entry of Stipulated Order. That joint motion made clear that the Defendants "do not admit liability or wrongdoing and preserve all available defenses, claims, objections, and rights." Stipulated Preliminary Injunction Order [ECF No. 29-1] at 5. On September 8, 2025, the parties filed a Joint Scheduling Report, noting that the Defendants "do not intend to waive, and they expressly reserve, their right to move to compel arbitration." Joint Scheduling Report [ECF No. 31] at 1 n.1. And, on September 12, 2025, the Defendants sought leave to use extra pages in their briefing on the First MTC. *See* Unopposed Motion for Leave to File Excess Pages [ECF No. 33].

None of the four filings concerned the merits of the case. *See Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*, 660 F.3d 988, 995 (7th Cir. 2011) (declining to find waiver when a

party's motion didn't "even ma[k]e mention of the merits in its briefing"); *Forby v. One Techs., L.P.*, 909 F.3d 780, 784 (5th Cir. 2018) (distinguishing a "full-throated attempt to win th[e] case on the merits" from a motion that "only delayed or raised procedural concerns"). And we cannot fault the Defendants for filing a Joint Scheduling Report—or for working with the Plaintiffs to resolve the PI Motion and the expedited-discovery deadlines. *See Pinnacle Constructors Grp. LLC v. SSC Tuscaloosa Apartments LLC*, 2024 WL 3042536, at *2 (11th Cir. June 18, 2024) (noting that participation in a "Rules-mandated meeting" doesn't qualify as "substantially invoking the litigation machinery" (quotation marks omitted)); *Garcia v. Fuentes Rest. Mgmt. Servs. Inc.*, 141 F.4th 671, 678 (5th Cir. 2025) ("Traditionally, this court has considered routine scheduling orders and discovery continuances as district court actions that may not move the needle on waiver." (cleaned up)); *see also Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 578 (5th Cir. 1991) ("Attempts at settlement . . . are not inconsistent with an inclination to arbitrate and do not preclude the exercise of a right to arbitration.").

The remaining arguments fare no better. ShowMojo's Terms of Use *do* provide safe harbor for injunctive-relief proceedings. *See* ShowMojo Terms of Use at 7–8 ("Nothing in this section will prevent either party from seeking immediate injunctive relief from any court of competent jurisdiction, and any such request shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate."). And the Plaintiffs' complaints of prejudice miss the mark, as "prejudice is not a condition of finding that a party . . . waived its right to stay litigation or compel arbitration under the FAA." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022). We thus cannot say that the Defendants waived their arbitration rights.

## CONCLUSION

After careful review, therefore, we **ORDER and ADJUDGE** as follows:

1. The Defendants' Motion to Compel Arbitration or, Alternatively, to Dismiss [ECF No. 63] is **GRANTED in part** and **DENIED in part**.

a. The parties are **ORDERED** to submit to arbitration the claims concerning ShowMojo. Every **120 days** from the date of this Order, the parties shall file a joint status report on the progress of their arbitration proceedings.

b. The claims concerning Tenant Turner are **STAYED** pending the arbitration of the claims concerning ShowMojo.

2. This case is **STAYED** and shall remain **CLOSED** pending the completion of arbitration. All deadlines are **TERMINATED**, and any other pending motions—including the Plaintiffs' Objections to the Order to Compel Discovery [ECF No. 117]—are **DENIED as moot**.

**DONE AND ORDERED** in the Southern District of Florida on September 14, 2026.



**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record